UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

Case No.

JAWHBS LLC, a Florida limited liability company; and SLS PROPERTIES THREE, LLC, a Nevada limited liability company,

    Plaintiffs,

vs.

JORGE AREVALO, an individual; JA ENERGY RESOURCES, LLC, a Florida limited liability company; SHUTTS & BOWEN, LLP, a Florida limited liability partnership; KEVIN D. COWAN, an individual; OMAR BOTERO, an individual; ALIANZA FINANCIAL SERVICES, LLC, a Florida limited liability company; ALIANZA HOLDINGS, LLC, a Florida limited liability partnership; AL DELANEY, an individual; CRYSTAL TOWER PARTNERS II, LLC, a Florida limited liability company; CRYSTAL TOWER ON BRICKELL PLAZA, LLC, a Florida limited liability company; WATSON INVESTIGATIONS, LLC, a Florida limited liability company; STEVEN CARLYLE CRONIG, an individual;

    Defendants.

## COMPLAINT WITH JURY DEMAND

Plaintiffs JAWHBS, LLC and SLS PROPERTIES THREE, LLC ("Plaintiffs") do hereby allege as their Complaint the following:

## PARTIES

1) Plaintiff JAWHBS LLC is a Florida limited liability company with its principal place of business in Miami-Dade County, Florida.

2) On or about March 5, 2015, Plaintiff JAWHBS LLC purchased for value and was transferred all potential claims of certain Chapter 7 bankruptcy trustees as set forth in more detail below in this Complaint. JAWHBS LLC is therefore the owner of "all of the Estates' right title and interest in any claims pursuant to 363(n)…" relating to the sales described herein in this Complaint.

3) Plaintiff SLS PROPERTIES THREE, LLC is a Nevada limited liability company with its principal place of business in Clark County, Nevada.

4) Defendant JORGE AREVALO, on information and belief, was at the time of the events alleged in this Complaint and continues to be a resident of Miami-Dade County, Florida.

5) Defendant JA ENERGY RESOURCES, LLC is a Florida limited liability company with its principal place of business in Miami-Dade County.

6) At all times alleged herein, JORGE AREVALO was the owner, principal, agent or alter ego of JA ENERGY RESOURCES, LLC.

7) Defendant KEVIN COWAN on information and belief, was at the time of the events alleged in this Complaint and continues to be a resident of Miami-Dade County, Florida.

8) Defendant SHUTTS & BOWEN, LLP is a Florida limited liability partnership with its principal place of business in Miami-Dade County, Florida. At all times alleged herein, Defendant COWAN was the owner, principal, agent or alter ego of SHUTTS & BOWEN, LLP.

9) Defendant OMAR BOTERO, on information and belief, was at the time of the events alleged in this Complaint and continues to be a resident of Miami-Dade County, Florida.

10) Defendant ALIANZA FINANCIAL SERVICES, LLC is a Florida limited liability company with its principal place of business in Miami-Dade County, Florida.

11) Defendant ALIANZA HOLDINGS, LLC is a Florida limited liability company with its principal place of business in Miami-Dade County, Florida.

12) Defendant AL DELANEY, on information and belief, was at the time of the events alleged in this Complaint and continues to be a resident of Miami-Dade County, Florida.

13) Defendant CRYSTAL TOWER PARTNERS II, LLC is a Florida limited liability company with its principal place of business in Miami-Dade County, Florida.

14) Defendant CRYSTAL TOWER ON BRICKELL PLAZA, LLC is a Florida limited liability company with its principal place of business in Miami-Dade County, Florida.

15) At all times alleged herein, OMAR BOTERO and/or AL DELANEY were the owners, principals, agents or alter egos of the CRYSTAL TOWER and ALIANZA entities.

16) Defendant STEVEN CRONIG on information and belief, was at the time of the events alleged in this Complaint and continues to be a resident of Miami-Dade County, Florida.

17) Defendant WATSON INVESTIGATIONS, LLC is a Florida limited liability partnership with its principal place of business in Miami-Dade County, Florida.

18) At all times alleged herein, Defendant CRONIG was the owner, principal, agent or alter ego of WATSON INVESTIGATIONS, LLC.

19) This Complaint will sometimes collectively refer to Defendants JORGE AREVALO; JA ENERGY RESOURCES, LLC; SHUTTS & BOWEN, LLP; and KEVIN COWAN simply as the "AREVALO GROUP."

20) This Complaint will sometimes collectively refer to Defendants OMAR BOTERO; ALIANZA FINANCIAL SERVICES, LLC; ALIANZA HOLDINGS, LLC; AL DELANEY;

CRYSTAL TOWER PARTNERS II, LLC; and CRYSTAL TOWER ON BRICKELL PLAZA, LLC simply as the "BOTERO GROUP."

21) This Complaint will sometimes collectively refer to Defendants WATSON INVESTIGATIONS, LLC and STEVEN CARLYLE CRONIG simply as the "CRONIG GROUP."

## JURISDICTION AND VENUE

22) The jurisdiction of this Court is invoked pursuant to 28 USC § 1331.

23) Supplemental jurisdiction of related state law claims is invoked pursuant to 28 USC § 1367.

24) Venue is appropriate in the Southern District of Florida pursuant to 28 USC § 1391(b)(1) and (2) because at least one of the Defendants resides in that District and a substantial part of the events giving rise to Plaintiffs' claims occurred in that District.

## ALLEGATIONS COMMON TO ALL CLAIMS

25) Plaintiffs' claims center around the July 2013 bankruptcy sale of four adjacent parcels of land at the intersection of SE 8th Street and SE 1st Avenue in the Brickell Avenue section of downtown Miami, Florida. These parcels will be collectively referred to as the "Brickell Parcels" or "the Parcels."

26) The Brickell Parcels are located in downtown Miami across from the one billion+ dollar Brickell CityCentre project. The Brickell Parcels are suitable for development of a high rise condominium project. Because of this development potential and unique location, the Brickell Parcels were, and continue to be, very valuable parcels of land.

27) Prior to July 2013, the Brickell Parcels were owned by two different business entities controlled by developer Renzo Renzi.

28)     In approximately early 2013, the legal entities owning the Brickell Parcels filed for bankruptcy protection in the Southern District of Florida.  As a result, two different bankruptcy trustees came to control the Brickell Parcels and sought to sell them for the benefit of creditors of the estates before a foreclosure could occur.

29)     In and before July 2013, the bankruptcy trustees sought to sell the Brickell Parcels through a bankruptcy sale under 11 USC § 363.  This process, which is controlled by the Court and involves disclosing offers which competing buyers have an opportunity to overbid is simply a form of an auction.

30)     The bankruptcy estates—which have now assigned or transferred all rights or claims over the sale to Plaintiff JAWHBS, LLC—also stood to financially benefit from the highest possible sales price for the Brickell Parcels.

31)     As a major creditor of Renzo Renzi, Plaintiff SLS PROPERTIES THREE, LLC stood to financially benefit from the highest possible sales price for the Brickell Parcels.

32)     The Defendants, and each of them, all had various parts and roles in a conspiracy and concert of action to collude with each other to artificially depress the sales price of the Brickell Parcels, to the detriment of the Plaintiffs.  With more specificity, the following occurred.

33)     Prior to June 14, 2013, the BOTERO GROUP had negotiated an agreement with the bankruptcy trustees to purchase the Brickell Parcels for $19,500,000.  A Letter of Intent regarding that purchase was signed on June 14, 2013.  The trustees filed a Motion to approve that sale on June 25, 2013 and a hearing was set in the US Bankruptcy Court on July 10, 2013 for the Court to consider approval of the sale.

34) The BOTERO GROUP intended to build a condominium project on the Brickell Parcels of 70 stories and 300+ units, resulting in net profits of over $90,000,000 after construction costs.

35) Although unknown to the trustees at the time, the AREVALO GROUP was also interested in the Brickell Parcels and, if not for the acts described herein, would have become a second competitive bidder, driving up the sales price to a fair market value.

36) Prior to July 8, 2013, the AREVALO GROUP and the BOTERO GROUP agreed to collude to artificially prevent competitive bidding on the Brickell Parcels and depress the sales price. The BOTERO GROUP agreed to pay the AREVALO GROUP the flat sum of $1,200,000 as well as a share in profits in exchange for "their forbearance from making an offer or bid to own the subject property" and reduced this to a writing dated July 8, 2013. Other terms for this agreement or understanding might include payoff or bribe.

37) Lest there be any doubt about the intent of the Defendants to collude to prevent any fair competition and sales bidding process, on July 5, 2013, BOTERO reminded AREVALO not to take any action that might upset the agreement BOTERO already had signed with the bankruptcy trustees because such action "will cause a bidding war where the only certain result is that the price for the property will go up for everyone…"

38) On July 8, 2013, DELANY sent AREVALO a draft term sheet. The draft term sheet again brazenly provided that AREVALO "[a]gree[s] within the formal agreement not to compete in any way, directly or indirectly against the Company or its parent, in the acquisition of the [Brickell Properties]."

39) On July 9, 2013, the day before the approval hearing, the BOTERO GROUP and the AREVALO GROUP again re-drafted their agreement and expressly stated that the AREVALO

GROUP would refrain from making any "filing, offer or bid to purchase or object to the trustees motion for approval for the sale to [the BOTERO GROUP] at the hearing scheduled for July 10, 2013 at 9:30 AM or at any adjourned date and time of the hearing set to decide on approving or not approving the trustee's sale to [the BOTERO GROUP]."

40) In fact, in the midst of finalizing the documentation, COWAN sent an email to BOTERO indicating that AREVALO was threatening to file a notice in the bankruptcy case. This notice would have alerted the Trustees to the existence of another potential bidder and foiled the collusion efforts.

41) On the day of the July 10, 2013 hearing, the AREVALO GROUP appeared through counsel at the hearing. At the hearing, the AREVALO GROUP represented to US Bankruptcy Court Judge Laurel Isicoff that it was prepared to submit a "higher and better offer" and admitted that the proposed agreements between the BOTERO GROUP and the AREVALO GROUP were "to effectively not make a higher and better bid in bankruptcy."

42) While it appears that the AREVALO GROUP did not initially understand the illegality of the collusion and proposed payoff, Judge Isicoff certainly did and made more than one comment during the hearing that in light of this information, a § 363(m) finding of good faith in the proposed sale was unlikely to occur.

43) After the hearing during which the collusion was exposed to the Court and the trustees, the BOTERO GROUP withdrew its purchase offer. The effect of this was only to continue the stifling of competition for the Brickell Parcels.

44) Undaunted but faced with a short deadline to submit another bid, the AREVALO GROUP prepared to submit a $22,000,000 offer for the Brickell Properties to the trustees. In order to secure the funding, the ARVALO GROUP contacted the CRONIG GROUP.

45) In turn, the CRONIG GROUP used the knowledge and information of the AREVALO GROUP to its advantage by sabotaging the AREVALO GROUP'S intended $22,000,000 bid. It did so by pulling out of or refusing to fund the AREVALO GROUP and instead under-bidding it for $21,500,000.

46) The CRONIG group knew that since there was only a small number of potential bidders and it had tanked or sabotaged the main competing offer of the AREVALO GROUP by refusing to finance it, it had fixed the auction in its favor and could name its own price.

47) The acts of all of the Defendants were intentional, willful and wanton.

48) The bankruptcy trustees, in the face of stifled competition and a hard deadline to prevent foreclosure, accepted the only available offer of $21,500,000 for the Brickell Parcels and a sale occurred to WATSON INVESTIGATIONS, LLC on or about July 26, 2013.

49) The sale price of the Brickell Parcels was significantly below market value.

50) The sale price of the Brickell Parcels was artificially depressed by the collusion and concerted acts of the three developer/investor groups, the AREVALO GROUP, the BOTERO GROUP and the CRONIG GROUP.

51) In fact, the CRONIG GROUP attempted to sell the still undeveloped Brickell Parcels in 2015 for $55,000,000 to $60,000,000, showing the $21,500,000 sales price was far beneath market value.

52) Some of the documents or agreements during the collusion and prior to the sale refer to a "buy out option" under which the AREVALO GROUP would have the option to pay $31,400,000 for the Brickell Parcels free and clear of any other side deals. Plaintiffs believe this figure represents the approximate, true value of the Brickell Parcels at the time had the Defendants not colluded to suppress bidding and competition.

53) In addition to the foregoing, based on several accepted valuation methods, Plaintiffs believe the fair market value of the Brickell Parcels at the time of the sale was $10,000,000 or more in excess of the actual purchase price.

**FIRST CAUSE OF ACTION**
**Antitrust Violations (15 USC § 1)**

54) Plaintiffs repeat and re-allege the allegations set forth in paragraphs 1 through 53 of the Complaint, and incorporate those allegations by reference.

55) The Sherman Antitrust Act, 15 USC § 1, broadly prohibits acts "in restraint of trade or commerce." Bid rigging, auction collusion and similar acts have determined to be a *per se* violation of the Sherman Act for over 100 years, see Addyston Pipe & Steel Co. v. United States, 175 US 211 (1899).

56) The bid rigging, auction collusion and/or other acts of the Defendants caused or contributed to a lower sales price of the Brickell Parcels, thus damaging the Plaintiffs. This occurred as a result of (1) reducing the number of bidders/buyers, (2) preventing a competitive bidding/auction process, (3) concealing the identify of other potential bidders/buyers from the trustees and court, (4) causing a time urgency which induced the trustees to accept an artificially reduced sales price, (5) allowing an artificially low bid/offer which would have been considerably higher if a competitive process had occurred and (6) withholding financing or sabotaging the offer of one bidder in order to alter the competitive bidding process and enter the bidding/auction and obtain the property for less.

57) The Plaintiffs were in the class of persons or entities meant to be protected by the antitrust laws.

58) The bid rigging, auction collusion and/or other acts of the Defendants caused damages to the Plaintiffs in the amount to be proven at trial but believed to be at least $10,000,000.

59) In addition to actual damages, pursuant to 15 U.S.C. § 15, Plaintiffs seek to recover treble damages, punitive damages, costs of suit and attorney's fees.

## SECOND CAUSE OF ACTION
### Violation of Florida Fair Trade Act

60) Plaintiffs repeat and re-allege the allegations set forth in paragraphs 1 through 59 of the Complaint, and incorporate those allegations by reference.

61) The Florida Deceptive and Unfair Trade Practices Act (FDUTPA) broadly prohibits all "[u]nfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce." § 501.204(1), Fla. Stat.

62) Bid rigging, auction collusion and/or the other acts of the Defendants are *per se* violations of the Federal Trade Commission Act and, therefore, are violations of the FDUTPA

63) The bid rigging and/or auction collusion or other acts of the Defendants caused or contributed to a lower sales price of the Brickell Parcels, thus damaging the Plaintiffs. This occurred as a result of (1) reducing the number of bidders/buyers, (2) preventing a competitive bidding/auction process, (3) concealing the identify of other potential bidders/buyers from the trustees and court, (4) causing a time urgency which induced the trustees to accept an artificially reduced sales price, (5) allowing an artificially low bid/offer which would have been considerably higher if a competitive process had occurred and (6) withholding financing or sabotaging the offer of one bidder in order to alter the competitive bidding process and enter the bidding/auction and obtain the property for less.

64) The Plaintiffs were in the class of persons or entities meant to be protected by the FDUTPA.

65) The bid rigging, auction collusion and/or other acts of the Defendants caused damages to the Plaintiffs in the amount to be proven at trial but believed to be at least $10,000,000.

66) In addition to actual damages, pursuant to § 501.2105 Fla. Stat., Plaintiffs seek to recover punitive damages, costs of suit and attorney's fees.

## THIRD CAUSE OF ACTION
### Bankruptcy Code Section 363(n)

67) Plaintiff JAWHBS LLC repeats and re-alleges the allegations set forth in paragraphs 1 through 66, and incorporates those allegations by reference.

68) 11 USC § 363(n) states the following:

The trustee may avoid a sale under this section if the sale price was controlled by an agreement among potential bidders at such sale, or may recover from a party to such agreement any amount by which the value of the property sold exceeds the price at which such sale was consummated, and may recover any costs, attorneys' fees, or expenses incurred in avoiding such sale or recovering such amount. In addition to any recovery under the preceding sentence, the court may grant judgment for punitive damages in favor of the estate and against any such party that entered into such an agreement in willful disregard of this subsection.

69) JAWHBS LLC has been transferred all rights of the bankruptcy trustees to pursue this action, which it brings on the trustees' behalf.

70) The Defendants took actions and had agreements with the goal of controlling the sales price of the Brickell Parcels.

71) The bid rigging, auction collusion and/or other acts of the Defendants caused or contributed to a lower sales price of the Brickell Parcels, thus damaging the Plaintiffs. This occurred as a result of (1) reducing the number of bidders/buyers, (2) preventing a competitive bidding/auction process, (3) concealing the identify of other potential bidders/buyers from the trustees and court, (4) causing a time urgency which reduced the ultimate sales price, (5) allowing an artificially low bid/offer which would have been considerably higher if a competitive process had occurred and (6) withholding financing or sabotaging the offer for one bidder in order to enter the bidding/auction and obtain the property for less.

72) The bid rigging, auction collusion and/or other acts of the Defendants caused damages to the Plaintiff JAWHBS LLC in an amount to be proven at trial but believed to be at least $10,000,000.

73) In addition to actual damages, Plaintiff JAWHBS LLC seeks to recover punitive damages, costs and expenses of suit and attorney's fees.

## FOURTH CAUSE OF ACTION
### Actual and Constructive Fraud

74) Plaintiffs repeat and re-allege the allegations set forth in paragraphs 1 through 73 of the Complaint, and incorporate those allegations by reference.

75) The Defendants made false representations of fact, known by them to be false at the time the representations were made, including their status as arms' length bidders and the value of the Brickell Parcels.

76) The representations were made for the purpose of inducing another, including the bankruptcy trustee, other Defendants and the bankruptcy court, to act in reliance on the representations.

77) There was actual reliance on the representations.

78) In addition to and in the alternative to the above, constructive fraud is defined as acts or transactions which equity regards as wrongful, to which the law attributes the same or similar effects as those which follow from actual fraud, and for which it gives the same or similar relief as that granted in cases of real fraud. The Defendants' bid rigging, auction collusion and/or other acts of the Defendants constitute constructive fraud.

79) The bid rigging, auction collusion and/or other acts of the Defendants caused damages to the Plaintiffs in an amount to be proven at trial but believed to be at least $10,000,000.

80)	In addition to actual damages, Plaintiff JAWHBS LLC seeks to recover punitive damages, costs and expenses of suit and attorney's fees.

## FIFTH CAUSE OF ACTION
### Civil Conspiracy

81)	Plaintiffs repeat and re-allege the allegations set forth in paragraphs 1 through 80 of the Complaint, and incorporate those allegations by reference.

82)	The Defendants entered into a conspiracy between themselves.

83)	The purpose of the conspiracy was to commit a tort or unlawful act, as described in this Complaint.

84)	The Defendants took overt acts in furtherance of the conspiracy.

85)	Plaintiffs were damaged by the acts of conspiracy.

86)	In addition to or in the alternative to the above, the Defendants had a peculiar power of coercion to control the bidding and auction of the Brickell Parcels by virtue of their combination and status as sophisticated real estate developers and investors, which an individual alone does not possess.

87)	The bid rigging, auction collusion and/or other acts of the Defendants caused damages to the Plaintiffs in the amount to be proven at trial but believed to be at least $10,000,000.

88)	In addition to actual damages, Plaintiffs seek to recover punitive damages, costs of suit and attorney's fees.

## SIXTH CAUSE OF ACTION
### Interference with Prospective Economic Advantage/Business Relationship

89)	Plaintiffs repeat and re-allege the allegations set forth in paragraphs 1 through 88 of the Complaint, and incorporate those allegations by reference.

90) There existed a business relationship or prospective business relationship between the Plaintiffs and potential bidders/buyers of the Brickell Parcels.

91) The Defendants had knowledge of the relationship.

92) The Defendants intentionally and unjustifiably interfered with the business relationship by colluding to avoid a sale at a fair market value.

93) Plaintiffs were damaged by the acts of the Defendants.

94) The bid rigging, auction collusion and/or other acts of the Defendants caused damages to the Plaintiffs in the amount to be proven at trial but believed to be at least $10,000,000.

95) In addition to actual damages, Plaintiffs seek to recover punitive damages, costs of suit and attorney's fees.

WHEREFORE, the Plaintiffs JAWHBS LLC and SLS PROPERTIES THREE, LLC seek the following relief:

   A. Compensatory damages in an amount to be proven at trial but believed to exceed $10,000,000;

   B. Treble damages;

   C. Attorney's fees incurred in bringing this Complaint;

   D. Costs of suit and expenses incurred in bringing this Complaint;

   E. Punitive damages for the Defendants' intentional, willful and wanton conduct;

   F. Such further relief as the Court may deem just and proper.

//

//

//

//

## **DEMAND FOR TRIAL BY JURY**

Plaintiffs hereby request a trial by jury in this matter.

Dated:   November 6, 2015

        Respectfully Submitted:

        s/ Jerrold A. Wish

        _____

        Jerrold A. Wish, Esq.
        Florida Bar # 352721
        jwish@wishlaw.net
        THE WISH LAW FIRM
        6000 Island Blvd., #2006
        Aventura, FL 33160-3788
        Ph. 786-200-7077
        *Attorney for Plaintiffs*