**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
MIAMI DIVISION

**Case No.  15-24176-CV- GAYLES**

JAWHBS LLC, a Florida limited liability
company; and SLS PROPERTIES THREE,
LLC, a Nevada limited liability company,

       Plaintiffs,

vs.

JORGE E. AREVALO, an individual;
JA ENERGY RESOURCES, LLC, a Florida
limited liability company; SHUTTS &
BOWEN, LLP, a Florida limited liability
partnership; KEVIN D. COWAN, an
individual; OMAR BOTERO aka OMAR
BOTERO-PARAMO, an individual;
ALIANZA FINANCIAL SERVICES, LLC, a
Florida limited liability company; ALIANZA
HOLDINGS, LLC, a Florida limited liability
partnership; ALBERT F. DELANEY, aka AL
DELANEY, an individual; CRYSTAL
TOWER PARTNERS II, LLC, a Florida
limited liability company; CRYSTAL TOWER
ON BRICKELL PLAZA, LLC, a Florida
limited liability company; WATSON
INVESTIGATIONS, LLC, a Florida limited
liability company; STEVEN CARLYLE
CRONIG, an individual;

       Defendants.

**FIRST AMENDED COMPLAINT WITH JURY DEMAND**

Plaintiffs JAWHBS, LLC and SLS PROPERTIES THREE, LLC ("Plaintiffs") do hereby

allege as their First Amended Complaint the following:

**PARTIES**

1)      Plaintiff JAWHBS LLC is a Florida limited liability company with its principal place of business in Miami-Dade County, Florida.

2)      On or about March 5, 2015, Plaintiff JAWHBS LLC purchased for value and was transferred all potential claims of certain Chapter 7 bankruptcy trustees as set forth in more detail below in this Complaint.  JAWHBS LLC is therefore the owner of "All claims the Estates may have arising out [of] the circumstances of the sale of the property known as 18 Southeast 8th Street, 20 Southeast 8th Street and 830 Southeast First Ave., Miami, Florida 33131, including and without limitation, any claims against any individuals for violating any provisions of the United States Code, tortious interference, bid rigging, or collusion or attempted collusion" and/or "all of the Estates' right title and interest in any claims pursuant to 363(n)…" relating to the sales described herein in this Complaint.

3)      Plaintiff SLS PROPERTIES THREE, LLC is a Nevada limited liability company with its principal place of business in Clark County, Nevada.

4)      Defendant JORGE E. AREVALO, on information and belief, was at the time of the events alleged in this Complaint and continues to be a resident of Miami-Dade County, Florida.

5)      Defendant JA ENERGY RESOURCES, LLC is a Florida limited liability company with its principal place of business in Miami-Dade County.

6)      At all times alleged herein, JORGE AREVALO was the owner, principal, agent or alter ego of JA ENERGY RESOURCES, LLC.  Plaintiffs allege that AREVALO, at the times set forth herein, acted as an agent for, acted in concert with, aided and abetted and/or entered into a

2

civil conspiracy with JA ENERGY RESOURCES, LLC or that JA ENERGY RESOURCES, LLC is otherwise responsible for the acts of AREVALO.

7)      Defendant KEVIN COWAN on information and belief, was at the time of the events alleged in this Complaint and continues to be a resident of Miami-Dade County, Florida.  It is further alleged that Defendant COWAN is a licensed attorney in the state of Florida.

8)      Defendant SHUTTS & BOWEN, LLP is a Florida limited liability partnership serving as a law firm with its principal place of business in Miami-Dade County, Florida.

9)      At all times alleged herein, Defendant COWAN was acting as the owner, principal, partner, agent or alter ego of SHUTTS & BOWEN, LLP making it vicariously or otherwise responsible for his actions.

10)     Plaintiffs allege that Defendants COWAN and SHUTTS & BOWEN, LLP, at the times set forth herein, acted as an agent for, acted in concert with, aided and abetted and/or entered into a civil conspiracy with Defendant AREVALO and the other Defendants or is otherwise responsible for the acts of AREVALO and the other Defendants.

11)     Although COWAN is an attorney, his actions in this matter cross the line from the mere providing of legal advice to active, personal participation in an illegal bid rigging scheme and other tortious behavior.  COWAN actively and knowingly engaged in a scheme designed to achieve anticompetitive ends and performed acts to intentionally further anticompetitive goals, including but not limited to formulating policy decisions with his client to restrain competition. Whether he understood the actions he was taking were against the law at the time he took them is irrelevant for liability and other purposes.

12)    Defendant OMAR BOTERO aka OMAR BOTERO-PARAMO, aka OMAR BOTERO-PARAMO SR., on information and belief, was at the time of the events alleged in this Complaint and continues to be a resident of Miami-Dade County, Florida.

13)    Defendant ALIANZA FINANCIAL SERVICES, LLC is a Florida limited liability company with its principal place of business in Miami-Dade County, Florida.

14)    Defendant ALIANZA HOLDINGS, LLC is a Florida limited liability company with its principal place of business in Miami-Dade County, Florida.

15)    Defendant ALBERT F. DELANEY aka AL DELANEY, on information and belief, was at the time of the events alleged in this Complaint a resident of Miami-Dade County or the State of Texas.  Plaintiffs have been unable to determine the state or states in which DELANEY was located at the time of the events alleged herein.

16)    Defendant CRYSTAL TOWER PARTNERS II, LLC is a Florida limited liability company with its principal place of business in Miami-Dade County, Florida.

17)    Defendant CRYSTAL TOWER ON BRICKELL PLAZA, LLC is a Florida limited liability company with its principal place of business in Miami-Dade County, Florida.

18)    At all times alleged herein, OMAR BOTERO and/or ALBERT DELANEY were acting as the owners, principals, agents or alter egos of the CRYSTAL TOWER and ALIANZA entities making them vicariously or otherwise responsible for their acts.

19)    On information and belief, the CRYSTAL TOWER and ALIANZA entities were merely partners, joint venturers, agents or alter egos of each other, making them vicariously or otherwise responsible for the acts of each other.

20)    Defendant STEVEN C. CRONIG on information and belief, was at the time of the events alleged in this Complaint and continues to be a resident of Miami-Dade County, Florida.

21)     Although CRONIG is an attorney, his actions in this matter cross the line from the mere providing of legal advice to active, personal participation in an illegal bid rigging scheme and other tortious behavior.  CRONIG actively and knowingly engaged in a scheme designed to achieve anticompetitive ends and performed acts to intentionally further anticompetitive goals, including but not limited to formulating policy decisions with his client to restrain competition. Whether he understood the actions he was taking were against the law at the time he took them is irrelevant for liability and other purposes.

22)     Defendant WATSON INVESTIGATIONS, LLC is a Florida limited liability company with its principal place of business in Miami-Dade County, Florida.

23)     At all times alleged herein, Defendant CRONIG was acting as the owner, principal, agent or alter ego of WATSON INVESTIGATIONS, LLC, making that company vicariously or otherwise responsible for his acts.

24)     When this Complaint refers to the "AREVALO GROUP" it will be collectively referring to Defendants JORGE AREVALO; JA ENERGY RESOURCES, LLC; SHUTTS & BOWEN, LLP; and KEVIN COWAN.

25)     When this Complaint refers to the "BOTERO GROUP" it will be collectively referring to Defendants OMAR BOTERO; ALIANZA FINANCIAL SERVICES, LLC; ALIANZA HOLDINGS, LLC; ALBERT DELANEY; CRYSTAL TOWER PARTNERS II, LLC; and CRYSTAL TOWER ON BRICKELL PLAZA, LLC.

26)     When this Complaint refers to the "CRONIG GROUP" it will be collectively referring to Defendants WATSON INVESTIGATIONS, LLC and STEVEN CRONIG.

27)     The BOTERO GROUP and the AREVALO GROUP acted in concert, acted as partners or joint venturers, aided and abetting each other and worked toward the common goal of

bid rigging as alleged herein and, therefore, are jointly and severally responsible for the acts alleged.

## JURISDICTION AND VENUE

28)     The jurisdiction of this Court is invoked pursuant to 28 USC § 1331 and 28 USC § 1334(b).

29)     Supplemental jurisdiction of related state law claims is invoked pursuant to 28 USC § 1367.

30)     Venue is appropriate in the Southern District of Florida pursuant to 28 USC § 1391(b)(1) and (2) because at least one of the Defendants resides in that District and a substantial part of the events giving rise to Plaintiffs' claims occurred in that District.

31)     Venue and subject matter jurisdiction is not appropriate in the Bankruptcy Court for the US Southern District of Florida under controlling US Supreme Court case decisions based on the distribution of the judicial powers under Article III of the Constitution as well as the statutory bases for jurisdiction and mandatory abstention set forth in 28 USC § 1334(b) and 28 USC § 157.

## ALLEGATIONS COMMON TO ALL CLAIMS

32)     Plaintiffs' claims center around the July 2013 bankruptcy sale of four adjacent parcels of land at the intersection of SE 8th Street and SE 1st Avenue in the Brickell Avenue section of downtown Miami, Florida.  These parcels will be collectively referred to as the "Brickell Parcels" or "the Parcels."

33)      The Brickell Parcels are located in downtown Miami across from the one billion+ dollar Brickell CityCentre project.  The Brickell Parcels are suitable for development of a high rise

condominium project.  Because of this development potential and unique location, the Brickell Parcels were, and continue to be, very valuable parcels of land.

34)     Prior to July 2013, the Brickell Parcels were owned by two different business entities controlled by developer Renzo Renzi.  The entities were Beacon at Brickell Village, LLC and Beacon Developer Partners, LLC.

35)     In approximately early 2013, the legal entities owning the Brickell Parcels filed for bankruptcy protection in the US Bankruptcy Court for the Southern District of Florida.  As a result of the filings, two different bankruptcy trustees came to control the Brickell Parcels and sought to sell them for the benefit of creditors of the estates before a foreclosure could occur.

36)     In and before July 2013, the bankruptcy trustees sought to sell the Brickell Parcels through a bankruptcy sale under 11 USC § 363.  This process, which is controlled by the court and involves disclosing offers after which competing buyers, creditors or other interested parties have an opportunity to object to or overbid is simply a form of an auction.

37)     The sale of the Brickell Parcels was not restricted to one entity or one location and was open for offers from within the state of Florida, from interstate bidders or even international prospective purchasers.

38)     The bankruptcy estates/trustees—which have now assigned or transferred all rights or claims arising out of the sale or bidding to Plaintiff JAWHBS, LLC—stood to financially benefit from the highest possible sales price for the Brickell Parcels.

39)     As a major creditor of the bankruptcy estates, Plaintiff SLS PROPERTIES THREE, LLC stood to financially benefit from the highest possible sales price for the Brickell Parcels.

40)     The Defendants, and each of them, all had various parts and roles in a conspiracy and concert of action to aid and abet and collude with each other to artificially depress the sales

price of the Brickell Parcels, to the detriment of the Plaintiffs.  With more specificity, the following occurred.

41)     Prior to June 14, 2013, the BOTERO GROUP had negotiated an agreement with the bankruptcy trustees to purchase the Brickell Parcels for $19,500,000.  This can be thought of as an opening or stalking horse offer.  A Letter of Intent regarding that purchase was signed on June 14, 2013.  The trustees filed a Motion to approve that sale on June 25, 2013 and a hearing was set in the US Bankruptcy Court on July 10, 2013 for the Court to consider approval of the sale.  The Motion included terms to allow a competitive bidding process.

42)     The BOTERO GROUP intended to build a condominium project on the Brickell Parcels of 70 stories and 300+ units, resulting in net profits of over $90,000,000 after construction costs.

43)     Although unknown to the trustees at the time, the AREVALO GROUP was also interested in the Brickell Parcels and, if not for the acts described herein, would have become a second competitive bidder against the BOTERO GROUP, driving up the sales price to a fair market value.

44)     Prior to July 8, 2013, the AREVALO GROUP and the BOTERO GROUP agreed to collude to artificially prevent competitive bidding on the Brickell Parcels and depress the sales price.  The BOTERO GROUP agreed to pay the AREVALO GROUP the flat sum of $1,200,000 as well as a share in profits in exchange for "their forbearance from making an offer or bid to own the subject property" and reduced this to a writing dated July 8, 2013.  Other terms for this agreement or understanding might include payoff or bribe.

45)     AREVALO, COWAN, BOTERO and DELANEY all personally knew of the negotiations and the agreement (which was a violation of law) and participated in the negotiations toward the illegal, anticompetitive purpose.

46)     Both AREVALO and COWAN indicated an intent of the AREVALO GROUP to expose their presence as a competing bidder group to the trustees or the court if the BOTERO GROUP did not agree to their terms.  They did so not out of an attempt to prevent or foil the anticompetitive behavior or expose it but rather as leverage to compel the agreement of the BOTERO GROUP to the surreptitious bid rigging agreement.

47)     The BOTERO GROUP was ready, willing and able to purchase the Brickell Parcels with no involvement from the AREVALO GROUP and did not need the AREVALO GROUP for any legitimate commercial reason.  The sole or primary purpose of negotiating and entering into an agreement with the AREVALO GROUP was to prevent competition.

48)     Eventually, on July 5, 2013 BOTERO, acting on behalf of the BOTERO GROUP, indicated agreement with the terms of the negotiations and writings, plainly stating in a text message to AREVALO "Jorge, we are going to do the business with you…"

49)     Lest there be any doubt about the intent of the BOTERO GROUP and AREVALO GROUP to collude to prevent any fair competition and sales bidding process, on July 5, 2013, BOTERO reminded AREVALO not to take any action that might upset the agreement BOTERO already had signed with the bankruptcy trustees because such action "will cause a bidding war where the only certain result is that the price for the property will go up for everyone…"

50)     In fact, in an e-mail on July 8, 2013, DELANEY wrote COWAN to confirm that the BOTERO GROUP "made a min bid of 19.5 mm.  We will go higher."

51)     On July 8, 2013, DELANEY sent AREVALO a draft term sheet.  The draft term sheet again brazenly provided that AREVALO "[a]gree[s] within the formal agreement not to compete in any way, directly or indirectly against the Company [BOTERO GROUP] or its parent, in the acquisition of the [Brickell Properties]."

52)     On July 9, 2013, the day before the approval hearing, the BOTERO GROUP and the AREVALO GROUP again re-drafted their agreement and expressly stated that the AREVALO GROUP would refrain from making any "filing, offer or bid to purchase or object to the trustees motion for approval for the sale to [the BOTERO GROUP] at the hearing scheduled for July 10, 2013 at 9:30 AM or at any adjourned date and time of the hearing set to decide on approving or not approving the trustee's sale to [the BOTERO GROUP]."

53)     In fact, in the midst of finalizing the documentation, COWAN personally sent an email to BOTERO indicating that AREVALO was threatening to file a notice in the bankruptcy case.  This notice might have have alerted the Trustees to the existence of another potential bidder and foiled some of the collusion efforts or effects.  The e-mail provides a clear indication that COWAN personally, while acting for SHUTTS & BOWEN, LLP, was actively involved in advancing the illegal, anticompetitive agreement and was relaying threats to expose the anti-competitive behavior, not to stop it, but rather to compel the BOTERO GROUP to continue with the surreptitious nature of the illegal, anticompetitive agreement.

54)     On the day of the July 10, 2013 hearing, AREVALO personally appeared along with counsel from SHUTTS & BOWEN at the hearing.  At the hearing, the AREVALO GROUP represented to US Bankruptcy Court Judge Laurel Isicoff that it was prepared to submit a "higher and better offer" and admitted that the prior agreement between the BOTERO GROUP and the AREVALO GROUP were "to effectively not make a higher and better bid in bankruptcy."

55)     While it appears that the AREVALO GROUP did not initially understand the illegality of the collusion and proposed payoff that their counsel had just admitted to, Judge Isicoff certainly did and made more than one comment during the hearing that in light of this information, a § 363(m) finding of good faith in the proposed sale to the BOTERO GROUP was unlikely to occur.

56)     After the hearing during which the collusion was exposed to the Court and the trustees, the BOTERO GROUP withdrew its purchase offer.  The effect of this was only to continue the stifling of competition for the Brickell Parcels by wasting time and eliminating a potential competitive bidder.  By that time, the effects of the bid rigging were already irreversible and had already artificially reduced the sales price of the Brickell Parcels.  The withdraw only worsened the effects of the anticompetitive behavior, not cured them.

57)     Undaunted but faced with a short deadline to submit another bid, the AREVALO GROUP prepared to submit a $22,000,000 offer for the Brickell Properties to the trustees.  In order to secure the funding, the AREVALO GROUP contacted persons associated with the CRONIG GROUP.

58)     In turn, the CRONIG GROUP used the knowledge and information and results of the prior bid rigging scheme of the AREVALO GROUP to its advantage by sabotaging the AREVALO GROUP'S intended $22,000,000 bid.  It did so by pulling out of or refusing to fund the AREVALO GROUP and instead under-bidding it for $21,500,000.

59)     The CRONIG group knew that since there was only a small number of potential bidders and it had tanked or sabotaged the main competing offer of the AREVALO GROUP by refusing to finance it, it had fixed the auction in its favor and could name its own price.

60)     CRONIG personally sent an e-mail on or about July 11, 2013 to a third party with the purpose of preventing AREVALO from obtaining financing for his $22,000,000 bid so, instead, the CRONIG GROUP could eliminate him as competition and acquire the Brickell Parcels at a lower price.

61)     Regardless of the fact that the CRONIG GROUP pretended to disassociate itself from the activities of the AREVALO GROUP and BOTERO GROUP, the CRONIG GROUP became an agent of the AREVALO GROUP by its mere status of being consulted for financing. Although the CRONIG GROUP was an unloyal agent, it was nevertheless an agent of the AREVALO GROUP consulted for financing and, therefore, responsible along with the AREVALO GROUP.

62)     Further, the independent acts of the CRONIG GROUP in intentionally sabotaging the $22,000,000 bid of the AREVALO GROUP so it could be the only bidder, eliminating all competition and obtaining the Brickell Parcels at a lower price that the AREVALO GROUP intended are separately actionable as anticompetitive, illegal behavior.

63)     The acts of all of the Defendants were intentional, willful, wanton, grossly negligent and in violation of applicable laws.

64)     The bankruptcy trustees, in the face of stifled competition and a hard deadline to prevent foreclosure, accepted the only available offer of $21,500,000 for the Brickell Parcels and a sale occurred to WATSON INVESTIGATIONS, LLC on or about July 26, 2013.

65)     At the time of the sale, the trustees were unaware of the extent of the bid rigging and collusion that had occurred among the BOTERO GROUP, AREVALO GROUP and the CRONIG GROUP.

66)    The $21,500,000 sale price of the Brickell Parcels was significantly below market value.

67)    The sale price of the Brickell Parcels was artificially depressed by the collusion and concerted acts of the three developer/investor groups, the AREVALO GROUP, the BOTERO GROUP and the CRONIG GROUP.

68)    In a later lawsuit filed by AREVALO against the CRONIG GROUP for their actions, AREVALO admitted that the Brickell Parcels were a "lucrative investment opportunity" that were "extremely valuable" and commanded a "premium price" due to their location and the price the BOTERO GROUP was going to pay was a "discounted rate."  The lawsuit irrefutably establishes the close connection between the AREVALO GROUP and the CRONIG GROUP.

69)    The CRONIG GROUP attempted to sell the still undeveloped Brickell Parcels in 2015 for $55,000,000 to $65,000,000 per acre, showing the $21,500,000 sales price was far beneath market value.  The Brickell Parcels amounted to a little less than a full acre.

70)    Further, some of the documents or agreements during the collusion and prior to the sale refer to a "buy out option" under which the AREVALO GROUP would have the option to pay $31,400,000 for the Brickell Parcels free and clear of any other side deals.  Plaintiffs believe this figure more closely represents the approximate, true value of the Brickell Parcels at the time had the Defendants not colluded to suppress bidding and competition.

71)    In addition to the foregoing, based on several commonly accepted valuation methods, Plaintiffs believe the fair market value of the Brickell Parcels at the time of the sale was $10,000,000 or more in excess of the actual purchase price.

## FIRST CAUSE OF ACTION
### Antitrust Violations (15 USC § 1, 15 USC § 12)

72)     Plaintiffs repeat and re-allege the allegations set forth in paragraphs 1 through 71 of the Complaint, and incorporate those allegations by reference.

73)     This cause of action is filed by both Plaintiffs against all Defendants.

74)     The Sherman Act, 15 USC § 1 et. seq., broadly prohibits acts "in restraint of trade or commerce."  Bid rigging, auction collusion and similar acts have determined to be a *per se* violation of the Sherman Act for over 100 years, see Addyston Pipe & Steel Co. v. United States, 175 US 211 (1899).

75)     The Clayton Act, 15 USC § 12 et. seq., supplements the Sherman Act and provides a private cause of action for violations of the Sherman Act.

76)     The Defendants' behavior in this case includes at least three different forms of anticompetitive bid rigging.  The first is paying a person not to make a competitive bid (AREVALO GROUP and BOTERO GROUP).  The second is forming a joint venture or other enterprise for the primary purpose of preventing competition (AREVALO GROUP AND BOTERO GROUP).  The third is taking actions to thwart or prevent the bids of rival bidders in a manner intended to stop a competitive bidding process (CRONIG GROUP).

77)     The alleged acts of the Defendants affected interstate commerce in at least, but not limited to, the following ways:  (1) the sale of real estate and an auction has such a substantial effect on interstate commerce that it per se involves interstate commerce, (2) the sale/auction/ bidding was not limited to persons or entities within the state of Florida, but rather to any person or entity wishing to bid, (3) at least one of the Plaintiffs, SLS PROPERTIES THREE, LLC, was a resident of the state of Nevada, (4) on information and belief, the COWAN GROUP was funded

from a source outside of Florida, a Russian billionaire, and (5) at least Defendant DELANEY has substantial ties and may reside in the state of Texas.

78) The bid rigging, auction collusion and/or other acts of the Defendants caused or contributed to a lower sales price of the Brickell Parcels, thus damaging the Plaintiffs. This occurred as a result of (1) reducing the number of bidders/buyers, (2) preventing a competitive bidding/auction process, (3) concealing the identify of other potential bidders/buyers from the trustees and court, (4) causing a time urgency which induced the trustees to accept an artificially reduced sales price, (5) allowing an artificially low bid/offer which would have been considerably higher if a competitive process had occurred and (6) withholding financing or sabotaging the offer of one bidder in order to alter the competitive bidding process and enter the bidding/auction and obtain the property for less.

79) The Plaintiffs were in the class of persons or entities meant to be protected by the antitrust laws.

80) The bid rigging, auction collusion and/or other acts of the Defendants caused damages to the Plaintiffs in the amount to be proven at trial but believed to be at least $10,000,000.

81) In addition to actual damages, pursuant to 15 U.S.C. § 15, Plaintiffs seek to recover treble damages, punitive damages, costs of suit and attorney's fees.

## SECOND CAUSE OF ACTION
**Violation of Florida Deceptive and Unfair Trade Practice Act Fla. Stat. § 501.204(1)**

82) Plaintiffs repeat and re-allege the allegations set forth in paragraphs 1 through 81 of the Complaint, and incorporate those allegations by reference.

83) The Second Cause of Action is filed by both Plaintiffs against all Defendants.

84)     The Florida Deceptive and Unfair Trade Practices Act (FDUTPA) broadly prohibits all "[u]nfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce." § 501.204(1), Fla. Stat.

85)     The conduct of bid rigging is a per se violation of the Sherman Act and the Federal Trade Commission Act.

86)     By reference, the FDUTPA incorporates and provides that all activity that violates the Sherman Act or Federal Trade Commission Act is deemed a violation of the FDUTPA.

87)     The conduct of the Defendants, including but not limited to the sale of real property, and participation in a bid/auction constitutes "trade or commerce" under the FDUTPA.

88)     The bid rigging and/or auction collusion or other acts of the Defendants caused or contributed to a lower sales price of the Brickell Parcels, thus damaging the Plaintiffs.  This occurred as a result of (1) reducing the number of bidders/buyers, (2) preventing a competitive bidding/auction process, (3) concealing the identify of other potential bidders/buyers from the trustees and court, (4) causing a time urgency which induced the trustees to accept an artificially reduced sales price, (5) allowing an artificially low bid/offer which would have been considerably higher if a competitive process had occurred and (6) withholding financing or sabotaging the offer of one bidder in order to alter the competitive bidding process and enter the bidding/auction and obtain the property for less.

89)     The Plaintiffs were in the class of persons or entities meant to be protected by the FDUTPA.

90)     The bid rigging, auction collusion and/or other acts of the Defendants caused damages to the Plaintiffs in the amount to be proven at trial but believed to be at least $10,000,000.

91)     In addition to actual damages, pursuant to § 501.2105 Fla. Stat., Plaintiffs seek to recover punitive damages, costs of suit and attorney's fees.

**THIRD CAUSE OF ACTION**
**Bankruptcy Code Section 363(n)**

92)     Plaintiff JAWHBS LLC repeats and re-alleges the allegations set forth in paragraphs 1 through 91, and incorporates those allegations by reference.

93)     Plaintiff JAWHBS, LLC brings this cause of action against all Defendants.

94)     11 USC § 363(n) states the following:

The trustee may avoid a sale under this section if the sale price was controlled by an agreement among potential bidders at such sale, *or may recover from a party to such agreement any amount by which the value of the property sold exceeds the price at which such sale was consummated, and may recover any costs, attorneys' fees, or expenses incurred* in avoiding such sale *or recovering such amount*. In addition to any recovery under the preceding sentence, the court may grant judgment for punitive damages in favor of the estate and against any such party that entered into such an agreement in willful disregard of this subsection.

95)     JAWHBS LLC has been transferred all rights of the bankruptcy trustees to pursue this action, which it brings on the trustees' behalf.

96)     The Defendants took actions and had agreements with the goal of controlling the sales price of the Brickell Parcels.

97)     The bid rigging, auction collusion and/or other acts of the Defendants caused or contributed to a lower sales price of the Brickell Parcels, thus damaging the Plaintiff.  This occurred as a result of (1) reducing the number of bidders/buyers, (2) preventing a competitive bidding/auction process, (3) concealing the identify of other potential bidders/buyers from the trustees and court, (4) causing a time urgency which reduced the ultimate sales price, (5) allowing an artificially low bid/offer which would have been considerably higher if a competitive process

had occurred and (6) withholding financing or sabotaging the offer for one bidder in order to enter the bidding/auction and obtain the property for less.

98)    The bid rigging, auction collusion and/or other acts of the Defendants caused damages to the Plaintiff JAWHBS, LLC in an amount to be proven at trial but believed to be at least $10,000,000.

99)    Plaintiff JAWHBS LLC does not seek the remedy of setting aside the actual sale but instead seeks only money damages.

100)    In addition to actual damages, Plaintiff JAWHBS LLC seeks to recover punitive damages, costs and expenses of suit and attorney's fees.

## FOURTH CAUSE OF ACTION
### Actual and Constructive Fraud

101)    Plaintiffs repeat and re-allege the allegations set forth in paragraphs 1 through 100 of the Complaint, and incorporate those allegations by reference.

102)    Both Plaintiffs bring the Fourth Cause of Action against all Defendants.

103)    The Defendants made false representations of material facts, known by them to be false at the time the representations were made, including their status as arms' length bidders and the value of the Brickell Parcels.

104)    The BOTERO GROUP along with the AREVALO GROUP made or allowed false representations that the BOTERO GROUP was acting in good faith, purchasing the Brickell Parcels at or near fair market value and the proposed purchase was at arm's length.  It made these representations to the trustees and the bankruptcy court to induce a sale, but these representations were untrue.

105)    Similarly, the CRONIG GROUP made or allowed false representations that the CRONIG GROUP was unrelated to other bidders, acting in good faith, purchasing the Brickell

Parcels at or near fair market value and the proposed purchase was at arm's length.  It made these representations to the trustees and the bankruptcy court to induce a sale, but these representations were untrue.

106)    The representations were made for the purpose of inducing another, including the bankruptcy trustees, other Defendants and the bankruptcy court, to act in reliance on the representations.

107)    There was actual reliance on the representations.

108)    In addition to and in the alternative to the above, constructive fraud is defined as acts or transactions which equity regards as wrongful, to which the law attributes the same or similar effects as those which follow from actual fraud, and for which it gives the same or similar relief as that granted in cases of real fraud.  The Defendants' bid rigging, auction collusion and/or other acts of the Defendants constitute constructive fraud.

109)    The bid rigging, auction collusion and/or other acts of the Defendants caused or contributed to a lower sales price of the Brickell Parcels, thus damaging the Plaintiff.  This occurred as a result of (1) reducing the number of bidders/buyers, (2) preventing a competitive bidding/auction process, (3) concealing the identify of other potential bidders/buyers from the trustees and court, (4) causing a time urgency which reduced the ultimate sales price, (5) allowing an artificially low bid/offer which would have been considerably higher if a competitive process had occurred and (6) withholding financing or sabotaging the offer for one bidder in order to enter the bidding/auction and obtain the property for less.

110)    The bid rigging, auction collusion and/or other acts of the Defendants caused damages to the Plaintiffs in an amount to be proven at trial but believed to be at least $10,000,000.

111)    In addition to actual damages, Plaintiffs seek to recover punitive damages, costs and expenses of suit and attorney's fees.

### FIFTH CAUSE OF ACTION
#### Civil Conspiracy/Civil Aiding and Abetting

112)    Plaintiffs repeat and re-allege the allegations set forth in paragraphs 1 through 111 of the Complaint, and incorporate those allegations by reference.

113)    The Fifth Cause of Action is filed by both Plaintiffs against all Defendants.

114)    The Defendants entered into a conspiracy between themselves.

115)    The purpose of the conspiracy was to commit a tort or unlawful act, as described in this Complaint.

116)    The Defendants took overt acts in furtherance of the conspiracy.

117)    Further and in addition to the above, the Defendants knew or should have known that the conduct of the other Defendants was illegal, harmful and tortious but aided and abetting the acts by giving substantial assistance or encouragement to the other Defendants.

118)    The Defendants were generally aware of his/its role as part of an overall illegal or tortious activity at the time they provided assistance.

119)    Specifically as to Defendants COWAN and SHUTTS & BOWEN, LLP, an attorney is liable to third parties to the same extent that a non-attorney would be for the same behavior; an attorney may not commit illegal, collusive or tortious acts, even if working for a client.  The acts of COWAN in this case indicate his personal involvement in drafting, negotiating and furthering the illegal, anticompetitive purpose of the agreements between the BOTERO GROUP and AREVALO/JA ENERGY RESOURCES, LLC.  COWAN actively and knowingly engaged in a scheme designed to achieve anticompetitive ends and performed acts to intentionally further

20

anticompetitive goals, including but not limited to formulating policy decisions with his client to restrain competition.

120)     Specifically as to Defendant CRONIG, an attorney is liable to third parties to the same extent that a non-attorney would be for the same behavior; an attorney may not commit illegal, collusive or tortious acts, even if working for a client.  The acts of CRONIG in this case indicate his personal involvement in drafting, negotiating and furthering an illegal, anticompetitive purpose.   CRONIG actively and knowingly engaged in a scheme designed to achieve anticompetitive ends and performed acts to intentionally further anticompetitive goals, including but not limited to formulating policy decisions with his client to restrain competition.

121)     The Defendants knowingly and substantially assisted the other Defendants, despite this knowledge.

122)     Plaintiffs were damaged by the acts of conspiracy.

123)     In addition to or in the alternative to the above, the Defendants had a peculiar power of coercion to control the bidding and auction of the Brickell Parcels by virtue of their combination and status as sophisticated real estate developers and investors, which an individual alone does not possess.

124)     The bid rigging, auction collusion and/or other acts of the Defendants caused or contributed to a lower sales price of the Brickell Parcels, thus damaging the Plaintiff.   This occurred as a result of (1) reducing the number of bidders/buyers, (2) preventing a competitive bidding/auction process, (3) concealing the identify of other potential bidders/buyers from the trustees and court, (4) causing a time urgency which reduced the ultimate sales price, (5) allowing an artificially low bid/offer which would have been considerably higher if a competitive process

21

had occurred and (6) withholding financing or sabotaging the offer for one bidder in order to enter the bidding/auction and obtain the property for less.

125)    The bid rigging, auction collusion and/or other acts of the Defendants caused damages to the Plaintiffs in the amount to be proven at trial but believed to be at least $10,000,000.

126)    In addition to actual damages, Plaintiffs seek to recover punitive damages, costs of suit and attorney's fees.

<b><u>SIXTH CAUSE OF ACTION</u></b><br><b>Interference with Prospective Economic Advantage/Business Relationship</b>

127)    Plaintiffs repeat and re-allege the allegations set forth in paragraphs 1 through 126 of the Complaint, and incorporate those allegations by reference.

128)    The Sixth Cause of Action is filed by both Plaintiffs against all Defendants.

129)    There existed a business relationship or prospective business relationship between the Plaintiffs and potential bidders/buyers of the Brickell Parcels.

130)    The Defendants had knowledge of the relationship.

131)    The Defendants intentionally and unjustifiably interfered with the business relationship by colluding to avoid a sale at a fair market value.

132)    Plaintiffs were damaged by the acts of the Defendants.

133)    The bid rigging, auction collusion and/or other acts of the Defendants caused or contributed to a lower sales price of the Brickell Parcels, thus damaging the Plaintiff.  This occurred as a result of (1) reducing the number of bidders/buyers, (2) preventing a competitive bidding/auction process, (3) concealing the identify of other potential bidders/buyers from the trustees and court, (4) causing a time urgency which reduced the ultimate sales price, (5) allowing an artificially low bid/offer which would have been considerably higher if a competitive process

had occurred and (6) withholding financing or sabotaging the offer for one bidder in order to enter the bidding/auction and obtain the property for less.

134)    The bid rigging, auction collusion and/or other acts of the Defendants caused damages to the Plaintiffs in the amount to be proven at trial but believed to be at least $10,000,000.

135)    In addition to actual damages, Plaintiffs seek to recover punitive damages, costs of suit and attorney's fees.

**WHEREFORE**, the Plaintiffs JAWHBS LLC and SLS PROPERTIES THREE, LLC seek the following relief:

A.  Compensatory damages in an amount to be proven at trial but believed to exceed $10,000,000;

B.  Treble damages;

C.  Attorney's fees incurred in bringing this Complaint and incurred by the trustees in investigating the allegations set forth herein;

D.  Costs of suit and expenses incurred in bringing this Complaint;

E.  Punitive damages for the Defendants' intentional, willful and wanton conduct;

F.  Such further relief as the Court may deem just and proper, except that Plaintiffs do not seek to set aside the actual sale but only seek money damages.

/ /

/ /

/ /

/ /

/ /

/ /

23

## DEMAND FOR TRIAL BY JURY

Plaintiffs hereby request a trial by jury in this matter.

Dated:   January 25, 2016

**/s/ Adam J. Breeden**

_____
Adam J. Breeden, Esq.
Appearing Pro Hac Vice
Adam@breedenandassociates.com
BREEDEN & ASSOCIATES, PLLC
1404 S. Jones Blvd.
Las Vegas, NV 89146
Ph. 702-508-9250
Fax 702-508-9365

Jerrold A. Wish, Esq.
Florida Bar # 352721
jwish@wishlaw.net
THE WISH LAW FIRM
1927 NW 104th Way
Gainesville FL 32606
Ph. 786-200-7077
*Attorneys for Plaintiffs*

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that a true and correct copy of the foregoing First Amended Complaint was served on January 25, 2016 on all counsel or parties of record on the service list through the Court's ECF system.

Dated:  January 25, 2016

**s/ Adam J. Breeden**
_____

Adam J. Breeden, Esq.
Appearing Pro Hac Vice
Adam@breedenandassociates.com
BREEDEN & ASSOCIATES, PLLC
1404 S. Jones Blvd.
Las Vegas, NV 89146
Ph. 702-508-9250
Fax 702-508-9365

Jerrold A. Wish, Esq.
Florida Bar # 352721
jwish@wishlaw.net
THE WISH LAW FIRM
1927 NW 104th Way
Gainesville FL 32606
Ph. 786-200-7077
*Attorneys for Plaintiffs*

25

Case No.: **15-24176-CV-GAYLES**
<u>SERVICE LIST</u>

| | |
|---|---|
| Adam J. Breeden, Esq.<br>Adam@breedenandassociates.com<br>BREEDEN & ASSOCIATES, PLLC<br>1404 S. Jones Blvd.<br>Las Vegas, NV 89146<br>Ph. 702-508-9250<br>Fax 702-508-9365<br>*Co-Counsel for Plaintiffs* | Jerrold A. Wish, Esq.<br>jwish@wishlaw.net<br>THE WISH LAW FIRM<br>1927 NW 104th Way<br>Gainesville FL 32606<br>Ph. 786-200-7077<br>*Co-Counsel for Plaintiffs* |
| Kendall Coffey, Esq.<br>kcoffey@coffeyburlington.com<br>Kevin C. Kaplan, Esq.<br>kkaplan@coffeyburlington.com<br>Erika S. Handelson, Esq.<br>ehandelson@coffeyburlington.com<br>COFFEY BURLINGTON<br>2601 South Bayshore Drive, PH1<br>Miami, FL 33133<br>Tel: 305.858.2900<br>Fax: 305.858.5261<br>*Counsel for Shutts & Bowen, LLP and*<br>*Kevin Cowan* | Charles M. Tatelbaum, Esq.<br>cmt@trippscott.com<br>Edward Curtis, Esq.<br>erc@trippscott.com<br>Michael C. Foster, Esq.<br>mcf@trippscott.com<br>TRIPP SCOTT<br>110 S.E. 6th Street, 15th Floor<br>Ft. Lauderdale, FL 33301<br>Ph. 954-525-7500<br>Fax 954-761-7500<br>*Counsel for Steven C. Cronig* |
| Ronald L. Kammer, Esq.<br>rkammer@hinshawlaw.com<br>H. Steven Vogel, Esq.<br>svogel@hinshawlaw.com<br>HINSHAW & CULBERTSON, LLP<br>2525 Ponce de Leon Blvd., 4th Floor<br>Coral Gables, FL 33134<br>Ph. 305-358-7747<br>Fax 305-577-1063<br>*Counsel for Watson Investigations, LLC* | Ian I. Martinez, Esq.<br>imartinez@bmrlawgroup.com<br>BELLO & MARTINEZ, PLLC<br>2850 Douglas Road, Suite 303<br>Coral Gables, FL 33134<br>Ph. 305.442.7970<br>*Co-Counsel for Defendants*<br>*Alianza Financial Services, LLC,*<br>*Alianza Holdings, LLC and*<br>*Omar Botero* |
| Lawrence Goodman, Esq.<br>lgoodman@devinegoodman.com<br>DEVINE GOODMAN et. al.<br>2800 Ponce de Leon Boulevard, Suite 1400<br>Coral Gables, FL 33134<br>Ph. 305.374.8200<br>Fax 305.374.8208<br>*Counsel for JA Energy Resources, LLC* | Andrew P. Kawel, Esq.<br>apkawel@kawellaw.com<br>KAWEL, PLLC<br>2850 Douglas Rd., Suite 303<br>Coral Gables, FL 33134<br>Ph. 305.209.4529<br>*Co-Counsel for Defendants*<br>*Alianza Financial Services, LLC,*<br>*Alianza Holdings, LLC and*<br>*Omar Botero* |