## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### Case No. 15-24176-CIV-GAYLES

JAWHBS, LLC and SLS PROPERTIES
THREE, LLC,
                         **Plaintiffs,**

          **v.**

JORGE E. AREVALO, et al.,
                         **Defendants.**
_____/

### <u>ORDER</u>

In this antitrust action, the Plaintiffs, JAWHBS, LLC ("JAWHBS"), and SLS Properties Three, LLC ("SLS"), have sued the Defendants, developers and their legal counsel, alleging that they colluded and participated in a bid-rigging scheme to acquire parcels of land in the Brickell Avenue section of Miami, Florida, at a depressed price during a U.S. Bankruptcy auction and sale. Presently before the Court are two motions to dismiss. The first motion [ECF No. 92] (the "Joint Motion") is filed by Defendants JA Energy Resources, LLC ("JA Energy"); Shutts & Bowen, LLP ("Shutts & Bowen"); Kevin D. Cowan; Albert F. Delaney; Omar Botero; Alianza Financial Services, LLC; Alianza Holdings, LLC; Watson Brickell Development, LLC f/k/a Watson Investigations, LLC; and Steven Carlyle Cronig. The second motion [ECF No. 97] (the "Shutts Motion") is filed separately by Defendants Shutts & Bowen and Cowan.[1] The Court has carefully considered the operative complaint, the parties' briefing, and the applicable law and is otherwise fully advised in the premises. For the reasons that follow, the Defendants' Joint Motion shall be granted in part and denied in part and the Shutts Motion shall be denied as moot.

---

[1]   Defendant Jorge Arevalo filed a separate motion, through which he fully joined in and adopted the arguments and positions set forth in the Joint Motion [ECF No. 118].

## I.    BACKGROUND

The Plaintiffs' allegations in the First Amended Complaint[2] concern the July 2013 bankruptcy sale of four adjacent parcels of land at the intersection of S.E. 8th Street and S.E. 1st Avenue in the Brickell Avenue section of Miami, Florida (the "Brickell Parcels" or the "Parcels"). First Am. Compl. ¶ 32. The Brickell Parcels are located across from the one-billion-plus–dollar Brickell City Centre project and are suitable for development of a high rise condominium project. *Id.* ¶ 33. Prior to July 2013, the Parcels were owned by two different business entities controlled by developer Renzo Renzi: Beacon at Brickell Village, LLC ("BBV"), and Beacon Developer Partners, LLC ("BDP"). *Id.* ¶ 34.

In early 2013, these entities filed for bankruptcy protection in the U.S. Bankruptcy Court for the Southern District of Florida. *Id.* ¶ 35. As a result, two different bankruptcy trustees (the "Trustees") came to control the Brickell Parcels and sought to sell them for the benefit of creditors of the estates before a foreclosure could occur. *Id.* In and before July 2013, the Trustees sought to sell the Brickell Parcels under 11 U.S.C. § 363, a process controlled by the court that involves disclosing offers after which competing buyers, creditors, or other interested parties have an opportunity to object or overbid. *Id.* ¶ 36. The sale of the Parcels was open for offers from anywhere in the world. *Id.* ¶ 37. The Trustees and the bankruptcy estates (which have now assigned or transferred all rights or claims arising out of the sale or bidding to Plaintiff JAWHBS), as well as

---

[2]   The motions to dismiss were filed and briefed when the First Amended Complaint was the operative complaint in this action. On May 31, 2016, the Plaintiffs filed a motion for leave for leave to file a Second Amended Complaint, pursuant to Federal Rule of Civil Procedure 15(a)(2), adding a new party (Defendant Francis H. "Fran" Scola) and a new claim against all defendants alleging violation of the Florida Antitrust Act. [ECF No. 131]. The Plaintiffs requested that the Court, should it grant the motion for leave to amend, not vacate the pending motions to dismiss the First Amended Complaint once the Second Amended Complaint was filed [*Id.* at 4]. By Endorsed Order dated June 3, 2016, the Court granted the motion for leave to amend and ruled that it would leave pending the motions to dismiss for determination in the ordinary course. [ECF No. 132]. On June 20, 2016, the Defendants filed a Joint Unopposed Motion for an Enlargement of Time to Respond to the Plaintiffs' Second Amended Complaint, requesting that they have until twenty days after the Court's ruling on the motions to dismiss the ***First*** Amended Complaint to answer or otherwise respond to the ***Second*** Amended Complaint. [ECF No. 143]. The Court granted the motion by Endorsed Order the same day. [ECF No. 144]. Given this posture, all discussion in this Order will pertain to the allegations in the First Amended Complaint.

Plaintiff SLS (a major creditor of the bankruptcy estates) stood to financially benefit from the highest possible sales prices for the Parcels. *Id.* ¶¶ 38-39. Yet the Plaintiffs allege that the Defendants "all had various parts and roles in a conspiracy and concert of action to aid and abet and collude with each other to artificially depress the sales price of the Brickell Parcels, to the detriment of the Plaintiffs." *Id.* ¶ 40.

Specifically, prior to June 14, 2013, the "Botero Group" (defined in the First Amended Complaint as Defendants Omar Botero; Alianza Financial Services, LLC; Alianza Holdings, LLC; Albert Delaney; Crystal Tower Partners II, LLC; and Crystal Tower on Brickell Plaza, LLC)[3] negotiated an agreement with the Trustees to purchase the Parcels for $19.5 million, and a Letter of Intent regarding that purchase was signed on June 14, 2013. *Id.* ¶ 41. The Trustees filed a motion in the Bankruptcy Court to approve that sale on June 25, 2013. *Id.* The motion also included terms to allow a competitive bidding process. *Id.* A hearing on the motion was set for July 10, 2013. *Id.* The Botero Group intended to build a 70-story, 300-plus–unit condominium project on the Brickell Parcels, resulting in net profits of over $90 million after construction costs. *Id.* ¶ 42.

Although unknown to the Trustees at the time, the "Arevalo Group" (defined in the First Amended Complaint as Defendants Jorge Arevalo; JA Energy Resources, LLC; Shutts & Bowen, LLP; and Kevin Cowan)[4] was also interested in the Brickell Parcels. *Id.* ¶ 43. The Plaintiffs contend that, if not for the acts they describe, the Arevalo Group would have become a second competitive bidder against the Botero Group, which would have driven the Parcels' sales price up to a fair market value. *Id.*

Prior to July 8, 2013, the Arevalo Group and the Botero Group agreed to artificially prevent

---

[3]   The Plaintiffs allege that Botero and/or Delaney acted at all relevant times as the owners, principals, agents, or alter egos of the Alianza and Crystal Tower entities, which themselves were merely partners, joint ventures, agents, or alter egos of each other. First Am. Compl. ¶¶ 18-19.

[4]   The Plaintiffs allege that Arevalo acted at all relevant times as the owner, principal, agent, or alter ego of JA Energy Resources, LLC, and that Cowan acted at all relevant times as the owner, principal, partner, agent or alter ego of Shutts & Bowen, LLP. First Am. Compl. ¶¶ 6, 9.

competitive bidding on the Parcels and depress the sales price. *Id.* ¶ 44. The Botero Group agreed to pay the Arevalo Group the flat sum of $1.2 million, as well as a share in profits in exchange for "their forbearance from making an offer or bid to own the subject property"—an agreement that was reduced to a writing dated July 8, 2013. *Id.* Arevalo, Cowan, Botero, and Delaney all personally knew of the negotiations and the agreement (which violated the law) and participated in the negotiations toward the illegal, anticompetitive purpose. *Id.* ¶ 45. Both Arevalo and Cowan indicated an intent of the Arevalo Group to expose their presence as a competing bidder group to the Trustees or the court if the Botero Group did not agree to their terms in order to compel the agreement of the Botero Group to the alleged bid rigging. *Id.* ¶ 46. The Plaintiffs allege that the Botero Group was ready, willing, and able to purchase the Parcels with no involvement from the Arevalo Group and did not need the Arevalo Group for any legitimate commercial reason. *Id.* ¶ 47. The sole or primary purpose of negotiating or entering into an agreement with the Arevalo Group was to prevent competition. *Id.*

On July 5, 2013, Botero, acting on behalf of the Botero Group, indicated an agreement with the terms of the negotiations and writings, by stating, in a text message to Arevalo, "Jorge, we are going to do the business with you . . . ." *Id.* ¶ 48. Botero reminded Arevalo not to take any action that might upset the agreement Botero had signed with the Trustees because such action "will cause a bidding war where the only certain result is that the price for the property will go up for everyone . . . ." *Id.* ¶ 49. In an e-mail on July 8, 2013, Delaney wrote to Cowan to confirm that the Botero Group "made a min bid of 19.5 mm. We will go higher." *Id.* ¶ 50. On July 8, 2013, Delaney sent Arevalo a draft term sheet, which provided that Arevalo "[a]gree[s] within the formal agreement not to compete in any way, directly or indirectly against the [Botero Group] or its parent, in the acquisition of the [Brickell Parcels]." *Id.* ¶ 51. On July 9, 2013, the day before the approval hearing, the Botero Group and the Arevalo Group again redrafted their agreement and expressly

stated that the Arevalo Group would refrain from making any "filing, offer or bid to purchase or object to the trustees['] motion for approval for the sale to [the Botero Group] at the hearing scheduled for July 10, 2013 at 9:30 AM or at any adjourned date and time of the hearing set to decide on approving or not approving the trustee's sale to [the Botero Group]." *Id.* ¶ 52. In the midst of finalizing this documentation, Cowan sent an email to Botero indicating that Arevalo was threatening to file a notice in the bankruptcy case. *Id.* ¶ 53.

At the hearing on July 10, 2013, Arevalo personally appeared along with counsel from Shutts & Bowen. At the hearing, the Arevalo Group represented to U.S. Bankruptcy Judge Laurel Isicoff that it was prepared to submit a "higher and better offer" and admitted that the prior agreement between it and the Botero Group was "to effectively not make a higher and better bid in bankruptcy." *Id.* ¶ 54. Given this admission, Judge Isicoff made more than one comment during the hearing that a § 363(m) finding of good faith in the proposed sale to the Botero Group was unlikely to occur. *Id.* ¶ 55. After the hearing, the Botero Group withdrew its purchase offer. *Id.* ¶ 56.

Faced with a short deadline to submit a bid, the Arevalo Group prepared to submit a $22 million offer for the Brickell Parcells. *Id.* ¶ 57. To secure this funding, the Arevalo Group contacted persons associated with the "Cronig Group" (defined in the First Amended Complaint as Defendants Steven Carlyle Cronig and Watson Brickell Development, LLC, then known as Watson Investigations, LLC).[5] *Id.* The Cronig Group used the knowledge, information, and results of the Arevalo Group's prior bid rigging scheme to its advantage by refusing to fund the Arevalo Group and instead under-bidded it for $21.5 million. *Id.* ¶ 58. Cronig personally sent an email on July 11, 2013, to a third party with the purpose of preventing Arevalo from obtaining financing for his $22 million bid so that the Cronig Group could eliminate him as competition and acquire the Parcells at a lower

---

[5]   The Plaintiffs allege that Cronig acted at all relevant times as the owner, principal, agent, or alter ego of Watson Investigations, LLC. First Am. Compl. ¶ 23.

price. *Id.* ¶ 60. The Trustees, facing stifled competition and a hard deadline to prevent foreclosure, accepted the only available offer of $21.5 million for the Brickell Parcels, and a sale of the Parcels to Watson Investigations LLC, occurred on or about July 26, 2013. *Id.* ¶ 64. At the time of the sale, the Trustees were unaware of the extent of the alleged bid rigging and collusion between and among the Botero Group, the Arevalo Group, and the Cronig Group. *Id.* ¶ 65.

In a later lawsuit Arevalo filed against the Cronig Group, he admitted that the Brickell Parcels were a "lucrative investment opportunity" that were "extremely valuable" and commanded a "premium price" due to their location, and the price the Botero Group was going to pay was a "discounted rate." *Id.* ¶ 68. The Cronig Group attempted to sell the still-undeveloped Brickell Parcels in 2015 for $55-to-65 million per acre, showing that the $21.5 million sales price for the nearly-one-acre Brickell Parcells was significantly below market value. *Id.* ¶ 69. Some of the documents or agreements prior to the sale referred to a "buy out option" under which the Arevalo Group would have the option to pay $31.4 million for the Parcels free and clear of any other side deals. *Id.* ¶ 70. The Plaintiffs believe that this figure more closely represents the approximate true value of the Brickell Parcels at the time of the sale, had the Defendants not colluded to suppress bidding. *Id.*

The Plaintiffs brought the instant action by filing a Complaint on November 11, 2015. They amended that Complaint on January 25, 2016. In the First Amended Complaint, the Plaintiffs allege six counts against the Defendants: (1) violations of the Sherman Antitrust Act, 15 U.S.C. § 1 *et seq.*, and the Clayton Antitrust Act, 15 U.S.C. § 12 *et seq.*; (2) a violation of the Florida Deceptive and Unfair Trade Practices Act, Fla. Stat. § 501.204(1); (3) a claim for damages under 11 U.S.C. § 363(n);[6] (4) actual and constructive fraud; (5) civil conspiracy and civil aiding and abetting; and (6) interference with prospective economic advantage and business relationship. *See*

---

[6]   This claim is brought by Plaintiff JAWHBS only.

First Am. Compl. ¶¶ 72-135. The Defendants have moved to dismiss all claims against them.

## II.     LEGAL STANDARD

To survive a motion to dismiss brought pursuant to Federal Rule of Civil Procedure 12(b)(6), a claim "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face,'" meaning that it must contain "factual content that allows the court to draw the reasonable inference that the defendant is liable for the conduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). While a court must accept well-pleaded factual allegations as true, "conclusory allegations . . . are not entitled to an assumption of truth—legal conclusions must be supported by factual allegations." *Randall v. Scott*, 610 F.3d 701, 709-10 (11th Cir. 2010). "[T]he pleadings are construed broadly," *Levine v. World Fin. Network Nat'l Bank*, 437 F.3d 1118, 1120 (11th Cir. 2006), and the allegations in the complaint are viewed in the light most favorable to the plaintiff, *Bishop v. Ross Earle & Bonan, P.A.*, 817 F.3d 1268, 1270 (11th Cir. 2016). The question is not whether the claimant "will ultimately prevail . . . but whether his complaint [is] sufficient to cross the federal court's threshold." *Skinner v. Switzer*, 562 U.S. 521, 530 (2011).

## III.    DISCUSSION

The Court begins by addressing the Defendants' three broader procedural arguments through which they seek dismissal of all or substantially all of the Plaintiffs' claims—(1) lack of standing; (2) res judicata; and (3) preemption—before proceeding to the substantive arguments regarding the individual counts.

### A.     *Procedural Arguments*

#### 1.     **Standing**

"After a company files for bankruptcy, creditors," like SLS, "lack standing to assert claims that are 'property of the estate.'" *In re Emoral, Inc.*, 740 F.3d 875, 879 (3d Cir. 2014) (citation and

internal quotation marks omitted). Relatedly, a bankruptcy trustee can sell to a third party, like JAWHBS, only claims that are "property of the estate," 11 U.S.C. § 363(b)(1), so an assignee does not have standing to bring claims that a trustee is not authorized to sell.

a.      *"Property of the Estate"*

As a threshold matter integral to resolution of the standing question, the Court must first determine whether the Plaintiffs' claims can be characterized as "property of the estate." The "estate," as defined in the Bankruptcy Code, includes, *inter alia*, "all legal or equitable interests of the debtor in property as of the commencement of the case." 11 U.S.C. § 541(a)(1). "This includes causes of action, which are considered property of the bankruptcy estate 'if the claim existed at the commencement of the filing and the debtor could have asserted the claim on his own behalf under state law.'" *In re Emoral*, 740 F.3d at 879 (quoting *Bd. of Trustees of Teamsters Local 863 Pension Fund v. Foodtown, Inc.*, 296 F.3d 164, 169 n.5 (3d Cir. 2002)). Notably, this iteration of the standard discusses only causes of action that exist at the commencement of the filing. In the Court's estimation, it is a matter of first impression in this Circuit whether a cause of action arising post-petition can also be considered "property of the estate." The Court concludes that it does.

The definition of an "estate" in the Bankruptcy Code also includes "[a]ny interest in property that the estate acquires after the commencement of the case." 11 U.S.C. § 541(a)(7). In discussing causes of action as property, the Ninth Circuit Bankruptcy Appellate Panel has stated that "[c]auses of action owned by the trustee are intangible items of property of the estate that may be sold. These include causes of action owned by the debtor as of the filing of the case." *Simantob v. Claims Prosector, LLC* (*In re Lahijani*), 325 B.R. 282, 287 (B.A.P. 9th Cir. 2005). By singling out "causes of action owned by the debtor as of the filing of the case" as a discrete category under the broader umbrella of "[c]auses of action owned by the trustee," that court

necessarily contemplated that there are causes of action that are not owned by the debtor *at the time of the filing*. This means, of course, that there exist causes of action that can be acquired by the debtor *after* the petition is filed. These after-acquired claims, therefore, also become "property of the estate" under 11 U.S.C. § 541(a)(7).

At bottom, "'[e]very conceivable interest of the debtor, future, nonpossessory, contingent, speculative, and derivative, is within the reach of' the bankruptcy estate." *Ritchie Capital Mgmt., L.L.C. v. Gen. Elec. Capital Corp.*, 121 F. Supp. 3d 321, 333 (S.D.N.Y. 2015) (quoting *Chartschlaa v. Nationwide Mut. Ins. Co.*, 538 F.3d 116, 122 (2d Cir. 2008)), *aff'd*, 821 F.3d 349 (2d Cir. 2016). The Court finds this authority persuasive and sees no reason to find otherwise. Moreover, the Defendants have provided no authority in support of the contention that these claims arising post-petition *cannot* be considered "property of the estate." In fact, counsel for the Defendants admit that they "could find no reported case that discusses the transfer of causes of action that arise post-bankruptcy filing." Joint Reply at 5 n.3. The Court declines to exclude these claims based the Defendants' unsupported assertions. Accordingly, the Court concludes that the Plaintiffs' claims in this case are properly considered "property of the estate."

**b.** **As a Creditor, SLS Lacks Standing to Bring Its Claims**

The Defendants argue that SLS, as a mere creditor alleging harm as a result of the bid rigging, does not have standing to bring its claims. The Court agrees.

"A cause of action that is 'property of the estate' is properly pursued by the bankruptcy trustee because it inures to the benefit of all creditors." *In re Emoral, Inc.*, 740 F.3d at 879. "If a claim" against others who have misused the debtor's property in some fashion "is a general one, with no particularized injury arising from it, and if that claim could be brought by any creditor of the debtor, the trustee is the proper person to assert the claim, and the creditors are bound by the outcome of the trustee's action." *St. Paul Fire & Marine Ins. Co. v. PepsiCo., Inc.*, 884 F.2d 688,

701 (2d Cir. 1989). To determine whether a cause of action is a "general" claim, courts look to the "nature of the wrongs alleged" to see if the alleged injury is "primary," "particularized," "special," "direct," "personal," "distinct," or "individualized" to creditors. *In re Lehr Constr. Corp.*, No. 11-10723, 2015 WL 5174467, at *5 (Bankr. S.D.N.Y. Sept. 2, 2015) (citing *Marshall v. Picard* (*In re Madoff*), 848 F. Supp. 2d 469, 479 (S.D.N.Y. 2012), *aff'd sub nom. Marshall v. Picard* (*In re Bernard L. Madoff Inv. Sec. LLC*), 740 F.3d 81 (2d Cir. 2014)). "On the other hand, if the claim is specific to the creditor, it is a 'personal' one and is a legal or equitable interest only of the creditor. A claim for an injury is personal to the creditor if other creditors generally have no interest in that claim." *Foodtown*, 296 F.3d at 170 (citation omitted).

Each of SLS's claims in this litigation arise from the contention that the Defendants per-petuated a bid rigging scheme that depressed the value of the Brickell Parcels to an amount well below market value, perhaps in excess of $10 million. In the First Amended Complaint, SLS admits that it is "a major creditor of the bankruptcy estates," *i.e.*, not the only creditor, and that it "stood to financially benefit from the highest possible sales price for the Brickell Parcels." First Am. Compl. ¶ 39. It admits that the Trustees also "stood to financially benefit from the highest possible sales price for the Brickell Parcels." *Id.* ¶ 38. Considering these allegations, and the fact that SLS has advanced no allegations of a particularized, direct, personal, etc., injury arising from the Defendants' actions, the Court can find only that each of SLS' claims arising out of the alleged bid rigging scheme are generalized claims that could have been bought by any creditor of the original debtors, BBV and BDP. Because these are generalized claims, they are properly asserted only by the Trustee, and SLS, as a creditor, lacks standing to assert them.

The Plaintiffs argue that "other non-bankruptcy statutes provide [them] standing," such as the antitrust laws. Pl.'s Opp'n to Joint Mot. at 15. "The class of persons who may maintain a private damage action under the antitrust laws is broadly defined in § 4 of the Clayton Act."

*Associated Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters*, 459 U.S. 519, 529 (1983). That section provides that "any person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws may sue therefor in any in any district court of the United States." 15 U.S.C. § 15(a). The Plaintiffs "believe this is broad enough to confer standing on both a creditor and a representative of the trustee/estate under the unique facts of this case." Pl.'s Opp'n to Joint Mot. at 15-16. Unfortunately for SLS, however, that belief is ill-founded.

In *Associated General Contractors*, the Supreme Court recognized the broad wording of the Clayton Act's standing provision, but considered "whether Congress intended such an open-ended meaning" and answered that question in the negative before holding that the statute "is not as broad as its words suggest." 459 U.S. at 529-30. The Court noted favorably a decision from the Third Circuit, *Loeb v. Eastman Kodak Co.*, 183 F. 704 (3d Cir. 1910), stating that *Loeb* "held as a matter of law that neither a creditor nor a stockholder of a corporation that was injured by a violation of the antitrust laws could recover." *Associated General Contractors*, 459 U.S. at 533 (citing *Loeb*, 183 F. at 709). And the Court also observed that "the lower federal courts have been 'virtually unanimous in concluding that Congress did not intend the antitrust laws to provide a remedy in damages for all injuries that might conceivably be traced to an antitrust violation.'" *Id.* at 534 (quoting *Hawaii v. Standard Oil Co.*, 405 U.S. 251, 263 n.14 (1972)); *see also Blue Shield of Va., Inc. v. McCready*, 457 U.S. 465, 477 (1982) ("It is reasonable to assume that Congress did not intend to allow every person tangentially affected by an antitrust violation to maintain an action to recovery . . . for the injury to his business or property."). Relying in part on this discussion, the Second Circuit held in *Rand v. Anaconda-Ericsson, Inc.*, 794 F.2d 843 (2d Cir. 1986), that a plaintiff's claim under the Sherman Act failed for lack of standing. In *Rand*, like in *Loeb*, "a stockholder/creditor sued under the antitrust laws, alleging that his stock was rendered worthless

and that his claim against the company was only partially satisfied because defendants' alleged antitrust violation drove the company into bankruptcy." *Id.* at 849 (citing *Loeb*, 183 F. at 706-07). "The [*Loeb*] court held that only the bankruptcy trustee could assert the claims set forth in the complaint, and, therefore, that the plaintiff lacked standing." *Id.* Based on this, the Second Circuit found that the plaintiff's antitrust claim was without merit. *Id.*

*Rand* and *Loeb* are in keeping with the generalized claim–particularized claim framework elucidated above. Congress could not have intended the antitrust laws to allow a creditor to usurp the powers of a bankruptcy trustee. This conclusion applies to SLS's FDUPTA claim, as well, which authorizes a private cause of action for injunctive relief and damages to "a person who has suffered a loss as a result of a violation of" the statute. Fla. Stat. § 501.211(1)–(2). This Court will not allow SLS to invoke FDUPTA to circumvent a decision left to the Trustee. As each of SLS's claims is property of the estate, SLS lacks standing to assert them. Accordingly, the Joint Motion to Dismiss Counts I, II, IV, V, and VI is granted as to SLS.

### c. As the Assignee of the Claims from the Bankruptcy Trustees, JAWHBS Has Standing to Bring Its Claims

The Court turns now to whether JAWHBS has standing to assert its claims. The thrust of the Defendants' argument on this point is that JAWHBS does not have standing because the causes of action are not "property of the estate" and thus could not have been transferred from the Trustees to JAWHBS. But the Court has already found that the claims in this litigation ***are*** property of the estate, and so this argument is rejected. *See supra* subsection III.A.1.a.

The Defendants also argue that the Plaintiffs, at best, purchased only those rights and claims related to the original purchase offer of $19.5 million by Defendant Crystal Tower Partners II, LLC, and ***not*** any rights and claims related to the $21.5 million purchase by Watson Investigations, LLC, and, as a result, they have no standing to pursue those claims as stated in the First

Amended Complaint. In support of this proposition, the Defendants rely on an exhibit attached to the Joint Motion to Dismiss, a "Request to Take Judicial Notice of Proceedings in the U.S. Bankruptcy Court for the Southern District of Florida."

When a party moves to dismiss under Rule 12(b)(6), a court is ordinarily limited to the allegations of a plaintiff's complaint and the exhibits attached thereto. *Brooks v. Blue Cross & Blue Shield of Fla., Inc.*, 116 F.3d 1364, 1368 (11th Cir. 1997). However, a court may consider an extrinsic document in ruling on a motion to dismiss if the document is "(1) central to the plaintiff's claim, and (2) its authenticity is not challenged." *Speaker v. U.S. Dep't of Health & Human Servs.*, 623 F.3d 1371, 1379 (11th Cir. 2010) (citation and internal quotation marks omitted). "In particular, [a court] may 'take judicial notice of and consider documents which are public records, [and] that are attached to a motion to dismiss,'" because documents in the public record are "not subject to reasonable dispute [as] they [are] capable of accurate and ready determination by resort to sources whose accuracy [can]not reasonably be questioned." *Eisenberg v. City of Miami Beach*, 1 F. Supp. 3d 1327, 1337 (S.D. Fla. 2014) (quoting *Day v. Taylor*, 400 F.3d 1272, 1275-76 (11th Cir. 2005)) (other citations and internal quotation marks omitted). A court may also "take notice of another court's order . . . for the limited purpose of recognizing the 'judicial act' that the order represents or the subject matter of the litigation." *United States v. Jones*, 29 F.3d 1549, 1553 (11th Cir. 1994).

The documents referenced in the Request to Take Judicial Notice are all pleadings and other records that were filed in the prior bankruptcy court proceedings out of which JAWHBS's claims arose. They are public records not capable of reasonable dispute and they therefore are appropriate for judicial notice. *See, e.g.*, *Beepot v. J.P. Morgan Chase Nat'l Corp. Servs., Inc.*, 57 F. Supp. 3d 1358, 1366 (M.D. Fla. 2014) (citing *Horne v. Potter*, 392 F. App'x 800, 802 (11th Cir. 2010) (per curiam) ("The district court properly took judicial notice of the documents in [the

plaintiff]'s first case . . . .")). And because the bankruptcy court proceedings are central to JAWHBS's claims in this action, the Court may consider this evidence in ruling on the motion to dismiss. *Id.* (citing *Talley v. Columbus, Ga. Hous. Auth.*, 402 F. App'x 463, 465 n.4 (11th Cir. 2010 (per curiam) ("Although the district court was ruling on a motion to dismiss, the court properly examined extrinsic documents detailing [the plaintiff]'s previous state and federal court cases that related to the condemnation of his property: the cases were central to [the plaintiff]'s instant federal claim.")).

Specifically, the Defendants have brought to the Court's attention the Trustees' Joint Motion for Authority to Sell Certain Litigation Claims Pursuant to 11 U.S.C. § 363 (the "Litigation Sale Motion"), in which, the Defendants contend, Trustees stated that they "have opted to sell whatever rights and claims and all of each estate's right, title, and interest in any claims pursuant to 11 U.S.C. § 363(n) or otherwise relating to ***Crystal's offer*** to purchase the [Brickell] Parcels, as is, where is, without representations or warranties." Joint Mot. at 12 (quoting Litigation Sale Motion). However, although the Request to Take Judicial Notice references eighteen different documents, the Defendants have attached only two documents to their request—transcripts of hearings held on July 10 and July 16, 2013. The Litigation Sale Motion is not attached to the Defendants' Motion and thus it would be improper for the Court to consider it.

Because no document is properly before the Court to refute JAWHBS's allegation in the Complaint that "[t]he bankruptcy estates/trustees . . . have now assigned or transferred all rights or claims arising out of the sale or bidding to Plaintiff JAWHBS, LLC," the Court must accept that allegation as true. Accordingly, the Court concludes that JAWHBS has standing to bring these claims.

### 2.    Res Judicata

The Defendants argue that each of the causes of action alleged in the First Amended

Complaint is barred by res judicata because each improperly seeks to relitigate claims that were previously litigated in the bankruptcy sale of assets pursuant to 11 U.S.C. § 363.

The doctrine of res judicata (or claim preclusion) "prohibits successive litigation of the very same claim by the same parties." *Whole Woman's Health v. Hellerstedt*, 579 U.S. —, 2016 WL 3461560, at *11 (June 27, 2016) (citation and internal quotation marks omitted). This prohibition bars "the parties or their privies from relitigating issues that were or could have been raised" in an action that resulted in a final judgment on the merits. *Allen v. McCurry*, 449 U.S. 90, 94 (1980). In the Eleventh Circuit, a party seeking to invoke this doctrine must establish four initial elements: "(1) the prior decision must have been rendered by a court of competent jurisdiction; (2) there must have been a final judgment on the merits; (3) both cases must involve the same parties or their privies; and (4) both cases must involve the same causes of action." *Kaiser Aerospace & Elecs. Corp. v. Teledyne Indus., Inc.* (*In re Piper Aircraft Corp.*), 244 F.3d 1289, 1296 (11th Cir. 2001). If the party raising res judicata satisfies these elements, the court next determines whether the claim in the new suit was or could have been raised in the prior action; if yes, res judicata applies. *Id.* But "[i]f even one of the[] [required] elements is missing, res judicata is inapplicable." *Id.*

The Defendants have clearly satisfied the first two elements. First, the sale order was rendered by the U.S. Bankruptcy Court for the Southern District of Florida in the course of Bankruptcy Judge Isicoff's presiding over the bankruptcy petitions, so it was rendered by a court of competent jurisdiction. Second, bankruptcy court sale orders "are final judgments on the merits for res judicata purposes, even though the order neither closes the bankruptcy case nor disposes of any claim." *Providence Hall Assocs. Ltd. P'ship v. Wells Fargo Bank, N.A.*, 816 F.3d 273, 278 (4th Cir. 2016) (quoting *Bank of Lafayette v. Baudoin* (*In re Baudoin*), 981 F.2d 736, 742 (5th Cir. 1993)); *see also Winget v. JP Morgan Chase Bank, N.A.*, 537 F.3d 565 (6th Cir. 2008); *Gekas v. Pipin* (*In re Met-L-Wood Corp.*), 861 F.2d 1012 (7th Cir. 1988).

15

However, the Defendants have not met their burden as to the third and fourth elements. As to the third element, while the Defendants do state that SLS was a party to the bankruptcy cases as a "major creditor" and that JAWHBS is in privity with the Trustees as the assignee of their claims, they fail to establish that all of the Defendants in this action or their privies were parties to the bankruptcy cases. Indeed, in the entirety of their briefing on the res judicata issue, they never mention a single Defendant by name.

And as to the fourth element, the Defendants have failed to establish that both cases involve the same causes of action. They argue that the claims JAWHBS brings here "could have been brought" in the bankruptcy court during the sale proceedings. *See* Joint Mot. at 6. The Eleventh Circuit has made clear that "for res judicata purposes, claims that 'could have been brought' are claims ***in existence at the time the original* [*pleading*] *is filed*** or claims actually asserted . . . in the earlier action." *In re Piper Aircraft*, 244 F.3d at 1298 (emphasis in original) (quoting *Manning v. City of Auburn*, 953 F.2d 1355, 1360 (11th Cir. 1992)); *see also Sophocleus v. Ala. Dep't of Transp.*, 371 F. App'x 996, 998 n.3 (11th Cir. 2010) (per curiam). There is no dispute that the claims at issue here were not actually asserted in the bankruptcy proceedings. And according to the First Amended Complaint, BBV and BDP filed for bankruptcy in "early 2013," but the alleged activities that give rise to the causes of action in this litigation did not begin until at least June 2013. First Am. Compl. ¶¶ 35, 41. So JAWHBS's claims were not in existence at the time the bankruptcy petition was filed because the petition predates the alleged unlawful activities by several months.

Thus, because the Defendants have failed to establish both the third and fourth elements, res judicata does not apply to bar JAWHBS's claims.

### 3.    Preemption

The Defendants next argue that the Plaintiffs' state law claims (Counts II, IV, V, and VI)

should be dismissed as preempted by 11 U.S.C. § 363(n). Generally, the existence of an affirmative

defense, such as preemption, will not support a motion to dismiss. *Quiller v. Barclays Am./Credit,*

*Inc.*, 727 F.2d 1067, 1069 (11th Cir. 1984), *aff'd*, 764 F.2d 1400 (11th Cir. 1985) (en banc). But

an exception allows dismissal under Rule 12(b)(6) when the affirmative defense "clearly appears

on the face of the complaint": if the "complaint itself demonstrates" that the claims are preempted,

then dismissal is proper. *Id.*; *see also Stansfield v. Minute Maid Co.*, 124 F. Supp. 3d 1226, 1230

(N.D. Fla. 2015), *appeal filed*, No. 15-14114 (11th Cir. Sept. 14, 2015).

    The Supremacy Clause of the U.S. Constitution provides that the Constitution and the laws

of the United States "shall be the supreme Law of the Land." U.S. Const. art. VI, cl. 2. "Under this

principle, Congress has the power to preempt state law." *Arizona v. United States*, 132 S. Ct. 2492,

2500 (2012). The clearest way through which Congress "may withdraw specified powers from the

States [is] by enacting a statute containing an express preemption provision." *Id.* at 2500-01. That

is not the case here, and no party alleges that it is. Beyond this express preemption, state law must

also give way to federal law in at least two other circumstances. The first circumstance, which is

not applicable here, is where state laws conflict with federal law, including cases where "compli-

ance with both federal and state regulations is a physical impossibility," *Fla. Lime & Avocado*

*Growers, Inc. v. Paul*, 373 U.S. 132, 142-43 (1963), and those instances where the challenged state

law "stands as an obstacle to the accomplishment and execution of the full purposes and objectives

of Congress," *Hines v. Davidowitz*, 312 U.S. 52, 67 (1941).

    The second circumstance, which *is* applicable here, is where "the States are precluded from

regulating in a field that Congress, acting within its proper authority, has determined must be regu-

lated by its exclusive governance." *Arizona*, 132 S. Ct. at 2501. Under this type of preemption,

known as "field preemption," the Supreme Court has "instructed [courts] that [they] may infer

congressional intent to displace state law altogether 'from a framework of regulation so pervasive

that Congress left no room for the states to supplement it or where there is a federal interest so dominant that the federal system will be assumed to preclude enforcement of state laws on the same subject." *Odebrecht Constr., Inc. v. Sec'y, Fla. Dep't of Transp.*, 715 F.3d 1268, 1274 (11th Cir. 2013).

The Defendants argue that the Plaintiffs' state law claims should be preempted because "the vast majority of federal and state courts have concluded that Congress intended to preempt state law claims based on actions taken by parties in bankruptcy courts." Joint Mot. at 19. It is accurate that "a mere browse through the complex, detailed, and comprehensive provisions of the lengthy Bankruptcy Code, 11 U.S.C. § 101 *et seq.*, demonstrates Congress's intent to create a whole system under federal control," but that system "is designed to bring together and adjust all of the rights and duties of **creditors and embarrassed debtors alike**." *MSR Exploration, Ltd. v. Meridian Oil, Inc.*, 74 F.3d 910, 914 (9th Cir. 1996) (emphasis added). It is also accurate that many courts have found many types of state law claims preempted by the Bankruptcy Code under various circumstances. But the Defendants have failed to address the unique circumstances here, wherein a creditor and the debtor (through its successors-in-interest) are together suing third parties over actions they took during the course of the bankruptcy proceedings. They also have failed to address what impact (if any) these circumstances may have on any preemption analysis, instead choosing to offer blanket assertions that the Bankruptcy Code should preempt all of the Plaintiffs' claims.

The First Amended Complaint does not itself demonstrate that the Plaintiffs' claims are preempted, and the Defendants have failed to meet their burden to establish, on this motion to dismiss, that the claims are preempted. *Cf. Smith v. Duff & Phelps, Inc.*, 5 F.3d 488, 492 n.9 (11th Cir. 1993) (explaining that a defendant bears the burden of proof on the issue of when a plaintiff's cause of action accrued because the statute of limitations is an affirmative defense). Accordingly,

the motion to dismiss on this ground is denied.

**B.     *Substantive Arguments***

Upon review of the First Amended Complaint, the Court finds that it need not actually reach the Defendants' arguments as to the individual causes of action themselves because, as the Defendants have correctly asserted, the First Amended Complaint is a "shotgun pleading" that violates Rule 8(a)(2).

A shotgun pleading "contains several counts, each one incorporating by reference the allegations of its predecessors, leading to a situation where most of the counts . . . contain irrelevant factual allegations and legal conclusions." *Strategic Income Fund, LLC v. Spear, Leeds & Kellogg Corp.*, 305 F.3d 1293, 1295 (11th Cir. 2002). Here, the First Amended Complaint clearly impermissibly "incorporates every allegation by reference into each subsequent claim for relief." *Perret v. Wyndham Vacation Resorts, Inc.*, 946 F. Supp. 2d 1327, 1334 (S.D. Fla. 2012). Just by way of example, Count VI of the First Amended Complaint incorporates the preceding one hundred twenty-six paragraphs, which span twenty-one pages. Many allegations in those one hundred twenty-six paragraphs "could not possibly be material to [this count]. Consequently, [the defendants] and the district court [must] sift through the facts presented and decide for themselves which [are] material to the particular cause of action asserted, a difficult and laborious task indeed." *Pelletier v. Zweifel*, 921 F.2d 1465, 1518 (11th Cir. 1991). The Court concludes that the First Amended Complaint therefore violates Rule 8(a)(2). *See Pilver v. Hillsborough County*, No. 15-2327, 2015 WL 3427108, at *2-3 (M.D. Fla. June 22, 2016); *see also Cramer v. Florida*, 117 F.3d 1258, 1263 (11th Cir. 1997) (describing shotgun pleadings as "altogether unacceptable"). Accordingly, the Defendants' motion to dismiss is granted on this ground, but the Court shall grant JAWHBS leave to amend to correct this deficiency.

*     *     *

19

Moreover, the Court has preliminarily reviewed the **Second** Amended Complaint and finds that it, too, suffers from the same shotgun-pleading deficiency as the First Amended Complaint. Thus, the Court will dismiss that complaint, as well, and will provide JAWHBS leave to file a **Third** Amended Complaint that will hopefully correct the errors addressed in this Order.

As a final note, the Court found, in considering the arguments vis-à-vis each individual claim, that the Defendants raised several strong points that could potentially give rise to a dismissal of one or more of the causes of action under Rule 12(b)(6) for failure to plead sufficient factual allegations. JAWHBS would do well to consider these points in drafting any amendment.

## IV.  CONCLUSION

Based on the foregoing, it is **ORDERED AND ADJUDGED** as follows:

(1)    the Defendants' Joint Motion to Dismiss the First Amended Complaint [ECF No. 92] is **GRANTED** as to Plaintiff SLS Properties Three, LLC. The First Amended Complaint [ECF No. 63] is **DISMISSED WITH PREJUDICE** in its entirety as to Plaintiff SLS Properties Three, LLC;

(2)    the Defendants' Joint Motion to Dismiss is **GRANTED IN PART** and **DENIED IN PART** as to Plaintiff JAWHBS, LLC. The First Amended Complaint is **DISMISSED WITHOUT PREJUDICE** in its entirety as to Plaintiff JAWHBS, LLC;

(3)    the Plaintiffs' Second Amended Complaint [ECF No. 133] is **DISMISSED WITH PREJUDICE** as to Plaintiff SLS Properties Three, LLC, and **DISMISSED WITH-OUT PREJUDICE** as to Plaintiff JAWHBS, LLC;

(4)    Plaintiff JAWHBS, LLC, is granted leave to file a Third Amended Complaint, which shall be filed no later than **August 25, 2016**. The Defendants shall answer or otherwise respond to the Third Amended Complaint within **twenty days** of the date it is filed by Plaintiff JAWHBS; and

(5)     Defendants Shutts & Bowen, LLP, and Kevin D. Cowan's Motion to Dismiss the

First Amended Complaint [ECF No. 97] and Defendant Jorge Arevalo's Motion to

Dismiss the First Amended Complaint [ECF No. 118] are **DENIED AS MOOT**.

**DONE AND ORDERED** in Chambers at Miami, Florida, this 4th day of August, 2016.

_____
DARRIN P. GAYLES
UNITED STATES DISTRICT JUDGE