**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
MIAMI DIVISION

**Case No.:   15-24176-CV-GAYLES**

JAWHBS LLC, a Florida limited liability
company,

      Plaintiff,

vs.

JORGE E. AREVALO, an individual;
JA ENERGY RESOURCES, LLC, a Florida
limited liability company; SHUTTS &
BOWEN, LLP, a Florida limited liability
partnership; KEVIN D. COWAN, an
individual; OMAR BOTERO aka OMAR
BOTERO-PARAMO, an individual;
ALIANZA FINANCIAL SERVICES, LLC, a
Florida limited liability company; ALIANZA
HOLDINGS, LLC, a Florida limited liability
partnership; ALBERT F. DELANEY, aka AL
DELANEY, an individual; CRYSTAL
TOWER PARTNERS II, LLC, a Florida
limited liability company; CRYSTAL TOWER
ON BRICKELL PLAZA, LLC, a Florida
limited liability company; WATSON
BRICKELL DEVELOPMENT, LLC f/k/a
WATSON INVESTIGATIONS, LLC, a
Florida limited liability company; STEVEN
CARLYLE CRONIG, an individual; and
FRANCIS H. "FRAN" SCOLA, III, an
individual;

      Defendants.

**PLAINTIFF JAWHBS, LLC'S OPPOSITION TO MOTION IN LIMINE REGARDING
PLAINTIFF'S EXPERT PETER ZALEWSKI (ECF # 320)**

1

**PLAINTIFF JAWHBS, LLC'S OPPOSITION TO MOTION IN LIMINE REGARDING
PLAINTIFF'S EXPERT PETER ZALEWSKI (ECF # 320)**

## I.      INTRODUCTION

In this Motion, Defendants request that the Court exclude Plaintiff's real estate broker expert, Peter Zalewski.  The Parties disagree as to the proper measure of antitrust damages in this case and whether the definition of "value" in 11 USC § 363(n) is interpreted to mean "fair market value."  The Defense otherwise raises some strained issues as to whether the expert witness is qualified to give his opinions under the Daubert and FRE 702 standards for expert opinions.

## II.      FACTUAL AND PROCEDURAL HISTORY

In this litigation, Plaintiff JAWHBS has been assigned the claims of certain bankruptcy trustees to pursue antitrust, bid rigging and collusion claims against certain developers and their legal counsel who are alleged to have colluded to artificially lower the price of certain parcels of land sold by the bankruptcy court.  A lengthy recitation of facts is not necessary to adjudicate this current motion in limine, but Plaintiff's statement of facts with citations to evidentiary support can be found in its Motion for Partial Summary Judgment (ECF # 305).

Because Plaintiff has viewed this matter as a mostly damages case, Plaintiff retained several experts with different backgrounds to opine as to the value of the property.  This included a real estate broker, Peter Zalewski, a real estate condominium developer, Howard Shapiro, and a real estate appraiser, David Randell (the latter two whose opinions are at issue in a separate Motion in Limine ECF # 317).  These experts will testify that the parcels were worth many millions more than the $21,500,000 sale price and will support Plaintiff's position that the parcels were sold at an artificially depressed sale price by approximately $10,000,000.

During discovery the Defendants were forced to disclose their own documents that indicated they had independently valued the parcels at figures between $29,000,000 and $33,000,000 with one of Botero's valuations of $31,000,000, by coincidence independently *exactly* matching the $31,000,000 valuation opinion of Plaintiff's developer expert Howard Shapiro.

The Defendants then appear to have had difficulty finding *any* valuation expert of their own who would disagree with all three of Plaintiff's experts and two of the Defendants' own independent valuations.  The Defendants moved for extensions to disclose experts twice (ECF # 153 and 203) but were denied the second time.  Some of the Defendants then jointly disclosed the identity of a defense rebuttal expert on valuation, appraiser M. Ronald Lipman, but failed to ever provide any written report of his opinions.  Instead, they simply disclosed his name and wrote that "Due to the limited amount of time since the filing of the Third Amended Complaint, a written report has not been generated by Mr. Lipman."[1]  Months passed and the Defendants never even attempted the untimely supplement of a report.  This defense expert, having never provided a written report, will clearly be excluded at trial.  Thus, the defense appears to have abandoned the concept of rebuttal experts, which presumably they could not retain, to instead focus on trying to get the damaging Plaintiff's experts against them excluded through technical <u>Daubert</u> arguments.

## III.    <u>THE RECOVERABLE DAMAGES ARE TIED TO *FAIR MARKET VALUE*</u>

### A.  *The Statute Involved Provides that Fair Market Value is the Correct Measure of Damages*

Although on the surface the defense Motion in Limine pertains to the exclusion of experts, the larger and more important issue will require the Court to determine the proper antitrust measure of damages and interpret the word "value" as used in 11 USC § 363(n) and determine whether

---

[1] Exhibit 1 Defendants Cronig, Scola & Watson Inv. Joint Rebuttal Expert Witness List and Disclosure.

"value" means *fair market value*.  Plaintiff maintains that it plainly does and thus opinions as to fair market value are appropriate in this case.  The Defendants *assume* that "value" means some other method of value, such as liquidation value, theoretical auction value or collusion sale value, urge the Court to adopt that approach, and therefore exclude any evidence as to fair market value.

Plaintiff's two primary causes of action are for Sherman Act antitrust violations (bid rigging) and the bankruptcy code's anti-collusion statute, 11 USC § 363(n).  11 USC § 363(n) states that damages for violation of that section are "any amount by which the **value** of the property sold exceeds the price at which such sale was consummated."  The use of this term "value" in the statute is what the Court must interpret.

By way of history, 11 USC § 363(n) was enacted in the sweeping changes to bankruptcy code enacted in 1978.  These changes allowed private sales in addition to public auctions during bankruptcy for the first time and Congress intended to enact a harsh deterrent to those who might try to fix or collude bankruptcy court sales or auctions.  As a remedial, anti-collusion statute, 11 USC § 363(n)  must be broadly interpreted in favor of the Plaintiff to fulfill its purpose of deterring collusion and providing a remedy against collusion.  Gonzales v. Garner Food Servs., 89 F.3d 1523, 1532 (11th Cir. 1996) ("The law is well established that remedial statutes are to be construed liberally so as to promote the remedial purposes of the statute.").

11 USC § 363(n) does not itself expressly define "value."  However, the bankruptcy code in other places does, in fact, indicate that "value" is interpreted to mean "fair market value."  For example, 11 USC § 522(a)(2) discussing exemptions expressly defines "value" as "fair market value."  Valuations of items such as electronic equipment, antiques, jewelry, etc. are all valued by "fair market value" not any theoretical bankruptcy or liquidation value.  See 11 USC § 522(f)(4)(B) ("'value' means fair market value…").  If a debtor redeems property under 11 USC § 722, the

debtor must redeem for "fair market value" not a bankruptcy or liquidation value.[2]  There are literally hundreds of bankruptcy law cases which use the phrase "value means fair market value" usually in the context of 11 USC § 522 (value for exemption purposes).  Plaintiff has not found a single section of the bankruptcy code which adopts a theoretical bankruptcy value as the measure to determine value, as the defense argues.

The Eighth Circuit is the only other circuit that has addressed "value" as specifically used in 11 USC § 363(n).  In describing the disposition of the case below, the Eighth Circuit noted that "[t]he trustee sought a determination of the **fair market value** of the property, compensatory damages of at least $ 350,000 and punitive damages of $ 1,000,000" in their 11 USC § 363(n) action.  Ramsay v. Vogel, 970 F.2d 471, 473 (8th Cir. 1992).  In doing so, the Eighth Circuit seems to have acknowledged that the term "value" in the statute is synonymous with "fair market value."  Another of the limited body of case law interpreting 11 USC § 363(n) finds that the question of damages is "whether that agreement resulted in a price which was less than the **fair market value** of the subject property."  In re : Am. Paper Mills of Vt., Inc., 322 B.R. 84, 94 (Bankr. D. Vt. 2004).  Plaintiff has found no case decided under 11 USC § 363(n) that has adopted the defense view that there is some automatic discount due to the fact that the property to be sold is in bankruptcy (a condition that every sale under 11 USC 363(n) will have), or sold quickly, etc.

### B.  Where Used in a Statute, "Value" Means Fair Market Value

Looking outside of 11 USC § 363(n), we find that in virtually every instance when the term "value" is used in a statute, it has been interpreted to mean **fair market value**.  United States v. Cartwright, 411 U.S. 546, 36 L. Ed. 2d 528, 93 S. Ct. 1713 (1973) (recognizing that "value," for purposes of the federal estate tax, means "fair market value" by regulation).  In case after case on

---

[2] See Legislative statements from Senate Report No. 95-989 and House Report No. 95-595 "the debtor will be required to pay the fair market value of the goods or the amount of the claim if the claim is less."

federal or state law, we find that courts consistently interpret the word "value" used alone in a statute to mean "fair market value."  This includes cases in the bankruptcy context:[3] E.g. Official Comm. of Unsecured Creditors of Tousa, Inc. v. Citicorp N. Am., Inc. (In re Tousa, Inc.), 422 B.R. 783, 858 (Bankr. S.D. Fla. 2009) ("Fair valuation for our purposes here is indistinguishable from fair market value."); In re Duque Rodriguez, 75 B.R. 829, 831 (Bankr. S.D. Fla. 1987) ("Fair valuation" for our purposes here is indistinguishable from "fair market value."); In re Creekside Senior Apts., 2012 Bankr. LEXIS 4237, *17-18 (Bankr. E.D. Ky. Sept. 12, 2012) (interpreting 11 USC 506(a)(1) "'value' means fair market value without any reduction for the cost of sale…"). This includes federal and state cases in the context of other areas of law as well.  E.g., James B. Lansing Sound, Inc. v. National Union Fire Ins. Co., 801 F.2d 1560, 1565 (9th Cir. Cal. 1986) (insurance context, "We agree that 'actual cash value' means fair market value."); Estate of Gloeckner v. Commissioner, 152 F.3d 208, 212 (2d Cir. 1998) (income tax context "'Value' means fair market value"); Wunderlich v. County of Santa Cruz, 178 Cal. App. 4th 680, 688 (Cal. App. 6th Dist. 2009) ("The starting point for assessing property is its full value. 'Full value' means fair market value…"); In re Estate of Seefeldt, 2006 SD 74, P21 (S.D. 2006) (estate context, "we hold that the Testator intended the terms "value" and "appraised value" to mean fair market value"). This includes Florida cases interpreting "value" for purposes of criminal law statutes also.  E.g., Bloodsaw v. State, 994 So. 2d 378, 379 (Fla. Dist. Ct. App. 3d Dist. 2008) (interpreting state criminal statute "the general rule under the theft statute is that value means fair market value at the time of the theft."); Smith v. State, 955 So. 2d 1227, 1228 (Fla. 5th DCA 2007); ("Value may be established by direct testimony of fair market value…").

---

[3] Literally over 2,000 cases can be located through a Lexis or Westlaw search for the phrase "value means fair market value."

Under antitrust cases, the difference between the price paid and fair market value of the property sold has been *repeatedly* held to be the correct measure of damages in the Eleventh Circuit and others.  Graphic Prods. Distribs. v. Itek Corp., 717 F.2d 1560, 1580 (11th Cir. 1983) (in Sherman Act antitrust case "Proof of the diminution in the going concern value of a business is ascertainable by comparing the **fair market value** of the business before and after the antitrust violation."); Fishman v. Estate of Wirtz, 807 F.2d 520, 548 (7th Cir. Ill. 1986) (discussing fair market value as the measure of damages in sports franchise Sherman Act antitrust case).

### C.  *Bfp v. Resolution Trust Corp. Plainly does not Apply to this Case*

The Defense argues against the otherwise common sense interpretation that "value" and the measure of damages in this case are determined by "fair market value."  The Defense place their emphasis on language in Bfp v. Resolution Trust Corp., 511 U.S. 531 (U.S. 1994), a case which might seem good for the defense when selectively quoted, but fails to hold muster on further examination and is easily distinguishable on its facts.  In Bfp v. Resolution Trust Corp., 511 U.S. 531 (1994), a 5-4 decision authored by the late Justice Scalia, the US Supreme Court was asked to decide whether, for fraudulent transfer purposes in the context of a state law foreclosure sale, the unique phrase "reasonably equivalent value" in the bankruptcy code meant fair market value. Resolution Trust held that it did not and that in a noncollusive foreclosure sale, the sale value was the "reasonably equivalent value" of the property.  This decision, however, has absolutely no bearing on the case at hand.  Resolution Trust (1) did not interpret 11 USC § 363(n), (2) did not comment on the proper measure of damages under 11 USC § 363(n), (3) interpreted the phrase "reasonably equivalent value" under 11 USC § 548(a)(2) not "value" under 11 USC § 363(n), (4) concerned a state law foreclosure sale, which is not the facts of this case (this was not a forced foreclosure sale) and (5) on several different occasions during the opinion stated that its holding

was limited to "noncollusive" real estate sales, whereas this case alleges obvious collusion.[4]  The underline Resolution Trust decision even recognized that in many situations "reasonably equivalent value" actually did mean "fair market value" but did not necessarily mean so in a forced state law foreclosure sale that was not tainted by collusion.  Since the latter two factors are utterly different from the facts in this case, Resolution Trust plainly does not apply.

In addition to Resolution Trust not applying by its plain terms, the interpretation of "value" that the Defendants argue makes no logical sense.  If "value" were always whatever price the property fetched at a collusive sale, then surely 11 USC § 363(n) is irrelevant and the statute can never be used because damages under that section would never be found under such an interpretation.  Of course, statutes must be interpreted instead to give them meaning.  Allen v. USAA Cas. Ins. Co., 790 F.3d 1274, 1276 (11th Cir. 2015) ("Statutory interpretations that render statutory provisions superfluous are, and should be, disfavored.").

### D.  The Defense Position on Damages Simply Invites the Jury to Speculate that Fair Market Value would not have been Attained even in a non-collusive Sale

The defense argument is that fair market value should not be used in this case because the defense *assumes* or *speculates* that even if the collusion had not occurred that a sale at fair market value would not have been attained.  The defense argument collapses into a speculative argument that bankruptcy estates never sell property for their fair market value, that collusion is factored into the value of property at bankruptcy sales or that bankruptcy sales should be a sitting target ready to be forced to accept whatever they receive, collusion or not.  These defense arguments are incorrect for several reasons.

---

[4] Another District Court has simply explained the Resolution Trust case by stating that "The Court [in Resolution Trust] noted that in many situations "reasonably equivalent value" means "fair market value," so a court can evaluate whether a debtor received "reasonably equivalent value" by comparing the fair market value of the property lost to the amount that the debtor received from the transfer. Id. at 545. But the Court rejected fair market value as the benchmark for mortgage foreclosures."  Smith v. SIPI, LLC, 526 B.R. 737, 742 (N.D. Ill. 2014).

First, the Eleventh Circuit has specifically held that an antitrust plaintiff may point to "what a hypothetical willing buyer would pay a hypothetical willing seller on the open market" to establish antitrust damages.  Graphic Prods. Distribs. v. Itek Corp., 717 F.2d 1560, 1580 fn. 37 (11th Cir. 1983) (analysis of fair market value determination of business value in Sherman Act antitrust case).  This harkens back to the general rule that, having colluded to affect the sale price, an antitrust defendant should not be rewarded or immunized from suit by arguing that damages (i.e., what the property would have sold for absent collusion) are too speculative.  Malcolm v. Marathon Oil Co., 642 F.2d 845, 864 (5th Cir.) ("the defendant should bear the burden of that uncertainty [in antitrust damages] because his unlawful actions created it.").

Second, the purported reasons the defense argue that fair market value would not have been attained were specifically asked of the Trustee as deposition and he refuted them.  At deposition, the Trustee *directly contradicted* the defense argument that this was a "fire sale" at any price, an argument that the defendants use to attempt to explain a non-collusive reason for how they were able to acquire the parcels at $10,000,000 less than their value:

> Q.  Well, it certainly wasn't your intent as the trustee to just sell these [parcels] for whatever you could get in a fire sale, was it?
> A.  No.[5]

The Trustee stated that there was no adverse condition known to him about the parcels themselves that would diminish their value, for example no irregular zoning restrictions, historical designations or environmental issues.[6]  The Trustee also repeatedly stated that his intent was to *receive higher and better offers* and *conduct an auction* if possible,[7] going so far as to literally write in the Notice of Sale Hearing[8] that "in the event that the Trustees receive alternative bids, an

---

[5] Exhibit 2 Drew Dillworth deposition at page 110.
[6] Exhibit 2 Drew Dillworth deposition at page 69.
[7] Exhibit 2 Drew Dillworth deposition at pages 38, 52, 64, 123-125.
[8] Exhibit 3 Notice of Sale Hearing at ¶ 3.

auction may occur after the hearing or at some other time as determined by the court." The Trustee also testified that his intent to obtain the "highest and best value" was the same as "fair market value:"

> Q.  Okay.  So you used the phrase "highest and best value," but you think of that as being synonymous with fair market value?
>
> A.  Seems the same, but to me the highest and best for a bankruptcy trustee or bankruptcy practitioner is the standard…

The Trustee testified that all bankruptcy sales are all-cash sales, and when asked does the mere fact by itself that this was an all-cash sale effect the value of the property in his opinion he testified "no."[9]  Moreover, the Trustee testified that closings in "15 days max. sometime…quicker" were typical, meaning that the short closing time for this sale was not a factor.[10]

Specifically on the fair market value as the measure of damages issue, the Trustee acknowledged during deposition that his counsel had taken the position that damages were fixed at the difference between the price paid and the $31,400,000 valuation in Arevalo's draft agreement (what Plaintiff alleges is the fair market value).[11]  The Trustee testified that he had sold property during bankruptcy proceedings *hundreds* of times[12] and that "nearly every sale" he had done in a bankruptcy context had sold for what he considered "highest and best" value.[13]  The Trustee testified that bankruptcy sales had on some occasions actually *exceeded* his pre-sale expectation and when asked point blank whether the "mere fact that a piece of property is being sold as part of a bankruptcy proceeding" alone affects the property's value he responded "it shouldn't."[14]  Therefore, the defense's characterization that this was some sort of fire sale where

---

[9] Exhibit 2 Drew Dillworth deposition at page 117.
[10] Exhibit 2 Drew Dillworth deposition at pages 118.
[11] Exhibit 2 Drew Dillworth deposition at pages 154-158.
[12] Exhibit 2 Drew Dillworth deposition at page 113.
[13] Exhibit 2 Drew Dillworth deposition at page 115.
[14] Exhibit 2 Drew Dillworth deposition at pages 116-117.

the parcels were guaranteed to sell at a steep discount merely because they were in bankruptcy is simply speculation and not in conformity with the testimony on this issue.

On this last point, the Florida Supreme Court[15] has also decided that **fair market value** is the starting point for damages or losses related to real estate and it is the burden of the party claiming a stigma or other factor *reducing* the value that has the burden of presenting expert testimony to that effect.  In <u>Finkelstein v. Dep't of Transp.</u>, 656 So. 2d 921 (Fla. 1995) the Florida Supreme Court addressed the value of real estate for eminent domain purposes and a counterargument that environmental contamination affected the fair market value.  The State had argued, without any expert support, that stigma from environmental contamination would reduce the fair market value of the property involved.  However, the State failed to present expert testimony from a real estate broker or appraiser on the issue.  Thus, these arguments of diminution of value were excluded.  The Florida Supreme Court plainly held that "[f]or a real property expert's opinion *of a reduction of market value* to be admissible it *must have a basis in facts and data reasonably relied upon by experts in the field of real property valuation*."  <u>Id.</u>, 656 So. 2d at 925 (emphasis added).  The court continued to explain that "[a]n opinion as to a decrease in value *cannot be a mere surmise* that because property [has a certain condition], it logically follows that the value of the property is decreased. There must be a factual basis through evidence…upon which to base a determination that contamination has decreased the value of the property. If there is no evidence in the record upon which the fact finder can determine that the value of the property has been decreased, then the petitioner would be entitled to the **fair market value** of the property valued as uncontaminated."  Yet, the Defendants ask this Court to do just the opposite of what this case dictates, in other words surmise based on no admissible evidence that even had the collusion

---

[15] The Florida Supreme Court's decision is not binding as to Plaintiff's federal causes of action.  However, it should be considered persuasive and would be binding as to the pendent state law tort claims.

not occurred that fair market value would not have been attained.  If the Defendants wanted to present evidence on reduction of fair market value, contrary to the Trustee's testimony, then they should have retained an expert.  Instead, they wish to argue this despite no adverse condition to the parcels themselves, and the fact that three groups (Botero, Arevalo and Watson Brickell Devel.) were apparently all willing to buy under the Trustee's terms.  The Court should not allow this.

### E.  A Relaxed Standard of Proof is Required in Antitrust Cases

Also relevant to the Court's determination of the proper measure of damages is that, as well-explained by Consol. Gas Co. v. City Gas Co., 665 F. Supp. 1493, 1542-1543 (S.D. Fla. 1987), an antitrust Plaintiff is held to a more relaxed standard in proving damages than a typical civil plaintiff.  The US Supreme Court has acknowledged the uncertainty necessarily involved in proving damages in antitrust cases: "The vagaries of the marketplace usually deny us sure knowledge of what plaintiff's situation would have been in the absence of the defendant's antitrust violation." J. Truett Payne Co. v. Chrysler Motors Corp., 451 U.S. 557, 566, 68 L. Ed. 2d 442, 101 S. Ct. 1923 (1981).  An antitrust wrongdoer cannot defeat recovery by insisting on rigorous proof of damages.  See Zenith Radio Corp. v. Hazeltine Research, Inc., 395 U.S. 100, 123, 23 L. Ed. 2d 129, 89 S. Ct. 1562 (1969).  The amount of damages can be determined by the trier of fact based on "a just and reasonable estimate…based on relevant data." Bigelow v. RKO Radio Pictures, Inc., 327 U.S. 251, 264, 90 L. Ed. 652, 66 S. Ct. 574 (1946).  In a binding Fifth Circuit case, the Fifth Circuit discussed the fact that an antitrust defendant, having caused injury, cannot then be heard to complain that the plaintiff's damages are too speculative.  In that case, the Fifth Circuit held that "[t]his relaxed standard [of damages in an antitrust case] is based on a recognition of the difficulty in reconstructing events that might have happened but for the defendant's unlawful conduct.  It is appropriate that if there is uncertainty, the defendant should bear the burden of that

uncertainty because his unlawful actions created it." <u>Malcolm v. Marathon Oil Co.</u>, 642 F.2d 845, 864 (5th Cir.).  The Eleventh Circuit has adopted the rule set forth in the <u>Malcolm</u> case. <u>See Graphic Products Distributors, Inc. v. Itek Corp.</u>, 717 F.2d 1560, 1578-79, 1580 n.38 (11th Cir. 1983) ("Once an antitrust violation and its causal relation to plaintiff's injury have been established, the burden of proving the amount of damages is much less severe.").

In closing to this section, 11 USC § 363(n) was drafted by Congress to set the amount of damages available under that statute using fair market value.  Antitrust damages are also routinely calculated using fair market value.  Congress chose to specify the statutory measure of damages was the difference between the price paid and the fair market value as a deterrent against collusion and to eliminate the exact speculation arguments that the Defendants present here as to value.  This assures that the colluding party will not be able to argue that the measure of damages is some sort of artificially depressed bankruptcy price, thus eliminating damages.  A party that has colluded to affect the sale price of property should not be able to defend the case by arguing speculation that even if the collusion had not occurred that a sale at fair market value would never have been attained.  This is especially true in this case where there are multiple documents indicating the Defendants' own much higher valuation of the parcels, despite the fact that the parcels were in bankruptcy and other closing terms sought by the Trustees.  If the Defendants think this result is harsh, then the statute is serving its intended purpose.  Congress intended the statute to *punish* those who colluded to depress the sale price of property during a bankruptcy court proceeding and *deter* others from attempting collusion.

## IV.  <u>PLAINTIFF'S EXPERTS SHOULD NOT BE EXCLUDED FROM TESTIFYING</u>

### A.  *Federal Rule of Evidence 702 and the <u>Daubert</u> standard.*

Federal Rule of Evidence 702 governs the admissibility of expert testimony and states:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

The rule is applied according to the landmark US Supreme court ruling in Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 113 S. Ct. 2786, 125 L. Ed. 2d 469 (1993). It is well-accepted law under Daubert that expert evidence is reliable and relevant, and thus admissible, when "(1) the expert is qualified to testify competently regarding the matters he intends to address; (2) the methodology by which the expert reaches his conclusions is sufficiently reliable as determined by the sort of inquiry mandated in Daubert; and (3) the testimony assists the trier of fact, through the application of scientific, technical, or specialized expertise, to understand the evidence or to determine a fact in issue." City of Tuscaloosa v. Harcros Chems., Inc., 158 F.3d 548, 562 (11th Cir. 1998) (explaining Daubert).

The qualification standard for expert testimony is "not stringent," and "so long as the expert is minimally qualified, objections to the level of the expert's expertise [go] to credibility and weight, not admissibility." Kilpatrick v. Breg, Inc., No. 08-10052-CIV, 2009 U.S. Dist. LEXIS 76128 (S.D. Fla. June 25, 2009). "[E]xperience in a field may offer another path to expert status." United States v. Frazier, 387 F.3d 1244, 1260-1261 (11th Cir. 2004)

As to methodology/reliability, "[e]xperts routinely rely on the work of others, a practice permitted by Fed. R. Evid. 703, so long as the facts or data on which they rely is of the type reasonably relied on by experts in the relevant field." City of St. Petersburg v. Total Containment, Inc., No. 06-20953, 2009 U.S. Dist. LEXIS 101367, 2009 WL 3335013, at *4 (S.D. Fla. Mar. 19, 2009). "[A]bsolute certainty" of an expert's opinions are not required. Jones v. Otis Elevator Co.,

861 F.2d 655, 662 (11th Cir. 1988).  The district court enjoys "broad latitude" in deciding whether expert testimony is reliable, and in how to conduct that inquiry. See Toole v. Baxter Healthcare Corp., 235 F.3d 1307, 1312 (11th Cir. 2000).

As to the helpfulness inquiry, "expert testimony is admissible if it concerns matters that are beyond the understanding of the average lay person. United States v. Frazier, 387 F.3d 1244, 1262 (11th Cir. 2004) citing United States v. Rouco, 765 F.2d 983, 995 (11th Cir. 1985) (expert testimony admissible if it offers something "beyond the understanding and experience of the average citizen").

The court must also not confuse cross-examination with exclusion under Daubert.  All experts are subject to cross-examination.  However, cross-examination even if considered effective by one's adversary does not form a basis to exclude an expert under the Daubert standard.  Daubert, 509 U.S. at 596 ("Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence.").  Any alleged "weaknesses in the underpinnings of the expert's opinion go to its weight rather than its admissibility."  Jones v. Otis Elevator Co., 861 F.2d 655, 663 (11th Cir. 1988).  [I]t is not the role of the district court to make ultimate conclusions as to the persuasiveness of the proffered evidence." Quiet Tech. DC-8, Inc. v. Hurel-Dubois UK Ltd., 326 F.3d 1333, 1341 (11th Cir. Fla. 2003).  Indeed "[a] district court's gatekeeper role under Daubert "is not intended to supplant the adversary system or the role of the jury."  Maiz v. Virani, 253 F.3d 641, 666 (11th Cir. 2001).

/ /

/ /

/ /

**B.  Expert Peter Zalewski's Opinions are Admissible**

1.  <u>Mr. Zalewski is well Qualified to Render Opinions</u>

The Defendants seem to not disclose all relevant facts about Mr. Zalewski's qualifications in order to convince the court that he is underqualified.

While the Motion in Limine states that Mr. Zalewski is a "journalist by training," this comes nowhere near a fair summary of his qualifications.  Mr. Zalewski has been a licensed real estate broker or agent since 1995[16] concentrating on the south Florida condominium market.  He has transacted over $30,000,000 in condominium sales, although today he chooses to focus on work as a south Florida condominium market analyst.[17]  A full copy of his CV is attached.[18]

As an analyst, Mr. Zalewski operates two websites[19] which have tracked all south Florida condominium developments east of I-95 in Miami-Dade, Broward and Palm Beach counties since the mid 2000s.[20]  He compiles extensive data regarding planned condo projects as well as individual unit sales and pre-sales (more on this issue below).  His work, which is available to ordinary buyers as well as institutional investors and hedge funds, has been featured in Hollywood movies and cited by the Federal Reserve Bank for data regarding this market.[21]  He produces market analysis reports on the condo market as well.[22]  On several occasions he has testified as a real estate valuation expert in litigation, including once in the US Bankruptcy Court for the Southern District of Florida.[23]  He is extremely familiar with all condo project land purchases and it is his business to be.

---

[16] Exhibit 4 P. Zalewski report and documents at PLTF 002615.
[17] Exhibit 4 P. Zalewski report and documents at PLTF 002615.
[18] Exhibit 4 P. Zalewski report and documents at PLTF 002612-002622.
[19] Exhibit 4 P. Zalewski report and documents at PLTF 002659.
[20] Exhibit 4 P. Zalewski report and documents at PLTF 002615.
[21] Exhibit 4 P. Zalewski report and documents at PLTF 002615
[22] Exhibit 4 P. Zalewski report and documents at PLTF 0026212.
[23] Exhibit 4 P. Zalewski report and documents at PLTF 002622.

In *addition* to these qualifications, he has been tracking the south Florida real estate market as a journalist since 1993.[24]  Plaintiff has disclosed perhaps 100 articles written by Mr. Zalewski during that time,[25] for the Miami Herald and The Real Deal Miami.

Only in hotly contested litigation where one's adversary concedes nothing would one even expect to find an argument made that a real estate analyst, broker and journalist with 25 years of experience *specifically* tracking the south Florida condominium market would lack qualifications to opine as to the value of the parcels in this case.  The defense argument does not hold merit.

2.  Mr. Zalewski's Methods are Sufficient to State his Opinion and his Opinions will Assist the Jury

In order to form his opinions, Mr. Zalewski was provided with parcel data and eighteen documents[26] relating to the parcels.  These documents consisted of *hundreds* of pages of building designs, architectural plans, press releases, sales brochures touting the parcels by the Defense, land comparable sales, government marketing studies, another appraisal from the Defendants and pro forma prepare by one Defendant listing proposed costs and revenue of the project.[27]  Most of these documents originated from the Defendants themselves.  However, Mr. Zalewski testified that he independently researched the value of the parcels in this case because he did not want to be swayed by any other analysis and used his own, proprietary system which tracks condominium projects to form his opinions.[28]

---

[24]  Exhibit 4 P. Zalewski report and documents at PLTF 002615.
[25]  Exhibit 4 P. Zalewski report and documents at PLTF 002623-002658.
[26] (1) ITEC Designs and Pro Forma (2) Arevalo letter with $31,400,000 buyout option 6.14.2013, (3) Option Agreement with handwritten changes, (4) B&B Parcel Survey, (5) Ricardo Bofill Architectural Plans, (6) CBRE E-mail and land value reports, (7) Data Sheet of land offerings, (8) CBRE Press Release, (9) Offering Memorandum for 830 Brickell, (10) CBRE Brochure on other land offerings, (11) CBRE Land Comp listings, (12) CBRE Report on Valuation- 5.11.2015, (13) Land Comps, (14) Listing, (15) July 2015 Marketing Summary, (16) MDDA Market Study- 2015, (17) Various land comp data, (18) Nov. 27, 2015 CBRE appraisal
[27] These documents will be separate deposited or lodged with the Court.
[28] Exhibit 4 P. Zalewski report and documents at PLTF 002614.

Mr. Zalewski's opinions begin by establishing that he considered the aforementioned "dozens of projects and sales" and is "familiar with common benchmarks and guidelines used by developers to value the land of an anticipated project" based on his 25 years of experience.[29]  He then explains the boom and bust cycle of this area of real estate and explains how the factors of "developers eager to participate in a boom" would have driven prices up,[30] a factor even the Trustee agreed with in calling the market "hot" at the time.  He then lays a foundation for the desirability of this particular site as being adjacent to the $1 billion CityCentre project, having the marketability of a "Brickell Plaza" address and the "significant market appeal" the site gained after the announcement of CityCentre.[31]  He had also been personally familiar with the site for years.

Next in his report, Mr. Zalewski proceeds to explain the multiple factors and methods that a developer will use to value a site.  Notably, an expert on real estate value may use alternate methods.  Powell v. Tosh, 942 F. Supp. 2d 678, 691 (W.D. Ky. 2013) ("criticism of the expert appraiser's chosen approach "goes to the weight of [his] testimony and not admissibility").  To do so, Mr. Zalewski created his own project chart detailing zoning, square footage, projected costs and profit.[32]  His figures are largely from publicly available sources not reasonably subject to impeachment, such as zoning, buildable square footage under the law, etc.  From there, Mr. Zalewski need only insert estimated figures for development cost per square foot and projected average price per square foot of completed units.  Both of these figures are estimates based on Mr. Zalewski's experience for condos in the Brickell area.[33]  Notably, his $650/square foot estimated sale price for units is the exact same as the pro forma prepared by Defendant Arevalo

---

[29] Exhibit 4 P. Zalewski report and documents at PLTF 002616 (first paragraph on page).
[30] Exhibit 4 P. Zalewski report and documents at PLTF 002616.
[31] Exhibit 4 P. Zalewski report and documents at PLTF 002616.
[32] Exhibit 4 P. Zalewski report and documents at PLTF 002619.
[33] Exhibit 4 P. Zalewski report and documents at PLTF 002619.

and less than a project literally next door to the land which has units selling at over $800/square foot.  Based on these figures, reflected on Chart A to Mr. Zalewski's report,[34] he is able to value the land as any developer would from a project cost perspective.  The basis of his opinions are accepted industry targets for land acquisition costs as a percentage of total project costs.  Using a mid-point of 33% as land costs, he valued the land at over $36,000,000.[35]

As a separate but correlating analysis, he was able to equate this opinion with a $109,000 cost of land per door, which based on his data conforms with similar projects in the area having a range of up to $150,000 per door for the land.[36]  Lastly, Mr. Zalewski does address a pure sales comparison approach and notes the weakness of that approach being that developers sometimes acquire land at artificially low prices by reporting a sale at one figure but agreeing to pay the seller a percentage of profits on the back end after construction, effectively paying more.[37]  Regardless, Mr. Zalewski specifically mentions several projects such as Echo Brickell, Brickell Flatiron, Brickell Heights East, BH02 and SLS Lux as having been considered for his analysis.[38]

The Defendants argue that Mr. Zalewski is only a data compiler.  This is incorrect.  Mr. Zalewski does compile mass amounts of data.  He currently tracks over 400 different south Florida condominium sites.[39]  For each site, he compiles dozens of data points, including project start and completion dates, unit square feet, number of total units, project floors or stories, project amenities, contractor and architect information, deposit requirements, pre-sale and post-construction unit sales with comparative data for price and price per square foot.  A sample or template of this data is attached[40] with the data (which is proprietary) redacted.  Subject to a

---

[34] Exhibit 4 P. Zalewski report and documents at PLTF 002619.
[35] Exhibit 4 P. Zalewski report and documents at PLTF 002616 (last paragraph on page).
[36] Exhibit 4 P. Zalewski report and documents at PLTF 002617.
[37] Exhibit 4 P. Zalewski report and documents at PLTF 002617.
[38] Exhibit 4 P. Zalewski report and documents at PLTF 002617.
[39] Exhibit 4 P. Zalewski report and documents at PLTF 002659.
[40] Exhibit 5 Data Template.

confidentiality agreement, Mr. Zalewski has been ordered by the court to provide access to his entire database[41] and has identified at least 26 condominium developments specifically in the Brickell area or downtown that he examined when forming his opinions.

## V.    CONCLUSION

In closing, the Defendants have been unable to find an expert to opine as to either fair market value or what they argue is the reduced bankruptcy value of the parcels.  They request that the court and jury simply disregard the fair market value of the parcels, despite the seemingly plain language of 11 USC § 363(n) and mountain of antitrust cases allowing fair market value as the standard for damages.

Plaintiff's expert is well-qualified and credentialed and satisfies the Daubert standard. Mr. Zalewski presents reasoned opinions based on industry and accepted valuation methods for real estate.  He relied on an immense body of data, prepared his own project projections and lists a detailed explanation of his methodology in his report.  Moreover, real estate valuation is not the type of opinion that has a pure scientific right or wrong and is not the type of evaluation that needs to be based on treatises or subject to peer review.  The role of FRE 702 and Daubert is not for the court to make an evaluation as to which expert is correct.  Instead, the Court's role is only to exclude unqualified or unreliable opinions.  Neither of these roles would be served by excluding Plaintiff's expert Mr. Zalewski.

/ /

/ /

/ /

/ /

---

[41]  Magistrate Judge Turnoff heard these issues at a discovery hearing in February, 2017, and ordered the data to be turned over without charge, but subject to a confidentiality agreement which has never been signed by the Defense.

The Defendants' Motion in Limine should be denied.

Dated this 28th day of March, 2017.

**/s/ Adam J. Breeden**

_____

| | |
|---|---|
| Adam J. Breeden, Esq. | Jerrold A. Wish, Esq. |
| Florida Bar # 124046 | Florida Bar # 352721 |
| Adam@breedenandassociates.com | jwish@wishlaw.net |
| BREEDEN & ASSOCIATES, PLLC | THE WISH LAW FIRM |
| 1404 S. Jones Blvd. | 1927 NW 104th Way |
| Las Vegas, NV 89146 | Gainesville FL 32606 |
| Ph. 702-508-9250 | Ph. 786-200-7077 |
| *Co-Counsel for Plaintiff* | *Co-Counsel for Plaintiff* |

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing Opposition to Motion to Exclude Expert Peter Zalewski was served on the 28th day of March, 2017, on all counsel or parties of record on the service list through the Court's ECF system or as otherwise indicated.

**s/ Adam J. Breeden**

_____

Adam J. Breeden, Esq.
Florida Bar # 124046
Adam@breedenandassociates.com
BREEDEN & ASSOCIATES, PLLC
1404 S. Jones Blvd.
Las Vegas, NV 89146
Ph. 702-508-9250
Fax 702-508-9365

Jerrold A. Wish, Esq.
Florida Bar # 352721
jwish@wishlaw.net
THE WISH LAW FIRM
1927 NW 104th Way
Gainesville FL 32606
Ph. 786-200-7077
*Attorneys for Plaintiffs*

Case No.:  **15-24176-CV-GAYLES**
<u>SERVICE LIST</u>

| | |
|---|---|
| Adam J. Breeden, Esq.<br>Adam@breedenandassociates.com<br>BREEDEN & ASSOCIATES, PLLC<br>1404 S. Jones Blvd.<br>Las Vegas, NV 89146<br>Ph. 702-508-9250<br>Fax 702-508-9365<br>*Co-Counsel for Plaintiff* | Jerrold A. Wish, Esq.<br>jwish@wishlaw.net<br>THE WISH LAW FIRM<br>1927 NW 104th Way<br>Gainesville FL 32606<br>Ph. 786-200-7077<br>*Co-Counsel for Plaintiff* |
| Kendall Coffey, Esq.<br>kcoffey@coffeyburlington.com<br>Kevin C. Kaplan, Esq.<br>kkaplan@coffeyburlington.com<br>David Zack, Esq.<br>dzack@coffeyburlington.com<br>COFFEY BURLINGTON<br>2601 South Bayshore Drive, PH1<br>Miami, FL 33133<br>Tel:  305.858.2900<br>Fax:  305.858.5261<br>*Counsel for Shutts & Bowen, LLP and Kevin Cowan* | Charles M. Tatelbaum, Esq.<br>cmt@trippscott.com<br>Edward Curtis, Esq.<br>erc@trippscott.com<br>Michael C. Foster, Esq.<br>mcf@trippscott.com<br>TRIPP SCOTT<br>110 S.E. 6th Street, 15th Floor<br>Ft. Lauderdale, FL 33301<br>Ph. 954-525-7500<br>Fax 954-761-7501<br>*Counsel for Steven C. Cronig* |
| Ronald L. Kammer, Esq.<br>rkammer@hinshawlaw.com<br>H. Steven Vogel, Esq.<br>svogel@hinshawlaw.com<br>HINSHAW & CULBERTSON, LLP<br>2525 Ponce de Leon Blvd., 4th Floor<br>Coral Gables, FL 33134<br>Ph. 305-358-7747<br>Fax 305-577-1063<br>*Counsel for Watson Brickell Development, LLC and Francis Scola* | Omar Botero<br>3333 Halissee Street<br>Miami, FL 33133<br>*Defendant- Served via US Mail and E-mail*<br>omar@alianzadevelopmentgroup.com<br><br>Alianza Financial Services, LLC<br>Alianza Holdings, LLC<br>999 Brickell Ave. PH 1002<br>Miami, FL 33133<br>*Defendants- Served via US Mail and E-mail* |
| Lawrence Goodman, Esq.<br>lgoodman@devinegoodman.com<br>DEVINE GOODMAN et. al.<br>2800 Ponce de Leon Boulevard, Suite 1400<br>Coral Gables, FL 33134<br>Ph. 305.374.8200<br>Fax 305.374.8208<br>*Counsel for JA Energy Resources, LLC and Jorge Arevalo* | Albert Delaney<br>Delaneyal@att.net<br>45 Scarlet Woods Court<br>Spring, TX 77380<br>*In proper person*<br>*Served via e-mail outside ECF* |