# UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF FLORIDA

### Case No. 1:15-cv-24176-GAYLES

**JAWHBS LLC**, a Florida limited liability
company,

      Plaintiff,

vs.

**JORGE AREVALO**, an individual;
**JA ENERGY RESOURCES, LLC**, a Florida
limited liability company; **SHUTTS &
BOWEN LLP**, a Florida limited liability
Partnership; **KEVIN D. COWAN**, an
Individual; **OMAR BOTERO**, an individual;
**ALIANZA FINANCIAL SERVICES, LLC**,
a Florida limited liability company; **ALIANZA
HOLDINGS, LLC**, a Florida limited liability
partnership; **AL DELANEY**, an individual;
**CRYSTAL TOWER PARTNERS II, LLC**, a
Florida limited liability company; **CRYSTAL
TOWER ON BRICKELL PLAZA, LLC**, a
Florida limited liability company; **WATSON
INVESTIGATIONS, LLC**,  a Florida limited
liability company; **STEVEN CARLYLE
CRONIG**.

      Defendants.

_____/

## DEFENDANTS' JOINT RESPONSE IN OPPOSITION TO PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT  [ECF No. 305]

Defendants Shutts & Bowen LLP ("Shutts"), Kevin D. Cowan ("Cowan," Shutts and Cowan are collectively referred to as the "Shutts Defendants"), Jorge Arevalo and JA Energy Resources, LLC (the parties joining in this response are collectively referred to here as the "Defendants") hereby submit their response to Plaintiff's Motion for Summary Judgment. Defendants also rely on their Statement of Material Facts in Opposition to Plaintiff's Motion for Partial Summary Judgment as to Liability ("DSOMF") and the Notice of Filing of Exhibits ("NOF"), which are filed herewith.

## I.   **INTRODUCTION**

Plaintiff's summary judgment position, and its underlying claims, are legally and factually baseless.  Ignoring the un-contradicted evidence developed through discovery in this case that directly undermines the claims, Plaintiff's Motion merely restates the same conclusory allegations of collusion and bid-rigging from its pleadings.  Plaintiff draws implausible inferences from a selective review of some of the documents, and asserts that Defendants should be deemed, as a matter of law, to have violated the antitrust laws and Section 363(n) of the Bankruptcy Code. (ECF No. 189, Counts I and IV).  The Motion represents the latest cynical attempt of the two partners who own the Plaintiff – Jerrold Wish and Herb Sider – to misuse the federal judicial process through unsupported theories predicated upon oxymoronic damages. This motion also presents a tactical dodge by the Plaintiff, calculating that its own summary judgment Motion might somehow obscure the fatal defects in Plaintiff's claims.  As shown by the DSOMF, Plaintiff's factual assertions can be refuted on a line by line basis, so Plaintiff's Motion should not be well taken.  More importantly, the manifest flaws of Plaintiff's claim warrant summary judgment in favor of Defendants.

COFFEY | BURLINGTON
2601 South Bayshore Drive, Penthouse, Miami, FL 33133 · T. 305·858·2900  F. 305·858·5261

Yet again, Plaintiff has repackaged its claims about how the so-called Beacon Parcels came to be sold by the Trustees in two related bankruptcy proceedings ("Bankruptcy Proceedings").[1] But, along the way, the sworn depositions have irrefutably disproven Plaintiff's characterization of the sales process. While Plaintiff continuously characterizes the case as one of "bid rigging," there was no agreement for "rigging," nor was there even an auction process for bidding. Instead, the Bankruptcy Trustees recommended – and the Bankruptcy Court agreed – a private sale with a specific buyer.

The only role of the Shutts Defendants was as counsel for the Arevalo Defendants, whose negotiations about a potential joint venture with the Botero Defendants failed. The Bankruptcy Trustees – who fulfilled their role as independent officers of the court, with fiduciary duties, selected under the auspices of the U.S. Department of Justice and supervised by federal bankruptcy judges – confirmed at deposition that the Shutts Defendants did nothing wrong. In fact, Trustee Dillworth testified that if the Shutts Defendants had not disclosed Jorge Arevalo's failed negotiations with Crystal Tower to the Bankruptcy Court at the July 10, 2013 hearing, the original sale to Crystal Tower for $19.5 million would have gone through. In that event, the bankruptcy estates would have obtained two million dollars less than the $21.5 million actually recovered as a result of the Shutts disclosures. (DSOMF ¶15).[2] Thus, the alleged transgression, rather than damaging the claimants, actually and substantially benefitted them.

Not only did the Bankruptcy Judge, the United States Trustee, and three bankruptcy Trustees approve the eventual sale to Watson Investigations, LLC – an entirely independent

---

[1] The "Bankruptcy Proceedings" are the bankruptcy filed by The Beacon at Brickell Village, LLC, case number 13-11961-BKC-LMI (the "BBV Case") and the bankruptcy filed by Beacon Developer Partners, LLC, case number 13-23470-BKC-LMI (the "BDP Case")(collectively, the "Bankruptcy Proceedings"). Drew Dillworth was appointed as the trustee in the BBV case, and Joel Tabas was the trustee in the BDP case (collectively, "Trustees").

[2] References to the record are to the DSOMF, filed herewith.

buyer – but Wish and Sider fully supported the sale, which put large sums in their pockets. Later on, though, they purchased the claims – for $25,000 (of which 85% came back to them in the form of a distribution) – to attack the very sale they had supported in open court with the hope of extracting more. Such shenanigans are manifestly improper in federal court – especially in the form of a manufactured claim against a Florida law firm and one of its well regarded lawyers, who never had any attorney-client relationship with the Plaintiff. Summary judgment for the Plaintiff is entirely unwarranted here; the Motion should be denied.

## II.   **Summary Judgment Standards**

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A plaintiff's "conclusory assertions…in the absence of supporting evidence, are insufficient to withstand [much less obtain] summary judgment." *Holifield v. Reno*, 115 F.3d 1555, 1564 n.6 (11th Cir. 1997). In antitrust cases especially, the federal judiciary has been determined and energetic in utilizing summary judgment as the proper vehicle for rejecting untenable and implausible lawsuits. Thus, in antitrust cases, plaintiffs face a very high burden to even *survive* a defendant's summary judgment motion, much less be *granted* summary judgment. "[T]he Supreme Court has . . . endorsed the use of summary judgment in antitrust cases in order to avoid chilling legitimate competitive behavior." *Tidmore Oil Co. v. BP Oil Co.*, 932 F. 2d 1384, 1388 (11th Cir. 1991) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 594 (1986)). Section 1 cases are often subject to summary judgment *against* the plaintiff. *See e.g., Atlantic Richfield Co. v. USA Petrol. Co.*, 495 U.S. 328, 345-46 (1990) (upholding summary judgment where plaintiff failed to show any injury flowing from the anticompetitive effects of the defendant's conduct); *Procaps S.A. v. Pantheon, Inc.*, 845 F. 3d 1072, 1082, 1087

(11th Cir. 2016) (upholding summary judgment based on lack of anticompetitive agreement and lack of anticompetitive effect); *Tidmore Oil*, 932 F. 2d at 1388 (upholding summary judgment where the plaintiff failed to prove the existence of an agreement); *Todorov v. DCH Healthcare Auth.*, 921 F. 2d 1438, 1459 (11th Cir. 1991) (upholding summary judgment on Section 1 conspiracy allegations where plaintiff failed to prove that a conspiracy existed); *Solomon v. Houston Corrugated Box Co., Inc.*, 526 F. 2d 389, 397 (5th Cir. 1976) (finding no agreement and upholding summary judgment); *Amis v. Gulf Abstract & Title, Inc*., 564 F. Supp. 1121, 1128 (M.D. Fla. 1983) (granting summary judgment  where plaintiff failed to refute sworn denials of an agreement ); *Horace Slay Auto Sales v. Gen. Motors Corp*., 495 F. Supp. 415, 423 (D. Miss. 1980) (granting summary judgment where there was no evidence of a concerted refusal to deal); *see also Matsushita*, 475 U.S. at 587. "[C]ourts should not permit factfinders to infer conspiracies when such inferences are implausible, because the effect of such practices is often to deter procompetitive conduct."  475 U.S. at 593.

## III.   ARGUMENT

### A. PLAINTIFF'S FAILURE TO PROVIDE A PROPER STATEMENT OF MATERIAL FACTS WARRANTS DENIAL OF ITS SUMMARY JUDGMENT MOTION.

Plaintiff has not provided a proper Statement of Material Facts as required by Southern District of Florida Local Rule 56.1.  This violation, in and of itself, warrants denial of the Motion.  *See Schainberg v. Urological Consultants of S. Fla.*, No. 12-21721, 2012 WL 12872735 (S.D. Fla. Oct. 10, 2012) (denying summary judgment motion due to lengthy paragraphs and unnumbered facts without references to supporting exhibits); *see also Pinson v. Wagner & Hunt*, No. 12-81158, 2014 WL 12531544 (S.D. Fla. Oct. 1, 2014) (reinforcing that a statement of material facts must be supported by evidence and have separately numbered paragraphs).  Rule 56.1(a) provides that the movant must provide a statement of material facts,

set out in separately numbered paragraphs, and the facts must be "supported by specific references to pleadings, depositions, answers to interrogatories, admissions, and affidavits on file with the Court."  The rambling, argumentative Statement of Material Facts incorporated at pages 2 through 11 of Plaintiff's motion clearly violates this requirement.   Many assertions lack citation to the record, while others are blatant hearsay and therefore inadmissible as to the Shutts Defendants or to specific defendants.[3]   The statement also does not lay out a manageable number of "facts" per paragraph, impeding a proper response by Defendants pursuant to the Rules. Plaintiff also cites directly to the record in its memorandum, e.g., pages 17-21, and not to its Statement of Material Facts.  This creates a moving target in pinning the Plaintiff down on the pertinent material facts.

Far from being a neutral statement of undisputed material facts, Plaintiff's Statement of Material Facts egregiously mischaracterizes and exaggerates the record in numerous areas. Defendants address these to the extent space permits in the DSOMF.   A few examples are especially illuminating:

Misstatement of the Record:   "[A] bankruptcy sale would have to close by [July 31, 2013].  However this was a soft deadline. . . ."  (ECF No. 305 at 3 ¶ 3).  Truth:  The July 30, 2013 deadline set by the bankruptcy Judge was a hard deadline; there was a real sense of urgency; and no one, including plaintiff's principals, Wish and Sider, requested an extension. (DSOMF ¶¶ 3- 4.)

Misstatement of the Record:  "The Trustees were willing to tentatively proceed to obtain bankruptcy court approval of Botero's non-binding offer."  (ECF No. 305 at 4 ¶ 4).  Truth: Trustee Dillworth testified that the price "made sense and we could extract some value for the

---

[3]  *E.g.*, party admissions as to some defendants, will not be admissible against the Shutts Defendants.  See F.R.E. 801(c)(2).

creditors" and other offers had to be "on the same terms" and "apples to apples" (i.e., all or substantially all cash on deposit), and he was promoting a private sale to Crystal Tower due to the hard deadline set by the bankruptcy court.  (DSOMF ¶ 4).

 <u>Misstatement of the Record</u>: "According to Delaney. . . Botero's own legal counsel told him that the deal may be illegal and/or criminal, and they could not do it."  <u>Truth</u>:  Delaney testified that the Carlton Fields attorneys never told him they were researching the legal effect of collusion, the legal research related to Renzi being a "scoundrel" and a good faith finding—not collusion, the attorneys were "less concerned" about a deal in which Arevalo would join Botero's company, and the advice related only to an auction environment, which did not exist. (DSOMF ¶ 12).

 Because Plaintiff has failed to comply with the letter and spirit of Rule 56.1, its motion for summary judgment should be denied.

### B.  LEGAL ADVICE IS NOT ACTIONABLE UNDER THE ANTITRUST LAWS.

 As this Court knows, this is not a malpractice claim by a former client based on negligence, but is rather a claim of intentional wrongdoing tantamount to criminal misconduct. As a result, the Plaintiff's claim is untenable because a lawyer cannot be held civilly liable to third parties under the antitrust laws for acts undertaken in the course of representing a client. *Spanish Int'l. Commc'ns Corp., Sin, Inc. v. Leibowitz*, 608 F. Supp. 178, 180 (S.D. Fla. 1985) (citing *Invictus Records, Inc. v. Am. Broad. Cos., Inc.*, 98 F.R.D. 419 (E.D. Mich. 1982)).  So well-settled is the protection accorded attorneys when acting in the course of client representation that few such cases are even brought.  As the *Invictus* Court held, "while generally individuals through whom a corporation acts may be liable for antitrust violations, those persons who function solely as legal advisers are exempted from liability." 98 F.R.D. at 428.

6

In the few cases indicating that attorneys may have a potential antitrust liability, the legal test imposes a demanding standard:   "the plaintiff must plead and prove that the defendant attorney exerted his power and influence so as to direct the corporation to engage in the complained of acts for an anticompetitive purpose." *Brown v. Donco Enters., Inc.*, 783 F.2d 644, 646-47 (6th Cir. 1986) (emphasis added); *see also Amarel v. Connell*, 102 F.3d 1494, 1522 (9th Cir. 1996), *as amended* (Jan. 15, 1997).   As the Court in *Brown* emphasized, "an attorney may be found individually liable under the antitrust laws only if he exceeds his role as legal adviser and becomes an active participant in formulating policy decisions with his client to restrain competition." 783 F.2d at 646 (emphasis added).  *See also, Array Holdings, Inc. v. Safoco, Inc.,* No. H-12-366, 2013 WL 2617965, at *8 (S.D. Tex. June 11, 2013) (dismissing antitrust claim against defendants' lawyers); *In re Se. Milk Antitrust Litig.*, 801 F. Supp. 2d 705, 739 (E.D. Tenn. 2011) (rejecting "guilt by association" antitrust theory as to corporate officer).   Likewise, in *Spanish*, the Court dismissed an antitrust action against an attorney, where there were "no factual allegations which would support the contention that Defendant had any interest in the [anti-competitive acts] other than an interest as an attorney representing his client" and where the complaint "allege[d] no financial, business or economic interest held by Defendant." 608 F. Supp. at 180.   Because "there was nothing other than legal advice involved," the Court in *Spanish* found that plaintiff's failure "to negate Defendant's status as an attorney warrant[ed] dismissal under the rationale of *Invictus*." *Id.*

Similar facts preclude liability here.  As Trustee Dillworth repeated, "[t]here is no upside to a lawyer" in doing anything wrong in such cases.  (DSOMF ¶ 16).     Undeniably, neither Shutts nor Mr. Cowan did anything that can credibly be characterized as formulating policy or "exerting his power and influence so as to direct the corporation[.]"  *Brown*, 783 F. 2d at 646-47.

Nor did the Shutts Defendants have any financial, business or economic interest in the alleged transactions.  Instead Mr. Cowan, during the course of two days in July, merely exchanged emails and reviewed and made comments on a draft agreement drafted by the other side and related to a potential business deal that his client had negotiated with another party.  As Trustee Dillworth repeatedly testified, "I certainly don't think lawyers would have knowingly done something wrong."  (DSOMF ¶ 16).  On these facts, summary judgment for Plaintiff must be denied.

Plaintiff's motion seeks to exaggerate the Shutts Defendants' role, and it certainly does not support summary judgment.  (ECF No. 305 at 20-21).  Cowan's limited involvement consisted of exchanging emails with Albert Delaney, who was drafting the potential joint venture's terms for Botero.  (DSOMF ¶ 9).  Cowan's focus was on the legal issues of "ensur[ing] that the title circumstances were acceptable," and also that the language in the documents accurately set forth the terms his client was discussing.  (*Id.*).  Cowan's role included adding hand-written revisions "making sure that the writing said what they told me it was supposed to say and…that the title was marketable."  (*Id.*).  He did not formulate or design the potential joint venture between Botero and Arevalo.  (*Id.*).  He only provided legal advice.  Consistent with his potential duties as part of a proposed joint venture, Botero and Arevalo discussed a "forbearance" agreement preventing Arevalo from making an offer on the Beacon Parcels.  (*Id.*).  Cowan, Arevalo, Botero and Delaney all testified that any discussion of a non-compete was proposed in the context of attempting to negotiate a joint venture.  (*Id.*).  Though Plaintiff points to an issue about a minimum bid, Cowan testified he did not remember what the discussion of minimum bid was or what was meant by filing a notice.  (*Id.* ¶ 11).  Plaintiff also vaguely points to a hearsay document regarding a "solution."  Arevalo testified that he thought he was being

"played" by Botero, that he wanted to talk further to find what the problem was in order to find a solution, and that they were not intentionally doing anything improper. (*Id*. ¶ 12.) Cowan testified that he did not recall receiving Delaney's email stating that there was a "problem" and that Delaney did not raise illegality as a problem. (*Id*.) As for payments under an agreement going through a law firm, this is "fairly standard" and Shutts would not be receiving a fee from the funds. (*Id*. ¶ 10.). Clearly, Plaintiff has not properly supported a motion for summary judgment on this record.

### C. THERE IS NO AGREEMENT

The evidence is un-contradicted that no agreement was ever entered between Botero and Arevalo. The witnesses involved in the July 2013 Bankruptcy Sale process have uniformly testified that no agreement was ever reached between the Arevalo and Botero parties or caused a lower sale price. (DSOMF ¶ 1). Plaintiff itself concedes that Botero and Arevalo did not enter the agreement they had been negotiating.[4] These facts, coupled with Plaintiff's concession, fundamentally undermine Plaintiff's claims.

The lack of an agreement requires denial of Plaintiff's motion for summary judgment – indeed, it mandates entry of summary judgment for Defendants. Liability under Section 1 of the Sherman Act requires concerted action by "contract, combination or . . . conspiracy' between separate entities." *Copperweld Corp. v. Indep. Tube Corp.*, 467 U.S. 752, 768 (1984) (analyzing Sherman Act § 1). The threshold requirement of every antitrust conspiracy claim, whether brought under section 1 or section 2 of the Sherman Act is 'an ***agreement*** to restrain trade." *City of Tuscaloosa v. Harcross Chems., Inc.*, 158 F. 3d 548, 569 (11th Cir. 1998) (emphasis added). Thus, the "courts must first ensure that an agreement to restrain trade exists." *Todorov*,

---

[4]  Plaintiff's statement of facts states, "[a]t the July 10, 2013 hearing, Arevalo was apparently upset that no signed deal was in place." (ECF No. 305 at 9.).

921 F. 2d at 1455.  Where, as here, the evidence confirms that no agreement exists, the Plaintiff's claims fail.  *See id.* (stating that section 1 claims require an agreement);  *Solomon,* 526 F. 2d at 393 ("The mere allegation of the Sherman Act claim requirements of a contract, combination, or conspiracy for the purpose of restraining trade or interstate commerce and resulting damages are not sufficient to withstand a motion for summary judgment once they have been rebutted."); *see also Tidmore,* 932 F. 2d at 1388 (upholding summary judgment where there was no agreement because "the essential fact is that there must be an agreement").

Nor can Plaintiff overcome this fatal obstacle through its conclusory argument that some agreement should be inferred.  (ECF No. 305 at 13).  Plaintiff's position is <u>factually</u> implausible – with no evidence (or even explanation) of what the agreement was, who it was between, how it would work, how it would economically benefit the various defendants, or even when it was made.  The argument is also <u>legally</u> undermined by the very case on which Plaintiff seeks to rely, *Todorov,* 921 F. 2d 1438.  The *Todorov* Court emphasizes that antitrust law "limits the range of permissible inferences in cases based on circumstantial evidence."  *Id.* at 1456.    Even tacit collusion is not enough. *Jacobs v. Tempur-Pedic Int'l, Inc.*, 626 F.3d 1327, 1343 (11th Cir. 2010).

Fundamentally, Courts must consider the plausibility of antitrust claims, and Plaintiff's conclusory theory is utterly implausible. *Matsushita,*  475 U.S. at 593 ("[C]ourts should not permit factfinders to infer conspiracies when such inferences are implausible, because the effect of such practices is often to deter procompetitive conduct."); *Tempur-Pedic Int'l, Inc.*, 626 F.3d at 1343 (emphasizing that it is the plaintiff's burden to demonstrate that it has a plausible claim). Plaintiff has made no showing as to how the unsuccessful negotiations between Arevalo and Botero amounted to a rational conspiracy or how Defendants were repaid for their efforts,

especially given that Watson purchased the property for $2 million more than the Crystal Tower offer. [5]  The Plaintiff has not demonstrated that Defendants had a "reasonable expectation" of profiting from the supposed scheme in the future.  *Matsushita*, 475 U.S. at 589.[6]  Plaintiff has come forward with no evidence of a "possible, and reasonable, explanation as to why [the Defendants] would deliberately act against [their] own economic interest[s]." *Todorov*, 921 F. 2d at 1457.  "[I]f the claim is one that simply makes no economic sense-[the plaintiff] must come forward with more persuasive evidence to support [its] claim than would otherwise be necessary." *Matsushita*, 475 U.S. at 587 (emphasis added).  Finally, "if a benign explanation for the action is equally or more plausible than a collusive explanation, the action cannot constitute a plus factor." *Williamson Oil Co., Inc. v. Philip Morris USA*, 346 F. 3d 1287, 1310 (11th Cir. 2003).

Here, the testimony of Trustee Dillworth demonstrates the implausibility of Plaintiff's claim.  As the Trustee confirmed, the full disclosure by a Shutts lawyer to the Bankruptcy Court of the unsuccessful negotiations between Arevalo and Botero to form a joint venture agreement resulted in a postponement of the initial sale.  (DSOMF ¶ 15).  Then, with the full endorsement of the Bankruptcy Trustees and the lawyer for the Plaintiff's own sister company, the property was sold to a different buyer for $2 million more.  The Trustee's sworn testimony confirms, not only how the increased price benefitted the Estate, but also that the Shutts Defendants did nothing wrong.  As Trustee Dillworth stated, "I didn't think the lawyers, if there was anything

---

[5] Notably, Plaintiff does not move for summary judgment against Watson Investigation, which is the party that actually acquired the property.

[6] "[F]orgone profits may be considered an investment in the future.  For the investment to be rational, the conspirators must have a reasonable expectation of recovery, in the form of later monopoly profits, more than the losses suffered." *Matsushita*, 475 U.S. at 588-89.  There is no suggestion that the Defendants will be able to make a profit on some future transaction.

COFFEY | BURLINGTON

2601 South Bayshore Drive, Penthouse, Miami, FL 33133 · T. 305·858·2900  F. 305·858·5261

there[,] intentionally did anything wrong.  There is no upside to a lawyer." (*Id.* ¶ 16).   On this record, there is no legal or evidentiary basis for Plaintiff's "speculative" claims of damage. (*Id.*)

### D.  THE RULE OF REASON APPLIES.

Another faulty premise of the Plaintiff's motion is that it has proven a *per se* violation of the Sherman Act. (ECF No. 305 at 13.) It is clear from the record (at a minimum, for purposes of opposing summary judgment) that Arevalo and Botero were attempting to negotiate a joint venture, but they never reached agreement.  Joint ventures are examined under the rule of reason, which Plaintiff has not addressed.[7]   "[C]ombinations, such as mergers, joint ventures, and various vertical agreements, hold the promise of increasing a firm's efficiency. . . [S]uch combinations are judged under a rule of reason, an inquiry into market power and market structure designed to assess the combination's actual effect."  *Copperweld*, 467 U.S. at 768; *see also Polk Bros., Inc. v. Forest City Enters., Inc*., 776 F. 2d 185, 188 ( 7th Cir. 1985) ("Joint ventures, mergers, systems of distribution -- all these and more require extensive cooperation, and all are assessed under the Rule of Reason that focuses on market power and the ability of the cooperators to raise price by restricting output.")   "A court must ask whether an agreement promoted enterprise and productivity at the time it was adopted.  If it arguably did, then the court must apply the Rule of Reason to make a more discriminating assessment. . . . [C]ondemnation *per se* is an unusual step. . . ."  *Polk Brothers, Inc.*, 776 F. 2d  at 189.

---

[7] In addition, "[t]he officers of a single firm are not separate economic actors pursuing separate economic interests, so agreements among them do not suddenly bring together economic power that was previously pursuing divergent goals."  *Copperweld*, 467 U.S. at 769; *see Bankers Ins. Co. v. Fla. Residential Prop. & Cas. Joint Underwriting Ass'n,* 137 F. 3d 1293, 1295-96 (11th Cir. 1998) (with respect to corporate officers and their counsel, the "'plurality of persons' needed for a § 1 violation is missing").  Had Arevalo and Botero completed their deal, they would not be subject to antitrust liability for cooperation within a single firm.

COFFEY | BURLINGTON

2601 South Bayshore Drive, Penthouse, Miami, FL 33133 · T. 305·858·2900  F. 305·858·5261

The proposed joint venture had substantial pro-competitive benefits.  Such a joint venture is very typical in real estate development.  Botero had the funding to purchase the Beacon Parcels at $19.5 million, but he also needed construction financing to create the intended end product: a condominium building with units to sell.  The discussions involved Arevalo obtaining that construction financing and providing some additional equity investment for the project.  It is very typical and expected that  co-venturers in developing the property would not compete with each other.  As stated in *Polk*, "[t]his was productive cooperation" and the non-compete was an "integral" part of the deal.  *Id.; see also In Re New Energy Corp.*, 739 F.3d 1077, 1079 (7th Cir. 2014) ("Joint ventures have the potential to improve productivity as well as the potential to affect prices; that's why in antitrust law they are analyzed under the Rule of Reason rather than a rule of per se illegality.") (DSOMF ¶ 1).  Moreover, there is no suggestion that an agreement between Botero and Arevalo (had one been reached) would have created a monopoly purchaser, as the property was available for purchase by anyone in Miami and, indeed, the world.[8]  This point is underlined by the fact that Watson Investigations came in and offered $2 million more.

"[W]hen the defendant puts forth a plausible procompetitive explanation for his actions, we will not be quick to infer, from circumstantial evidence, that a violation of the antitrust laws has occurred; the plaintiff must produce more probative evidence that the law has been violated." *Todorov*, 921 F. 2d at 1456.  Given the pro-competitive justifications for cooperation between Arevalo and Botero in a joint venture (there can be no suggestion that Botero and Arevalo had

---

[8] The ability to control the market is essential to finding an antitrust violation  *Polk Bros.*, 776 F.2d 185 at191 ("Unless the firms have the power to raise price by curtailing output, their agreement is unlikely to harm consumers, and it makes sense to understand their cooperation as benign or beneficial.")  There is no evidence whatsoever showing any control in the present case.

market power for purchasing real estate in Miami), summary judgment is clearly inappropriate for the Plaintiff.

### E.   PLAINTIFF LACKS ANTITRUST STANDING.

Plaintiff ignores the critical issues of causation and damages for good reason:   the conduct of Shutts in appearing at the July 10, 2013 hearing actually benefited the estate and Plaintiff's sister company SLS Properties III, LLC by facilitating the subsequent bid by Watson for $2 million more.  (DSOMF ¶ 15). Causation of damages is as essential to the issue of liability as to the issue of damages. If it loses on those issues, Plaintiff cannot succeed on this motion or in this case.  As stated in *Matsushita,* to succeed in its claim, Plaintiff must show "an illegal conspiracy **that caused [Plaintiff] to suffer a cognizable injury**." 475 U.S. at 585-86 (emphasis added).  In Plaintiff's false insistence that liability is completely independent of causation, it ignores the reality that courts have rejected attempts to ignore causation and damages because they cannot be separated from the issue of liability.  *Blau v. Lamb*, 163 F. Supp. 528, 531-32 (S.D.N.Y. 1958) (stating that damages issues are fundamental to recovery and could not be severed through summary judgment motion); *Chorbajian v. Pan Am. World Airways*, 19 F.R.D. 321, 321-22 (S.D.N.Y 1956) (holding that partial summary judgment would not streamline the trial); *Preston v. Preston*, No. 6049, 1981 WL 15086, at *3 (Del. Ch. Ct. Apr. 16, 1981) (holding that issues of breach, causation and damages could not be effectively separated on summary judgment, would put an improper burden on the court, and would not conserve judicial resources);

As much as Plaintiff would like to put these issues off for trial, causation and damages are intimately tied to Plaintiff's standing – a fundamental prerequisite to bringing a claim.  "An antitrust plaintiff must show that he has been damaged and that the antitrust violation alleged is the cause of his injury."  *Cable Holdings of Ga., Inc. v. Home Video, Inc.*, 825 F.2d 1559, 1562

(11th Cir. 1987).   Standing is a two-part inquiry of whether the plaintiff establishes 1) "antitrust injury," and 2) "whether the plaintiff is an efficient enforcer of the antitrust laws, which requires some analysis of the directness or remoteness of the plaintiff's injury." *Todorov*, 921 F. 2d at 1449. Antitrust injury includes "common-law tort concepts such as proximate cause, directness of injury, and certainty of damages." *Id*. at 1448.  Thus, "plaintiffs must plead and prove that the injury they have suffered derives from some anticompetitive conduct and is the type the antitrust laws were intended to prevent." *Id.* at 1450.  In making this determination, the Court should examine factors, such as the directness or remoteness of the plaintiff's alleged harm, and whether the damages are highly speculative.  *Id*. at 1451-52.  If the plaintiff's damages do not flow from what made the defendants' conduct allegedly unlawful, "this is not antitrust injury." *Id*. at 1453-54.

There is simply no antitrust injury "of the type the antitrust laws were intended to prevent and that flows from that which makes [the] defendant['s] acts unlawful." *Duty Free Ams., Inc. v. Estee Lauder Cos. Inc.,* 797 F. 3d 1248, 1272 (11th Cir. 2015).  Plaintiff's predecessor, Trustee Dillworth characterized any claim of damages as "speculative" and problematic, and it is easy to see why.  (DSOMF ¶ 16).  The only result of the Botero-Arevalo negotiations was that, when disclosed by Shutts, they prompted a six day postponement and an <u>increased</u> purchase price of $21.5 million, the "best available" price, which benefited the estate by $2 million.  (*Id*. ¶ 15). The sale to Watson was approved by the bankruptcy court, both Trustees of the Bankruptcy Proceedings, the Trustee of a related bankruptcy proceeding and the United States Trustee's office, which is a component of the United States Department of Justice.  (*Id*.)  Trustee Dillworth informed the bankruptcy court that the sale resulted in "a homerun estate for the creditors."  (*Id.*)

COFFEY | BURLINGTON

2601 South Bayshore Drive, Penthouse, Miami, FL 33133 · T. 305·858·2900  F. 305·858·5261

It is utterly illogical to speculate that several days of private discussions between two parties, who never reached agreement, controlled the market or a later sale to a different, independent buyer, or caused any damage. Speculative allegations about antitrust claims cannot withstand summary judgment – and certainly do not warrant entry of summary judgment in their favor. *Aquatherm Indus., Inc. v. Fla. Power & Light Co.*, 971 F. Supp. 1419, 1425 (M.D. Fla. 1997) (speculative and conclusory claims should not burden the judicial process). As for the disclosure made on July 10, rather than reduce competition and negatively impact the sales price, that disclosure led directly to a new buyer at a higher price. (DSOMF ¶ 15). Without competent evidence establishing the causal link, summary judgment should be granted for the Defendants – not Plaintiff. *See Mr. Furniture Warehouse, Inc. v. Barclays Am./Commercial, Inc.*, 919 F.2d 1517, 1520 (11th Cir. 1990) (stating that plaintiff in antitrust claim must establish "the causal connection between the alleged antitrust violation and the injury"); *M.C. Mfg. Co., Inc. v. Tex. Foundries, Inc.*, 517 F. 2d 1059 (5th Cir. 1975) (reversing district court judgment where plaintiff failed to prove that the alleged injury resulted from the alleged scheme).

### F.  THE CLAIM UNDER SECTION 363(N) LIKEWISE FAILS.

11 U.S.C. § 363(n) provides that:

> The ***trustee*** may avoid a sale under this section if the sale price was controlled by an ***agreement among potential bidders at such sale***, or may recover from ***a party to such agreement*** any amount by which the value of the property sold exceeds the price at which such sale was consummated, and may recover any costs, attorneys' fees, or expenses incurred in avoiding such sale or recovering such amount.

11 U.S.C. § 363(n) (emphasis added). Thus, Section 363(n) provides a remedy for a trustee where the trustee demonstrates:  (1) there was an agreement; (2) between potential bidders; (3) that controlled the price; (4) at a sale. *See, e.g., In re Sunnyside Timber, LLC*, 413 B.R. 352 (Bankr. W.D. La. 2009).

16

Plaintiff has not satisfied any of these elements.[9]  As discussed at length in section III.C.

above, there is no agreement.[10]  Further, the Shutts Defendants undeniably were never bidders or

potential bidders at the sale.  They were not, and were never intended to be, actual or potential

purchasers of the Property; nor were they ever parties to any agreement.  Their sole and

exclusive role was as counsel to Arevalo in connection with a potential joint venture with Crystal

Tower. The Defendants have been unable to locate a single case where a court imposed liability

on an attorney under 363(n).  This is unsurprising as the statute is directed at "bidders."

Moreover, intention to set the price must also be proven.  "Collusion requires 'an intention or an

objective to influence the price.'"  *In re GSC, Inc*., 453 B.R. 132, 154 (Bankr. S.D.N.Y 2011)

(quoting *In re N.Y. Trap Rock Corp*., 42 F.3d 747, 752 (2d Cir.1994) (finding an effect on sale

price alone not sufficient to constitute collusive bidding)).   Plaintiff has submitted no evidence

that the Shutts Defendants intended to control the price. Botero, for his part, testified that he had

no objection to Arevalo making a separate offer if they could not reach agreement. (DSOMF ¶

7). And Arevalo never had the funding to make a separate offer (hence his search for a joint

venture partner).  (DSOMF ¶ 5).

---

[9] The Section 363(n) claim, as well, is time barred.  Since Section 363 does not itself contain a statute of limitations, the courts characterize section 363(n) claims (and all related claims) as motions under Rule 60(b)(3). *In re Int'l Nutronics, Inc.*, 28 F. 3d 965, 969-70 (9th Cir, 1994); *In re Clinton St. Food Corp*., 254 B.R. 523, 531-32 (Bankr. S.D.N.Y. 2000). Rule 60(c)(1) provides that Rule 60(b)(3) motions must be made "no more than a year after the entry of the judgment or order or the date of the proceeding" *Sunnyside Timber*, 413 B.R. at 361; *see also In re Met-L-Wood Corp*., 861 F.2d 1012, 1018 (7th Cir. 1988) (explaining the applicability of the one-year statute of limitations to motions under Rule 60(b)(3)). Plaintiff's (as purported successor in interest to the Trustees) claims are time-barred because they first were raised over two years after the July 2013 Sale Order (This case was filed on November 7, 2015).  (ECF No. 1).

[10] Even if Botero and Arevalo had reached agreement on the joint venture, that in itself would not violate 363(n). Joint offers do not constitute collusion. *In re GSC, Inc*., 453 B.R. 132, 154 (Bankr. S.D.N.Y 2011).

Plaintiff's theory also fundamentally disregards the established fact that no "sale" ever took place on the $19.5 million contract. While Crystal Tower had entered a contract to purchase the Beacon Parcels for $19.5 million, **that sale did not go through**. Accordingly, there can be no Section 363 claims regarding the $19.5 million contract since no "sale" ever took place with respect to that contract. It is undisputed that the Defendants had no involvement whatsoever with the only sale that actually took place in this case – the actual purchase of the property by Watson Investigations for $21.5 million.

The law is clear that the agreement at issue must be with the actual purchaser of the property and must control the sales price of that purchase. *See, e.g., Landscape Properties, Inc. v. Vogel*, 46 F.3d 1416 (8th Cir. 1995) (concluding that an element of the claim is that the "**sales price** of the property was **controlled** by an agreement between the Defendants.") (emphasis added). As the Courts have explained, the requirement that the agreement "***control***" price at a sale does not implicate agreements that merely "affect" the sale price. *See In re New York Trap Rock Corp.,* 42 F.3d 747, 752 (2d Cir. 1994). There is no such evidence, and Plaintiff's motion should be denied.[11]

## G. THE BANKRUPTCY COURT PROCEEDINGS PRECLUDE PLAINTIFF'S CLAIMS.

Plaintiff's claims are barred by the July 22, 2013 Sale Order issued by the U.S. Bankruptcy Court for the Southern District of Florida ("Sale Order"). That "final judgment[] on

---

[11] Plaintiff also lacks standing under 11 U.S.C. § 363(n), which empowers only the "trustee" to avoid a sale. *See Butan Valley, N.V.*, No. H-09-3003, 2009 WL 5205343, at *2 (S.D. Tex. Dec. 23, 2009). Additionally, the only rights and claims Plaintiff purchased from the Trustees were those "relating to Crystal's offer to purchase the BBV and BDP Parcels." (DSOMF ¶16). That offer was terminated and never resulted in a sale. Plaintiff therefore cannot claim damages flowing from the sale of the property to Watson Investigations at a higher price. *See* Litigation *In Re New Energy Corp.*, 739 F.3d 1077, 1079 (7th Cir. 2014) (plaintiff lacked standing to complain of sale at increased price).

18

the merits" (DSOMF ¶ 15) collaterally estops the Plaintiff from seeking to re-litigate the same issues here. *See Irvin v U.S.,* 335 Fed. Appx. 821, 822 (11th Cir. 2009) ("[R]e-litigation of an issue that has been previously litigated and decided is precluded"); s*ee Allen v. McCurry,* 449 U.S. 90, 94-95 (1980) ("[T]he Court has eliminated the requirement of mutuality in applying collateral estoppel to bar relitigation of issues decided earlier in federal-court suits.").

Under similar circumstances, the Seventh Circuit held that a bankruptcy trustee was barred from filing a RICO suit against the debtor and others – *including their lawyers* – involved in a bankruptcy asset sale after the sale had been confirmed. *In re Met–L–Wood Corp.,* 861 F.2d 1012, 1016, 1018 (7th Cir. 1988). The Court expressly upheld the trial court's order of dismissal, based on "[t]he ground" of "collateral estoppel." *Id.; see In re Farmland Indus., Inc. v. Rinaldi,* 639 F. 3d 402 (8th Cir. 2011) (affirming lower court's dismissal, based on collateral estoppel, of fraud claims by unsuccessful bidder in bankruptcy sale, including on grounds that there was no injury traceable to defendant's actions); *In re Int'l Nutronics,* 28 F. 3d at 969-70 (upholding dismissal of antitrust claims for damages based on holding that "a bankruptcy court's order confirming a sale has preclusive effects").

The Sale Order expressly provides in paragraph 3 that "the proposed sale is the product of an arms-length negotiation and transaction between Watson and the Trustees.  The proposed transaction represents appropriate and valid exercise of the Trustees' business judgment." Paragraph 7 of the Sales Orders holds that "sale and transfer . . . shall be free and clear of all . . . claims . . . of every kind and nature, . . . at law or in equity."  Finally, in paragraph 13 of the Sales Orders, the Court expressly holds that the sale was "in 'good faith,' as that term is used [in] 11 U.S.C. § 363(m)."  (DSOMF ¶ 15).

In this case, the principles of estoppel are especially compelling.  Not only did the Trustee, as Plaintiff's predecessor in interest, support the Sale Order, counsel for SLS – Plaintiff's sister company controlled by the same principals – confirmed on the record at the hearing that *"[w]e fully support the sale motion as well."*  (DSOMF ¶ 15).  Established principles of judicial estoppel also bar Plaintiff from disavowing the position of the Trustees (its predecessors in interest) or its sister Company.  *Burnes v. Pemco Aeroplex, Inc.*, 291 F.3d 1282, 1285 (11th Cir. 2002) (stating that party is estopped from advancing an inconsistent position to one accepted in an earlier proceeding); *see In re 785 Partners, LLC,* 470 B.R. 126, 133 (Bankr. S.D.N.Y 2012) (stating that assignee stands in shoes of assignor).  "Words have meaning," as the late Justice Antonin Scalia said in 2013, "[a]nd their meaning doesn't change."  Jennifer Senior, *In Conversation: Antonin Scalia*, N.Y. MAG., Oct. 6, 2013. Wish and Sider should not be heard to change positions now.

## IV.   <u>CONCLUSION</u>

For all the reasons set forth above, Plaintiff's motion should be denied.

COFFEY | BURLINGTON

2601 South Bayshore Drive, Penthouse, Miami, FL 33133 · T. 305·858·2900  F. 305·858·5261

Respectfully submitted,

By: _____ */s/ Kendall B. Coffey* _____
        Kendall B. Coffey, Esq. – Florida Bar No. 259861
        kcoffey@coffeyburlington.com
        Kevin C. Kaplan, Esq. – Florida Bar No. 933848
        kkaplan@coffeyburlington.com
        David J. Zack, Esq. – Florida Bar No. 641685
        dzack@coffeyburlington.com
        vmontejo@coffeyburlington.com
        service@coffeyburlington.com
        COFFEY BURLINGTON, P.L.
        2601 South Bayshore Drive, Penthouse One
        Miami, Florida  33133
        Telephone: (305) 858-2900
        Facsimile:  (305) 858-5261
        *Counsel for Defendants Shutts & Bowen LLP and*
        *Kevin D. Cowan*

        */s/ Lawrence Goodman* _____
        Lawrence D. Goodman, Esq.
        Florida Bar No. 712647
        lgoodman@devinegoodman.com
        efiling@devinegoodman.com
        smallet@devinegoodman.com
        DEVINE GOODMAN RASCO
        WATTS-FITZFERALD, LLP
        2800 Ponce de Leon Boulevard, Suite 1400
        Coral Gables, FL 33134
        Telephone: (305) 374-8200
        Facsimile:  (305) 374-8208
        *Counsel for JA Energy Resources, LLC and Jorge*
        *Arevalo*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a true and correct copy of the foregoing was served by Notice of Electronic Filing generated by CM/ECF, on March 28, 2017, on all counsel or parties of record on the Service List below.

*/s/ Kendall B. Coffey*
Kendall B. Coffey

## <u>SERVICE LIST</u>

### Case No. 1:15-cv-24176-GAYLES

## <u>SERVICE LIST</u>

| **Jerrold A. Wish, Esq.**<br>jwish@wishlaw.net<br>THE WISH LAW FIRM<br>1927 NW 104th Way<br>Gainesville, Florida  32606<br>Telephone:  (786) 200-7077<br><br>*Attorneys for Plaintiff* | **Adam J. Breeden, Esq.**<br>Adam@Breedenandassociates.com<br>tina@breedenandassociates.com<br>BREEDEN & ASSOCIATES, PLLC<br>1404 S. Jones Blvd.<br>Las Vegas, NV 89146<br>Telephone:  (702) 508-9250<br>Facsimile:   (702) 508-9365<br><br>*Attorneys for Plaintiff* |
| --- | --- |
| **Ronald L. Kammer, Esq.**<br>rkammer@hinshawlaw.com<br>dphangsang@hinshawlaw.com<br> nbroche@hinshawlaw.com<br>**H. Steven Vogel, Esq.**<br>svogel@hinshawlaw.com<br>clucas@hinshawlaw.com<br>HINSHAW & CULBERTSON LLP<br>2525 Ponce de Leon Blvd., 4th Floor<br>Coral Gables, Florida 33134<br>Telephone: (305) 358-7747<br>Facsimile: (305) 577-1063<br><br>*Attorneys for Defendant Watson Investigations, LLC and Francis H. Scola, III* | Omar Botero<br>333 Halissee Street<br>Miami, Florida  33133<br><br><br>Omar Botero and<br>Alianza Financial Services, LLC and<br>Alianza Holdings, LLC<br>2020 Coral Way, Suite 2-363<br>Miami, Florida  33145 |

COFFEY | BURLINGTON
2601 South Bayshore Drive, Penthouse, Miami, FL 33133 · T. 305·858·2900  F. 305·858·5261

| | |
|---|---|
| **Charles Tatelbaum, Esq.**<br>cmt@trippscott.com<br>lxc@trippscott.com<br>**Michael C. Foster, Esq.**<br>mcf@trippscott.com<br>iah@trippscott.com<br>**Edward R. Curtis, Esq.**<br>erc@trippscott.com<br>pfb@trippscott.com<br>**Christina V. Paradowski, Esq.**<br>cvp@trippscott.com<br>TRIPP SCOTT, P.A.<br>110 S.E. 6th Street, 15th Floor<br>Ft. Lauderdale, FL  33301<br>Telephone:  (954) 525-7500<br>Facsimile:  (954) 761-7500<br><br>*Attorneys for Steven C. Cronig* | **Albert F. Delaney,** *Pro Se*<br>45 Scarlet Woods Court<br>Spring, TX  77380<br>Telephone:  (786) 683-0002<br>vfsdelaney@att.net<br><br>*Defendant* |

COFFEY | BURLINGTON

2601 South Bayshore Drive, Penthouse, Miami, FL 33133 · T. 305·858·2900  F. 305·858·5261