UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Case No. 15-cv-24176-GAYLES

JAWHBS, LLC,

          Plaintiff,

     v.

JORGE E. AREVALO, et al.,

          Defendants.

_____/

## ORDER

**THIS CAUSE** comes before the Court on two motions to dismiss. The first motion [ECF No. 208] (the "Joint Motion") is filed by Defendants Jorge E. Arevalo; JA Energy Resources, LLC ("JA Energy"); Shutts & Bowen, LLP ("Shutts & Bowen"); Kevin D. Cowan; Albert F. Delaney (who proceeds in this action *pro se*); Omar Botero (who also proceeds in this action *pro se*); Alianza Financial Services, LLC ("Alianza Financial"); Alianza Holdings, LLC ("Alianza Holdings"); Watson Brickell Development, LLC ("Watson Brickell"), formerly known as Watson Investigations, LLC; and Steven Carlyle Cronig.[1] The second motion [ECF No. 210] (the "Shutts Motion") is filed by Defendants Shutts & Bowen and Cowan. In this antitrust action, Plaintiff JAWHBS, LLC ("JAWHBS"), has sued the Defendants, developers and their legal counsel, alleging that they colluded and participated in a bid-rigging scheme to acquire parcels of land in the Brickell Avenue section of Miami, Florida, at a depressed price during a U.S. Bankruptcy auction and sale. The Court has carefully considered the operative complaint, the parties' briefs, and the

---

[1] This motion was also brought by Francis H. Scola, III, at the time it was filed, but the Court has since dismissed all claims against Scola on motion of the parties [ECF No. 338]. Also since filing, defaults were entered against Alianza Financial and Alianza Holdings [ECF No. 366], after they failed to retain counsel following the withdrawal of their prior counsel. Because these Defendants were represented by counsel at the time this motion was filed, however, the Court will consider them nondefaulted parties for purposes of this Order.

Defaults were entered earlier in the litigation against Defendants Crystal Tower Partners II, LLC, and Crystal Tower on Brickell Plaza, LLC [ECF No. 51], both of which never made an appearance.

applicable law and is otherwise fully advised in the premises. For the reasons that follow, the motions to dismiss shall be granted in part and denied in part.

## I.       BACKGROUND

JAWHBS's allegations in its Third Amended Complaint concern the July 2013 bankruptcy sale of four adjacent parcels of land at the intersection of S.E. 8th Street and S.E. 1st Avenue in the Brickell Avenue section of Miami, Florida (the "Brickell Parcels" or the "Parcels")—18 S.E. 8th Street, 30 S.E. 8th Street, and 830 Brickell Plaza/S.E. 1st Avenue, respectively. Third Am. Compl. ¶ 34. Three of the Parcels are parcels of land and the fourth is a parcel of land rights in the form of an easement for ingress/egress to the site over an adjacent lot. *Id.* The Brickell Parcels are located across from the one-billion-plus–dollar Brickell City Centre project and next to the Mary Brickell Village shopping and dining area, and they are suitable for development of a high rise condominium project. *Id.* Prior to July 2013, the Parcels were owned by two different business entities controlled by developer Renzo Renzi: Beacon at Brickell Village, LLC ("BBV"), and Beacon Developer Partners, LLC ("BDP"). *Id.* ¶ 35.

In early 2013, BBV and BDP filed for bankruptcy protection in the U.S. Bankruptcy Court for the Southern District of Florida. *Id.* ¶ 36. As a result, two different bankruptcy trustees (the "Trustees") came to control the Brickell Parcels and sought to sell them for the benefit of creditors of the estates before a foreclosure could occur. *Id.* In and before July 2013, the Trustees sought to sell the Brickell Parcels under 11 U.S.C. § 363, a process controlled by the court that involves disclosing offers after which competing buyers, creditors, or other interested parties have an opportunity to object or overbid. *Id.* ¶ 37. The sale of the Parcels was open for offers from anyone, anywhere in the world. *Id.* ¶ 38. The Trustees; the bankruptcy estates (which have now assigned or transferred all rights or claims arising out of the sale or bidding to Plaintiff JAWHBS); and SLS Properties Three, LLC ("SLS"), a major creditor of the bankruptcy estates (and a former

Plaintiff in this action) all stood to benefit financially from the highest possible sales prices for the Parcels. *Id.* ¶¶ 39-40. Yet JAWHBS alleges that the Defendants "all had various parts and roles in a conspiracy and concert of action to aid and abet and collude with each other to artificially depress the sales price of the Brickell Parcels, to the detriment of the Plaintiffs." *Id.* ¶ 41.

Specifically, prior to June 14, 2013, Omar Botero, acting on behalf of Alianza Financial; Alianza Holdings; Crystal Tower Partners II, LLC; and Crystal Tower on Brickell Plaza, LLC (collectively, along with Delaney, defined in the Third Amended Complaint as the "Botero Group," *see id.* ¶ 27),[2] negotiated a proposal with the Trustees to purchase the Parcels for $19.5 million through a company called Crystal Tower Brickell. *Id.* ¶ 42. Botero signed a letter of intent vis-à-vis the purchase on June 14th, but the Trustees never executed it. *Id.* The Trustees filed a motion in the Bankruptcy Court to approve the sale on June 25th, and the hearing was set for July 10th. *Id.* Botero and Delaney, acting on behalf of Alianza Financial, Alianza Holdings, Crystal Tower Partners, and Crystal Tower on Brickell Plaza, intended to build a 70-story, 300-plus–unit condominium project on the Brickell Parcels that would result in net profits of over $90 million. *Id.* ¶ 43. Unbeknownst to the Trustees at the time, the "Arevalo Group" (defined in the Third Amended Complaint as Arevalo; JA Energy; Shutts & Bowen; and Cowan, *see id.* ¶ 26)[3] was also interested in the Brickell Parcels. *Id.* ¶ 44. JAWHBS contends that, if not for the acts it alleges, the Arevalo Group would have become a second competitive bidder against the Botero Group, which would have driven the Parcels' sales price up to a fair market value. *Id.*

Prior to July 10, 2013, the Arevalo Group and the Botero Group agreed to collude to artificially prevent competitive bidding on the Brickell Parcels and depress their sales price. *Id.* ¶ 45.

---

[2]   JAWHBS alleges that Botero and/or Delaney acted at all relevant times as the owners, principals, agents, or alter egos of the Alianza and Crystal Tower entities, which themselves were merely partners, joint ventures, agents, or alter egos of each other. Third Am. Compl. ¶¶ 17-18.

[3]   JAWHBS alleges that Arevalo acted at all relevant times as the owner, principal, agent, or alter ego of JA Energy, and that Cowan acted at all relevant times as the owner, principal, partner, agent or alter ego of Shutts & Bowen. *Id.* ¶¶ 5, 8.

The Botero Group agreed to pay the Arevalo Group the flat sum of $1.2 million, as well as a share in profits and a discount to purchase an interest in the Parcels, in exchange for "their forbearance from making an offer or bid to own the [Parcels]"—an agreement that was reduced to a writing dated July 8, 2013. *Id.* Arevalo, Cowan, Botero, and Delaney all personally knew of the negotiations and the agreement, and they participated in the negotiations toward the anticompetitive purpose. *Id.* ¶ 46. To compel the Botero Group's assent to the alleged bid rigging, both Arevalo and Cowan indicated the Arevalo Group's intent to expose their presence as a competing bidder group to the Trustees or the Bankruptcy Court if the Botero Group did not agree to their terms. *Id.* ¶ 47. According to JAWHBS, the Botero Group was ready, willing, and able to purchase the Parcels without the Arevalo Group's involvement and had no legitimate commercial need for the Arevalo Group's involvement. *Id.* ¶ 48. The sole or primary purpose of negotiating or entering into an agreement with the Arevalo Group was to prevent competition. *Id.*

On July 5, 2013, Botero, acting on behalf of the Botero Group, indicated an agreement with the terms of the negotiations and writings by stating in a text message to Arevalo, "Jorge, we are going to do the business with you . . . ." *Id.* ¶ 49. Botero reminded Arevalo not to take any action that might upset the agreement Botero had signed with the Trustees because such action "will cause a bidding war where the only certain result is that the price for the property will go up for everyone . . . ." *Id.* ¶ 50.

In an e-mail dated July 8, 2013, Delaney wrote to Cowan to confirm that the Botero Group "made a min bid of 19.5 mm. We will go higher." *Id.* ¶ 51. On July 8, 2013, Delaney sent Arevalo and Cowan a draft term sheet, which provided that Arevalo "[a]gree[s] within the formal agreement not to compete in any way, directly or indirectly against the [Botero Group] or its parent, in the acquisition of the [Brickell Parcels]." *Id.* ¶ 52. On July 9, 2013, the day before the approval hearing, the Botero Group and the Arevalo Group again redrafted their agreement and expressly

4

stated that the Arevalo Group would refrain from making any "filing, offer or bid to purchase or object to the trustees['] motion for approval for the sale to [the Botero Group] at the hearing scheduled for July 10, 2013 at 9:30 AM or at any adjourned date and time of the hearing set to decide on approving or not approving the trustee's sale to [the Botero Group]." *Id.* ¶ 53. In the midst of finalizing this documentation, Cowan sent an email to Botero indicating that Arevalo was threatening to file a notice of appearance in the bankruptcy case, which may have alerted the Trustees to the existence of another potential bidder. *Id.* ¶ 54. Cowan also made handwritten notes on draft agreements to ensure that no one would file a notice with the Bankruptcy Court that would alert the court or the Trustees of Arevalo's presence. *Id.*

At the hearing on July 10, 2013, Arevalo personally appeared along with counsel from Shutts & Bowen. At the hearing, the Arevalo Group represented to U.S. Bankruptcy Judge Laurel Isicoff that it was prepared to submit a "higher and better offer" and admitted that the prior agreement between it and the Botero Group was "to effectively not make a higher and better bid in bankruptcy." *Id.* ¶ 55. Given this admission, Judge Isicoff made more than one comment during the hearing that a finding of good faith in the proposed sale to the Botero Group, pursuant to 11 U.S.C. § 363(m), was unlikely to occur. *Id.* ¶ 56. After the hearing, the Botero Group withdrew its purchase offer. *Id.* ¶ 57.

Faced with a short deadline to submit a bid, the Arevalo Group prepared to submit a $22 million offer for the Brickell Parcells. *Id.* ¶ 58. To secure this funding, the Arevalo Group contacted persons associated with the "Watson Group" (defined in the Third Amended Complaint as Watson Brickell, Cronig, and former Defendant Francis Scola, *id.* ¶ 28).[4] *Id.* ¶ 58. The Watson Group used the knowledge, information, and results of the Arevalo Group's prior bid rigging to its advantage

---

[4]   JAWHBS alleges that Cronig acted at all relevant times as the owner, principal, agent, or alter ego of Watson Brickell. *Id.* ¶ 22.

by refusing to fund the Arevalo Group and by offering a lower bid of $21.5 million. *Id.* ¶ 59. The bid was submitted with Cronig as a straw man buyer who refused to identify the true principals behind the Watson Group to conceal their association with Arevalo. *Id.*. The Watson Group knew that there existed only a small number of potential buyers, and by sabotaging the main competing offer by the Arevalo Group—by refusing to finance it or by interfering with its financing—it fixed the auction in its favor and could name its own price. *Id.* ¶ 60. Cronig personally sent an email on July 11, 2013, to a third party with the purpose of preventing Arevalo from obtaining financing for his $22 million bid so that the Watson Group could eliminate him as competition and acquire the Parcels at a lower price. *Id.* ¶ 61.

The Trustees, facing stifled competition and a hard deadline to prevent foreclosure, accepted the only available offer of $21.5 million for the Brickell Parcels—a price significantly below the true value or market value of the Parcels—and a sale of the Parcels to Watson Brickell, occurred on or about July 26, 2013. *Id.* ¶¶ 65, 67. At the time of the sale, the Trustees and the Bankruptcy Court were unaware of the extent of the alleged bid rigging and collusion between and among the Botero Group, the Arevalo Group, and the Watson Group. *Id.* ¶ 66.

In a later lawsuit Arevalo filed against the Watson Group, he admitted that the Brickell Parcels were a "lucrative investment opportunity" that were "extremely valuable" and commanded a "premium price" due to their location, and the price the Botero Group was going to pay was a "discounted rate." *Id.* ¶ 69. Following the sale, internal documents from the Botero Group were discovered stating that the Botero Group valued the Parcels at $31 million. *Id.* ¶ 70. The Watson Group later acquired a parcel adjacent to the Brickell Parcels. *Id.* ¶ 71. In 2015, it attempted to sell the still-undeveloped Brickell Parcels for $55-to-65 million per acre. *Id.* Some documents or agreements entered into prior to the sale referred to a "buy out option," under which the Arevalo Group would have the option to pay $31.4 million for the Parcels, free and clear of any other side

deals. *Id.* ¶ 72. JAWHBS alleges that this figure more closely represents the approximate true value of the Brickell Parcels at the time of the sale, had the Defendants not colluded to suppress bidding. *Id.*

On or about March 5, 2015, JAWHBS purchased for value and was transferred all potential claims of the Trustees and the estates pursuant to an Assignment of Claims given by the Trustees. *Id.* ¶ 76. JAWHBS and SLS then filed the instant action November 11, 2015. In an Order dated August 4, 2016, the Court dismissed SLS as a Plaintiff for lack of standing, dismissed JAWHBS's claims for failure to state a claim, and granted JAWHBS leave to amend its complaint. [ECF No. 176]. The Third Amended Complaint is now before the Court, in which JAWHBS brings six causes of action against all Defendants, alleging (1) violations of the Sherman Antitrust Act, 15 U.S.C. § 1 *et seq.*, and the Clayton Antitrust Act, 15 U.S.C. § 12 *et seq.*; (2) violations of the Florida Anti-trust Act, Fla. Stat. § 542.15 *et seq.*; (3) violations of the Florida Deceptive and Unfair Trade Practices Act ("FDUTPA"), Fla. Stat. § 501.204(1); (4) a claim for damages under 11 U.S.C. § 363(n); (5) civil conspiracy and civil aiding and abetting; and (6) interference with prospective economic advantage and business relationship. *See* Third Am. Compl. ¶¶ 77-141. The Defendants have moved to dismiss all claims.

## II.    LEGAL STANDARD

To survive a motion to dismiss brought pursuant to Federal Rule of Civil Procedure 12(b)(6), a claim "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face,'" meaning that it must contain "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). While a court must accept well-pleaded factual allegations as true, "conclusory allegations . . . are not entitled to an assumption of truth—legal conclusions must be supported by factual allegations."

*Randall v. Scott*, 610 F.3d 701, 709-10 (11th Cir. 2010). "[T]he pleadings are construed broadly," *Levine v. World Fin. Network Nat'l Bank*, 437 F.3d 1118, 1120 (11th Cir. 2006), and the allegations in the complaint are viewed in the light most favorable to the plaintiff, *Bishop v. Ross Earle & Bonan, P.A.*, 817 F.3d 1268, 1270 (11th Cir. 2016). The question is not whether the claimant "will ultimately prevail . . . but whether his complaint [is] sufficient to cross the federal court's threshold." *Skinner v. Switzer*, 562 U.S. 521, 530 (2011).

## III.   DISCUSSION

### A.   *Shotgun Pleading*

At the outset, the Court rejects the Defendants' argument that the Third Amended Complaint should be dismissed as a shotgun pleading because, they contend, JAWHBS impermissibly accuses groups of Defendants of committing the allegedly unlawful acts. "The fact that defendants are accused collectively does not render the complaint deficient," because "[t]he complaint can be fairly read to aver that all defendants are responsible for the alleged conduct." *See Kyle K. v. Chapman*, 208 F.3d 940, 944 (11th Cir. 2000).

### B.   *Res Judicata*

The Defendants' argument that JAWHBS's claims are barred by res judicata also has no merit.[5] The Court reiterates below the relevant standard governing a res judicata analysis, previously discussed in its order on the Defendants' first motions to dismiss.

The doctrine of res judicata (or claim preclusion) "prohibits successive litigation of the very same claim by the same parties." *Whole Woman's Health v. Hellerstedt*, 579 U.S. —, —, 136 S. Ct. 2292, 2305 (2016) (citation and internal quotation marks omitted). This prohibition bars "the parties or their privies from relitigating issues that were or could have been raised" in an action that resulted in a final judgment on the merits. *Allen v. McCurry*, 449 U.S. 90, 94 (1980).

---

[5]   The Court notes that Shutts & Bowen and Cowan did not join in this argument. Joint Mot. at 8 n.7.

In the Eleventh Circuit, a party seeking to invoke this doctrine must establish four initial elements: "(1) the prior decision must have been rendered by a court of competent jurisdiction; (2) there must have been a final judgment on the merits; (3) both cases must involve the same parties or their privies; and (4) both cases must involve the same causes of action." *Kaiser Aerospace & Elecs. Corp. v. Teledyne Indus., Inc.* (*In re Piper Aircraft Corp.*), 244 F.3d 1289, 1296 (11th Cir. 2001). If the party raising res judicata satisfies these elements, the court next determines whether the claim in the new suit was or could have been raised in the prior action; if yes, res judicata applies. *Id.* But "[i]f even one of the[] [required] elements is missing, res judicata is inapplicable." *Id.*

Here, the Defendants again fail to establish that this case and the bankruptcy proceedings involve the same causes of action. The Defendants contend that JAWHBS's claims involve the same facts and legal issues regarding collusion that were previously raised in the Bankruptcy Court, but this argument is wholly irrelevant, as it ignores the temporal elephant in the room. The Eleventh Circuit's view on this issue is unequivocal:

> [W]e do not believe that the res judicata preclusion of claims that "could have been brought" in earlier litigation includes claims *which arise after the original pleading is filed in the earlier litigation*. Instead, we believe that, for res judicata purposes, claims that 'could have been brought' are claims *in existence at the time the original [pleading] is filed* or claims actually asserted . . . in the earlier action.

*Id.* at 1298 (first emphasis added) (quoting *Manning v. City of Auburn*, 953 F.2d 1355, 1360 (11th Cir. 1992)); *see also Sophocleus v. Ala. Dep't of Transp.*, 371 F. App'x 996, 998 n.3 (11th Cir. 2010) (per curiam). There is still no dispute that JAWHBS's claims were not actually asserted in the bankruptcy proceedings. And the allegations in the Third Amended Complaint are unchanged from the previous iteration—BBV and BDP filed for bankruptcy in early 2013, but the alleged activities that give rise to the instant claims did not begin until June of that year at the earliest. Thus, JAWHBS's claims could not have been in existence at the time BBV and BDP's bankruptcy petition was filed. *Cf. Hodges v. Publix Super Markets, Inc.*, 372 F. App'x 74, 77 (11th Cir. 2010)

(per curiam) (rejecting a plaintiff's attempt to rely on *In re Piper Aircraft Corp.* to avoid dismissal on res judicata grounds because the facts alleged in his second action "were in existence at the time he filed" his first). Because the Defendants have failed to satisfy this element, their res judicata argument fails.

### C.     *Substantive Claims*

#### 1.     **Federal Antitrust**

Section 1 of the Sherman Act provides: "Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the Several States or with foreign nations, is declared to be illegal." 15 U.S.C. § 1. Section 4 of the Clayton Act creates a private right of action for "any person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws" (including the Sherman Act), who "may sue therefor . . . , and shall recover threefold the damages by him sustained." 15 U.S.C. § 15(a).[6] But because this provision, if read literally, would "encompass every harm that can be attributed directly or indirectly to the consequences of an antitrust violation," *Associated Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters*, 459 U.S. 519, 529 (1983), "courts require parties to show that they are the proper plaintiffs to vindicate the public's interest in enforcing the antitrust laws," *Palmyra Park Hosp., Inc. v. Phoebe Putney Mem'l Hosp.*, 604 F.3d 1291, 1298 (11th Cir. 2010). To maintain a private damage action, Section 4 of the Clayton Act requires that a plaintiff must establish that it has standing and that the defendant has violated the antitrust laws. *See Levine v. Cent. Fla. Med. Affiliates, Inc.*, 72 F.3d 1538, 1545 (11th Cir. 1996). The standing required is what Eleventh Circuit cases "have referred to as 'antitrust standing,'" *Duty Free Ams., Inc. v. Estee Lauder Cos., Inc.*, 797 F.3d 1248, 1273 (11th Cir. 2015), a prudential consideration "aimed at preserving the effective enforcement of the antitrust laws" that goes beyond the requirements of mere Article III

---

[6]   JAWHBS brings a claim under this section. *See* Third Am. Compl. ¶ 86; *see also id.* ¶ 80.

"case or controversy" standing, *Palmyra Park Hosp.*, 604 F.3d at 1299.

Courts employ a two-prong test for antitrust standing. First, the plaintiff must allege not merely a violation of antitrust laws, but that it suffered an "antitrust injury," defined as an "injury of the type the antitrust laws were intended to prevent and that flows from that which makes the defendants' acts unlawful." *Brunswick Corp. v. Pueblo Bowl-o-Mat, Inc.*, 429 U.S. 477, 489 (1977); *see also Palmyra Park Hosp.*, 604 F.3d at 1299. Second, the plaintiff must allege facts sufficient to show that it is an "efficient enforcer" of the antitrust laws. *Palmyra Park Hosp.*, 604 F.3d at 1299. Courts consider a nonexhaustive list factors in determining whether a plaintiff would be an efficient enforcer: the directness or indirectness of the injury, the remoteness of the injury, whether other potential plaintiffs were better suited to vindicate the harm, whether the damages were highly speculative, the extent to which the apportionment of damages was highly complex and would risk duplicative resources, and whether the plaintiff would be able to efficiently and effectively enforce the judgment. *Id.*; *see also Associated General*, 459 U.S. at 537-46.

The lower federal courts have been generally reluctant to articulate a bright-line rule as to what a plaintiff must establish in order to be considered an efficient enforcer, relying instead on *Associated General*'s flexible list of factors. However, the Eleventh Circuit did articulate one such bright-line rule (directly applicable here) in *Sunbeam Television Corp. v. Nielsen Media Research, Inc.*, 711 F.3d 1264, 1273 (11th Cir. 2013), when it held, as a matter of first impression, that "[w]hether or not the plaintiff is a customer or competitor, in order to meet the second prong, the plaintiff must prove the existence of a competitor willing and able to enter the relevant market, but for the exclusionary conduct of the incumbent monopolist." For present purposes, this particular rule in *Sunbeam* should be read to require that, to withstand a motion to dismiss, JAWHBS must allege the existence of a viable potential competitor who "has 'take[n] some affirmative steps to

11

enter'" the relevant market,[7] *id.* (quoting *Gas Utils. Co. of Ala., Inc. v. So. Natural Gas Co.*, 996 F.2d 282, 283 (11th Cir. 1993)), but whose efforts have been stifled by the Defendants' alleged exclusionary conduct.

JAWHBS has not done so. It alleges that the agreement between the Arevalo Group and the Botero Group depressed the sale price of the Brickell Parcels below their true value or market value, and it alleges that the actions of the Watson Group vis-à-vis the Arevalo Group had the effect of fixing the sale price in the Watson Group's favor. But these allegations relate more to the first prong—whether JAWHBS plausibly suffered an antitrust injury—than the second. What JAWHBS pertinently does *not* allege is the existence of any potential bidder who was willing and able to enter a bid for the Brickell Parcels *but for* the conduct of the Defendants that excluded that potential bidder from the market. This failure by JAWHBS to advance the required allegations results in a failure to satisfy the second prong of the antitrust standing analysis, which itself is dispositive of the entire antitrust claim; the Court need not undergo an analysis of whether JAWHBS has alleged that it suffered an antitrust injury, nor of the overarching question of whether the Defendants have violated the antitrust laws. *See id.* at 1273-74. Accordingly, the motions to dismiss Count I of the Third Amended Complaint are granted.

## 2.    State Antitrust

In enacting the Florida Antitrust Act, Fla. Stat. § 542.15 *et seq.*, the Florida Legislature expressly stated its "intent . . . that, in construing this chapter, due consideration and great weight be given to the interpretations of the federal courts relating to comparable federal antitrust statutes." *Id.* § 542.32. To that end, "[c]onsistent with the above stated intent of the Florida legislature, the standing requirements for a private cause of action under the Florida Antitrust Act parallel the standing requirements of Section 4 of the Clayton Act." *Mack v. Bristol-Myers Squibb Co.*, 673

---

[7]    In this case, the "relevant market" would be the group of bidders vying to purchase the Brickell Parcels.

So. 2d 100, 102 (Fla. 1st DCA 1996) (citation omitted); *accord Andrx Pharm., Inc. v. Elan Corp., PLC*, 421 F.3d 1227, 1233 n.5 (11th Cir. 2005) (explaining that Florida and federal antitrust law are "analyzed under the same rules and case law"). Given that the Court has already found that JAWHBS lacks antitrust standing to bring this lawsuit under Section 4 of the Clayton Act, its claim under the Florida Antitrust Act must likewise be dismissed.

### 3.    FDUTPA

To state a claim under FDUTPA, a plaintiff must allege (1) a deceptive act or unfair practice, (2) causation, and (3) actual damages. *State Farm Mut. Auto. Ins. Co. v. Med. Serv. Ctr. of Fla., Inc.*, 103 F. Supp. 3d 1343, 1354 (S.D. Fla. 2015). A deceptive act is "one that is likely to mislead consumers," and an unfair practice is "one that offends established public policy and one that is immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers." *Washington v. La Salle Bank Nat'l Ass'n*, 817 F. Supp. 2d 1345, 1350 (S.D. Fla. 2011). Alternatively, a plaintiff satisfies the first element of his FDUTPA claim if he alleges a violation of "[a]ny law, statute, rule, regulation, or ordinance which proscribes unfair methods of competition, or unfair, deceptive, or unconscionable acts or practices." *Cross v. Point & Pay, LLC*, No. 16-1182, 2017 WL 1196676, at *5 (M.D. Fla. Mar. 31, 2017) (quoting Fla. Stat. § 501.203(3)(c)). Relevant to the instant motion, allegations that amount to a violation of the antitrust laws would satisfy this element. *See* Fla. Stat. § 501.204(2) (providing the Florida Legislature's intent that, in construing what constitutes, *inter alia*, unfair methods of competition, "due consideration and great weight shall be given to the interpretations of . . . the federal courts relating to [section] 5(a)(1) of the Federal Trade Commission Act"); *see also FTC v. Ind. Fed'n of Dentists*, 476 U.S. 447, 454-55 (1986) (finding that antitrust violations are unfair methods of competition under the Federal Trade Commission Act). That said, even in these so-called "*per se* violations" of FDUTPA, the plaintiff still must allege causation and actual damages.

Unlike in the federal and state antitrust analyses above, no standing issue prevents the Court from reaching an analysis of the merits of this claim, because "any person affected by a violation of this part" may bring a claim alleging a violation of FDUTPA. Fla. Stat. § 501.203; *see also Caribbean Cruise Line, Inc. v. Butter Bus. Bureau of Palm Beach Cnty., Inc.*, 169 So. 3d 164, 169 (Fla. 4th DCA 2015) ("[T]he legislature no longer intend[s] FDUTPA to apply to only consumers, but to other entities able to prove the remaining elements of the claim as well.").

### a. *Arevalo Group and Botero Group*

Taking the allegations in the Third Amended Complaint as true, and viewing all inferences in the light most favorable to JAWHBS, the Court finds that JAWHBS satisfies the first element of the FDUTPA analysis because it sufficiently alleges *per se* violations of the Sherman Act against Arevalo, JA Energy, Shutts & Bowen, and Cowan (the Arevalo Group); and Botero, Delaney, Alianza Financial, and Alianza Holdings (the Botero Group). "Conspiracies between firms to submit collusive, non-competitive, rigged bids are per se violations" of the Sherman Act. *United States v. Flom*, 558 F.2d 1179, 1183 (5th Cir. 1977). "An agreement that one company would not submit a bid lower than another is price fixing of the simplest kind and is a per se violation." *Id.* And "[a]n agreement to 'fix prices, allocate customers, rig bids, and coerce (others) to join the conspiracy' violate[s] the Act . . . ." *Id.* (quoting *United States v. Pa. Refuse Removal Ass'n*, 357 F.2d 806, 807 (3d Cir. 1966)). JAWHBS alleges that the Botero Group agreed to pay the Arevalo Group not to submit a lower bid on the Brickell Parcels. This is enough to withstand the Rule 12(b)(6) challenge as to those Defendants, as it describes a horizontal price-fixing scheme, which amounts to a *per se* violation of FDUTPA sufficient to satisfy the first element.[8]

---

[8]   In their separate motion to dismiss, Shutts & Bowen and Cowan argue that JAWHBS cannot allege that they violated the antitrust laws because, they contend, attorneys are exempt from antitrust liability for performing legal work on a client's behalf. "[A]n attorney may be found individually liable under the antitrust laws only if he exceeds his role as legal adviser and becomes an active participant in formulating policy decisions with his client to restrain competition." *Brown v. Donco Enters., Inc.*, 783 F.2d 644, 646 (6th Cir. 1986); *see also Tillamook Cheese & Dairy*

JAWHBS satisfies the second and third elements of its FDUTPA claim as to these De-
fendants, as well. The causal link between the Defendants' activity and the Brickell Parcels'
depressed sale price is plainly evident from the allegations, and "[p]ast lost profits," such as the
loss JAWHBS contends the Trustees suffered as a result of the depressed price, "appear to be a
proper form of 'actual damages'" under the statute. *Global Tech Led, LLC v. Hilumz Int'l Corp.*,
No. 15-0553, 2017 WL 588669, at *9 (M.D. Fla. Feb. 14, 2017). Accordingly, the motions to
dismiss Count III as to these Defendants are denied.

### b.    *Watson Group*

As for Watson Brickell and Cronig, the Court comes to a different conclusion. To suffi-
ciently state a claim for violation of Section 1 of the Sherman Act, a plaintiff must allege "that
there was concerted action between two or more persons—a 'conscious commitment to a common
scheme designed to achieve an unlawful objective'—in restraint of trade." *Procaps S.A. v. Patheon,
Inc.*, 845 F.3d 1072, 1080 (11th Cir. 2016) (quoting *Monsanto Co. v. Spray-Rite Serv. Corp.*, 465
U.S. 752, 568 (1984)). In other words, "Section 1 targets concerted action, not independent action."
*Id.* at 1082 (citing *Am. Needle, Inc. v. Nat'l Football League*, 560 U.S. 183, 190 (2010)). Taking
JAWHBS's allegations as true, all it has alleged is that Watson Brickell, Cronig, and Scola took
the information they gleaned from the consultation with Arevalo about Arevalo's planned bid and
used that information to their advantage in submitting a lower bid. These allegations do not amount

---

*Ass'n v. Tillamook County Creamery Ass'n*, 358 F.2d 115, 118 (9th Cir. 1966). Therefore, to state a claim against
an attorney for individual liability under antitrust law, a plaintiff must allege "that the defendant attorney exerted
his power and influence so as to direct [his client] to engage in the complained of acts for an anticompetitive pur-
pose." *Brown*, 783 F.2d at 646-47. While JAWHBS's allegations as to Cowan's participation in the alleged bid-
rigging scheme are not voluminous, the Court finds they are sufficient. JAWHBS alleges that Cowan participated
in the negotiations, along with Arevalo, Botero, and Delaney, regarding the Botero Group's payment to the Arevalo
Group in exchange for the Arevalo Group's forbearance from entering a bid. And it alleges that Cowan indicated
the Arevalo Group's intent to expose its presence as a competing bidder to the Trustees and/or the Bankruptcy
Court if the Botero Group did not agree to the scheme. Accepting these allegations as true, the Court finds it is plau-
sible that Cowan (and thereby Shutts & Bowen) exceeded the role of legal adviser and became an active participant
in the scheme, sufficient to support a claim for violation of the antitrust laws and thereby satisfy the first element
of the FDUTPA analysis.

to an antitrust violation, but instead simply describe the independent (though perhaps under-handed) machinations of a business competitor. *See Spectrum Sports, Inc. v. McQuillan*, 506 U.S. 447, 459 (1993) ("The [Sherman Act] directs itself not against conduct which is competitive, even severely so, but against conduct which unfairly tends to destroy competition itself."). And as JAWHBS does not allege that any agreement exists between Watson Brickell and Cronig and any other party, any FDUTPA claim against Watson Brickell or Cronig based on a *per se* violation of the antitrust laws must fail.

The Court then must turn to an analysis of a more "traditional" FDUTPA claim. Under this analysis, the Court cannot find that the allegations regarding Watson Brickell and Cronig's conduct amount to either a deceptive act or an unfair practice. Watson Brickell, through Cronig and Scola, refused to fund Arevalo's intended bid. This is not an act "likely to mislead consumers," nor is it a practice that "offends established public policy" or is "immoral, unethical, oppressive, unscrupu-lous or substantially injurious to consumers." *Washington*, 817 F. Supp. 2d at 1350. Simply because conduct is anticompetitive does not mean it necessarily becomes a deceptive act or unfair practice for purposes of FDUTPA. As a result, the motion to dismiss Count III is granted as to Watson Brickell and Cronig.

### 4.    11 U.S.C. § 363(n)

Section 363(n) of the Bankruptcy Code provides that a debtor may (a) avoid a sale approved under section 363(b) if the sale price was controlled by an agreement among potential bidders, or (b) recover from a party to such an agreement any amount by which the value of the property sold exceeds the price at which the sale was consummated. 11 U.S.C. § 363(n). Courts have articulated three essential elements of a Section 363(n) claim: (1) an agreement; (2) between potential bidders; (3) that controls the price at bidding. *Sunnyside Land, LLC v. Sims* (*In re Sunnyside Timber, LLC*), 413 B.R. 352, 364 (Bankr. W.D. La. 2009). Though it is true that "[a]n agreement proscribed by

section 363(n) need not be an explicit written agreement, but may be an oral agreement to collude or an agreement inferred from the behavior of the parties or the circumstances," *id.* at 363, a plaintiff must advance allegations of *an* agreement before a court need concern itself with the character of any agreement.

No allegations amounting to an agreement exist here. JAWHBS argues that it sufficiently states a Section 363(n) claim because, it alleges, Watson Brickell, Cronig, and Scola "took actions to 'sabotage' or interfere with the planned higher bid of Mr. Arevalo. Interference with other competing bids is a classic example of an agreement to control the sale price . . . ." Pl.'s Opp'n to Joint Mot. at 19. The Court disagrees. Even taking the allegations underlying that conclusion as true, the Defendants are correct that the allegations of "sabotage" by Watson Brickell, Cronig, and Scola are insufficient because "'sabotage' is the antithesis of an agreement between two parties." Defs.' Joint Reply at 8. The allegations JAWHBS provides simply do not amount to an actual agreement between Watson Brickell/Scola/Cronig (whom JAWHBS alleges acted completely in concert with one another) and any other potential bidder to *control* the sales price at bidding. Because Watson Brickell, Scola, and Cronig are alleged to have acted as one bidder, JAWHBS's allegations necessarily lack the requisite second bidder needed to support a claim under this section. As a result, the motions to dismiss Count IV must be granted.[9]

### 5.    Tortious Interference

To state a claim for tortious interference, a plaintiff must allege "(1) the existence of a business relationship[;] . . . (2) knowledge of the relationship on the part of the defendant[s]; (3) an intentional and unjustified interference with the relationship by the defendant[s]; and (4) damage to the plaintiff as a result of the breach of the relationship." *Ethan Allen, Inc. v. Georgetown Manor, Inc.*, 647 So. 2d 812, 814 (Fla. 1994). JAWHBS has failed to allege the existence of an actual busi-

---

[9]   The Court need not address the Defendants' argument that this claim is time barred.

ness relationship, as required. Rather, JAWHBS alleges merely a theoretical or otherwise speculative "business relationship" between it (derived from the estates and Trustees) and "potential bidders/buyers of the Brickell Parcels." Third Am. Compl. ¶ 135; *cf. Walters v. Blankenship*, 931 So. 2d 137, 139-40 (Fla. 5th DCA 2006) (holding that plaintiffs alleged the existence of a business relationship with successful bidders and prospective bidders at a condominium auction where the plaintiffs identified bidders, each of which was required to deposit a $50,000 cashier's check as a condition precedent to participation as a bidder at the action). This is not sufficient to satisfy this element and, as a result, is not sufficient to state a claim. Consequently, the motions to dismiss Count VI are granted.

### 6.      Civil Conspiracy/Civil Aiding and Abetting

To state a claim for civil conspiracy under Florida law, a plaintiff must allege: "(a) an agreement between two or more parties, (b) to do an unlawful act or to do a lawful act by unlawful means, (c) the doing of some overt act in pursuance of the conspiracy, and (d) damage to plaintiff as a result of the acts done under the conspiracy." *Philip Morris USA, Inc. v. Russo*, 175 So. 3d 681, 686 n.9 (Fla. 2015). Because a civil conspiracy derives from the underlying claim that forms the basis of the conspiracy, a claim that is found not to be actionable cannot serve as the basis for a conspiracy claim. *Am. United Life Ins. Co. v. Martinez*, 480 F.3d 1043, 1067 (11th Cir. 2007). The only remaining viable claim that could serve as a basis is the FDUTPA claim against Arevalo, JA Energy, Shutts & Bowen, Cowan, Botero, Delaney, Alianza Financial, and Alianza Holdings. No claims remain against Watson Brickell and Cronig. Accordingly, the motions to dismiss Count V are granted in full as to Defendants Watson Brickell and Cronig. As to the other defendants, the motions are granted in part to the extent that the civil conspiracy claim derives from any other

claim than the FDUTPA claim.[10]

### D. *Punitive Damages*

Finally, to the extent JAWHBS seeks punitive damages for either its FDUTPA or civil conspiracy (and aiding and abetting) claims, those prayers for relief are stricken. FDUTPA does not provide for punitive damages. *See* Fla. Stat. § 501.211; *Hugh's Concrete & Masonry Co. v. Se. Personnel Leasing, Inc.*, No. 12-2631, 2013 WL 5798638, at *7 (M.D. Fla. Oct. 28, 2013). Furthermore, because the civil conspiracy/civil aiding and abetting claim, in its current form, is based only on the FDUTPA claim, the Court will not allow punitive damages on that claim, either.

## IV. CONCLUSION

Based on the foregoing, it is **ORDERED AND ADJUDGED** that the Defendants' motions to dismiss [ECF Nos. 208 & 210] are **GRANTED IN PART** and **DENIED IN PART** as follows:

(1) Counts I, II, IV, and VI of the Plaintiff's Third Amended Complaint [ECF No. 180] are **DISMISSED** as to all Defendants;

(2) Counts III and V of the Third Amended Complaint are **DISMISSED** as to Defendants Watson Brickell Development, LLC, and Steven Carlyle Cronig;

(3) Count V of the Third Amended Complaint is **DISMISSED IN PART** as to all other Defendants to the extent it has its basis in any claim other than the claim in Count

---

[10] The Court comes to the same conclusion if JAWHBS's civil conspiracy claim is framed as a civil aiding and abetting claim. To support such a claim, a plaintiff must allege

> (1) the party whom the defendant aids must perform a wrongful act that causes an injury; (2) the defendant must be generally aware of his role as part of an overall illegal or tortious activity at the time he provides the assistance; (3) the defendant must knowingly and substantially assist the principal violation.

*Julin v. Chiquita Brands Int'l, Inc.* (*In re Chiquita Brands Int'l, Inc. Alien Tort Statute & S'holder Derivative Litig.*), 690 F. Supp. 2d 1296, 1310 (S.D. Fla. 2010) (quoting *Halberstam v. Welch*, 705 F.2d 472, 477 (D.C. Cir. 1983), *cited with approval in Cent. Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.*, 511 U.S. 164, 181 (1994)); *see also Schneberger v. Wheeler*, 859 F.2d 1477, 1480 (11th Cir. 1988) (holding that knowledge of the violation and of one's own role in the violation are required to satisfy the test for aiding and abetting). The elements of a civil aiding and abetting claim, by their own terms, presuppose the existence of a violation. The corollary to that premise, then, is that without a violation there can be no aiding and abetting liability. Thus, there can be no aiding and abetting liability here for any claim other than the claim for violation of FDUTPA, and the Court finds that JAWHBS has set forth allegations to support this claim on those grounds sufficient to withstand a motion to dismiss.

III for violation of the Florida Deceptive and Unfair Trade Practices Act; and

(4)     the Plaintiff's prayers for punitive damages in Counts III and V of the Third Amended

Complaint are **STRICKEN**.

Defendants Jorge E. Arevalo; JA Energy Resources, LLC; Shutts & Bowen, LLP; Kevin D.

Cowan; Albert F. Delaney; and Omar Botero shall **ANSWER** the Third Amended Complaint by

**May 2, 2017**.

**DONE AND ORDERED** in Chambers at Miami, Florida, this 12th day of April, 2017.

DARRIN P. GAYLES
UNITED STATES DISTRICT JUDGE